**FILED**

**JUN 1 8 2008**

**Clerk,** U.S. District and
**Bankruptcy Courts**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Clark S. CHENEY,

    Plaintiff,

      v.

IPD ANALYTICS, LLC, *et al.*,

    Defendants.

Case: 1:08-cv-01044
Assigned To : Bates, John D.
Assign. Date : 6/18/2008
Description: TRO/PI

## PLAINTIFF CHENEY'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and , Plaintiff Clark S. Cheney hereby moves for a preliminary injunction to allow him to discharge his obligation to inform his clients of his departure from Defendants' law practice and to advise his clients that they may continue to engage him for legal advice. See Legal Ethics Comm. of the D.C. Bar, Op. 273 (1997). Particularly, Plaintiff respectfully requests that the Court enter an order that:

1) Plaintiff Clark Cheney may contact all clients who have received legal analysis from him during his employment at IPD Analytics, LLC, and

    a) inform the clients of his departure;

    b) inform the clients that the "Non-Hire" paragraph of their Subscription Agreement with Defendants is unenforceable as applied to retaining Clark Cheney for legal advice;

    c) provide the clients with a copy of the Court's preliminary injunction order;

    d) request a response from clients about whether they wish to continue to receive legal analysis from Clark Cheney.

2

2) Plaintiff Cheney may provide a copy of the Court's preliminary injunction order to any employee or past employee of IPD Analytics, LLC, and may:

    a) seek assistance from the employee in gathering client files and other necessary information for clients that elect to continue to receive legal analysis from Plaintiff,

    b) solicit any professional or non-professional employee or past employee of IPD Analytics, LLC, to join Plaintiff Cheney in his legal practice.

3) Defendants IPD Analytics, LLC, Intellectual Property Development, Inc., Howard B. Krass, and Mark C. Mamolen shall

    a) within three business days of the Court's order, provide Plaintiff Cheney with a list of contact information for all clients who have received legal analysis from Plaintiff Cheney during his employment at IPD Analytics, LLC, organized by the service to which the client has subscribed. The list shall include the client's business name, the name of the person at the client's business responsible for the client account, the names of all other persons on the client account, the client's mailing address, the client's facsimile number, and email addresses and telephone numbers and extensions for each person named on the account.

    b) turn over to Plaintiff Cheney all client files for clients that elect to continue their relationship with Mr. Cheney within three business days of receiving written notice of such election. The files shall include copies of all written legal analysis the client received, all relevant documents upon which such legal analysis is based, and any other files reasonably necessary to continue servicing the client.

c) within three business days of the Court's order, turn over to Plaintiff Cheney his work product files relating to any legal analysis the client received from Plaintiff Cheney, including all court documents that Plaintiff Cheney used in formulating his legal analysis.

For the reasons stated in the accompanying memorandum supporting this motion, expedition of this motion is essential. Therefore, pursuant to Local Rule 65(d), Plaintiff respectfully requests a hearing no later than 20 days from the filing of this motion.

The grounds for this motion are fully set forth in the accompanying memorandum and the Declaration of Clark S. Cheney.

Dated June *18*, 2008                                   Respectfully submitted,

                                                        Clark S. Cheney, DC Bar No. 491919
                                                        Law Office of Clark S. Cheney
                                                        517 F Street, NE
                                                        Washington, DC  20002
                                                        (202) 253-7195

                                                        *Pro se Plaintiff*

3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Clark S. CHENEY, | |
| Plaintiff, | |
| v. | Civil Action No. _____ |
| IPD ANALYTICS, LLC, *et al.*, | |
| Defendants. | |

## MEMORANDUM SUPPORTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Clark S. Cheney, DC Bar No. 491919
Law Office of Clark S. Cheney
517 F Street, NE
Washington, DC 20002
(202) 253-7195

Dated June 18, 2008                          *Pro se Plaintiff*

08 1044

FILED

JUN 1 8 2008

Clerk, U.S. District and
Bankruptcy Courts

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 1

    A.   The Employment Agreement ...................................................................... 2

    B.   The Subscription Agreement ...................................................................... 2

ARGUMENT .............................................................................................................. 3

I.   Legal Standard for a Preliminary Injunction ...................................................... 3

II   Preliminary Relief Is Required to Protect Plaintiff's Clients and
Plaintiff's Business from Defendants' Attempts to Restrict Competition .............. 3

    A.   Plaintiff Cheney Is Likely to Succeed on His Claim that
the Employment Agreement Is Unenforceable .......................................... 4

        i.   Enforcement of the Agreements Will Unduly
Injure Mr. Cheney and the Public ................................................. 5

        ii.  The Employment and Subscription Agreements Are Overbroad .............. 7

    B.   Plaintiff and His Clients Will Be Irreparably Harmed
Without Immediate Relief ........................................................................ 9

    C.   The Balance of Hardships Favors Allowing
Plaintiff Cheney to Contact His Clients ................................................... 11

    D.   A Well-defined Public Interest in Protecting Clients Favors Immediate Relief ........... 12

III.  Plaintiff's Requested Relief ................................................................................ 12

## TABLE OF AUTHORITIES

**Cases**

Blackman v. District of Columbia, 277 F. Supp.2d 71 (D.D.C. 2003)....................................... 3

Deutsch v. Barsky, 795 A.2d 669 (D.C. 2002)........................................................................... 4

\* Dowd & Dowd v. Gleason, 693 N.E.2d 358 (Ill. 1998) ........................................................ 6, 7

Dwyer v. Jung, 336 A.2d 498 (N.J. Super. Ch. 1975) .............................................................. 12

Ellipso, Inc. v. Mann, 480 F.3d 1153 (D.C. Cir. 2007) ............................................................ 3

Ellis v. James V. Hurson Associates, Inc., 565 A.2d 615 (D.C. 1989) ..................................... 4

Faretta v. California, 422 U.S. 806 (1975) .............................................................................. 12

Illinois v. Allen, 397 U.S. 337 (1970)....................................................................................... 12

\* Jacob v. Norris, McLaughlin & Marcus, 607 A.2d 142 (N.J. 1992) ................................... 7, 12

Mbakpuo v. Ekeanyanwu, 738 A.2d 776 (D.C. 1999) ............................................................. 10

\* Neuman v. Akman, 715 A.2d 127 (D.C. 1998)............................................................. 5, 6, 7, 12

Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev., 963 F.Supp. 1 (D.D.C. 1997).............. 10


**Treatises**

Restatement (Second) of Contracts § 186 (1981)....................................................................... 4

\* Restatement (Second) of Contracts § 188 (1981)............................................................ 4, 5, 8, 9


**Ethics Opinions**

\* Legal Ethics Comm. of the D.C. Bar, Op. 181 (1987) ........................................................... 6, 7

\* Legal Ethics Comm. of the D.C. Bar, Op. 221 (1991) ...................................................... 1, 4, 10

\* Legal Ethics Comm. of the D.C. Bar, Op. 273 (1997) ........................................................... 3, 9


**Rules of Professional Conduct**

D.C. R. of Prof. Conduct 1.4...................................................................................................... 9

\* D.C. R. of Prof. Conduct 5.6............................................................................................. 5, 6, 7

\* Authorities upon which Plaintiff chiefly relies

## INTRODUCTION

Plaintiff Clark S. Cheney is a member of the D.C. Bar. On February 19, 2008, Defendants terminated Mr. Cheney's employment, immediately after Mr. Cheney gave written notice of Defendants' contact breach and ERISA[1] violations. In the weeks since that time, Defendants have refused to allow Plaintiff Cheney to inform his clients of his departure, and Defendants have threatened litigation if Plaintiff does so. Because "[t]he client's decision on representation may well be affected by the attorney's unexplained failure to communicate regarding his or her departure" (see Legal Ethics Comm. of the D.C. Bar, Op. 221 (1991), Plaintiff Cheney respectfully requests that the Court issue preliminary orders to protect him and his clients' interests.

## BACKGROUND

Counts I-IV of Plaintiff's Complaint concern Plaintiff's rights and responsibilities to his clients under two documents. The first is an "Employment Agreement" that Defendants required Plaintiff Cheney to sign as a condition of employment. (See Declaration of Clark S. Cheney ("Cheney Decl."), June 17, 2008, ¶ 7 and Ex. A, Employment Agreement, Feb. 6, 2006.) The second is a form contract that Defendants require clients to sign titled "Subscription Agreement " (See Cheney Decl. ¶ 14 and Ex. B, Subscription Agreement.) Defendants assert that these documents contain provisions that prevent Mr. Cheney from practicing law in competition with Defendants.

The resolution of this motion turns on the enforceability of the Employment Agreement and the Subscription Agreement. For the Court's reference, relevant provisions of the Employment Agreement and the Subscription Agreement are reproduced below.

---

[1]     Employee Retirement Income Security Act of 1974. 29 U.S.C. §§ 1001 et seq.

## A. The Employment Agreement

The Employment Agreement contains a paragraph titled "1.4 Non-Competition."

(Cheney Decl. Ex. A.) It states:

> Employee [Plaintiff Cheney] agrees that during the Employment Term and for a period of one (1) year thereafter, for any reason, Employee will not, directly or indirectly, in any State of the United States, or in any country in the world where the [Defendants'] Company engages or proposes to engage in Business as of the date of the termination of Employee's employment by the Company, (i) become employed by (either directly or indirectly) or in any other way provide services that compete with the Company's Business for any entity that was a customer of the Company at any time during the Employment Term, (ii) compete with the Company in Business, or (iii) participate in the ownership, management, operation, financing, or control of, or be employed by or consult for or otherwise render services to, any person, corporation, firm, or other entity that competes with the Company in Business.

Paragraph 1.4 also defines the "Business" of Defendants' Company to mean:

> providing or planning to provide research and/or analysis, for investment purposes, of pending litigation and/or intellectual property issues, throughout the United States or in any country in the world,

and

> any other portion of the Company's business in which Employee actively participated or regarding which Employee received Confidential Information at any time before or during the Employment Term.

The Employment Agreement also contains a paragraph titled "1.5 Non-Solicitation/Non-Hire of Employees." (Cheney Decl. Ex. A.) It states:

> Employee agrees that, during the Employment Term and for a period of two (2) years thereafter, Employee shall not, directly or indirectly, whether for Employee's account or for any other person or entity, (a) solicit for employment or hire, or attempt to solicit for employment or hire, any person who is employed by (or, but for the violation of this Agreement, would have been employed by) the Company, or (b) otherwise interfere with the relationship between any such person and the Company.

## B. The Subscription Agreement

The Defendants require their clients to sign a form contract called a "Subscription Agreement." (Cheney Decl. Ex. B.) One paragraph in the contract is titled "4. Non-Hire". It states:

During the Term of this Agreement and for a period of one year thereafter the Subscriber shall not employ or contract with any current personnel of IPD Analytics or former personnel of IPD Analytics who had been employed by IPD Analytics within the one year period immediately preceding such employment or contract with undersigned.

# ARGUMENT

## I.      Legal Standard for a Preliminary Injunction

Courts must weigh four factors in deciding whether to grant a preliminary injunction: (1) the likelihood that the moving party will prevail on the merits; (2) the prospect of irreparable injury if relief is withheld; (3) whether the injunction will harm the other party; and (4) the public interest. Ellipso, Inc. v. Mann, 480 F.3d 1153, 1157 (D.C. Cir. 2007) (affirming preliminary injunction freezing defendant's assets).

Plaintiff Cheney is not required to prevail on all of these factors for this Court to issue a preliminary injunction. See Blackman v. District of Columbia, 277 F. Supp. 2d 71, 77 (D.D.C. 2003). "Rather, . . . the factors must be viewed as a continuum, with more of one factor compensating for less of another. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Id. at 77-78 (citation omitted). For example, an injunction may be justified where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury. Id. at 78 (citations omitted).

## II.     Preliminary Relief Is Required to Protect Plaintiff's Clients and Plaintiff's Business from Defendants' Attempts to Restrict Competition

Defendants have threatened litigation if Plaintiff Cheney contacts the clients to whom he provided legal advice while in Defendants' employ. However, a lawyer is "obligated to inform that lawyer's clients of his/her planned departure and of the lawyer's prospective new affiliation, and to advise the client whether the lawyer will be able to continue to represent it." Legal Ethics Comm. of the D.C. Bar, Op. 273 (1997). Because a client's decision about whether to continue

with the attorney "may well be affected by the attorney's unexplained failure to communicate regarding his or her departure" (Legal Ethics Comm. of the D.C. Bar, Op. 221 (1991)), this Court should enter a preliminary injunction that allows Plaintiff Cheney to fulfill his ethical obligations to his client in a timely way.

### A. Plaintiff Cheney Is Likely to Succeed on His Claim that the Employment Agreement Is Unenforceable

Defendants claim that the Employment Agreement and Subscription Agreement prevent him from contacting clients, providing legal analysis in competition with Defendants, or soliciting Defendants' legal personnel. However, Plaintiff Cheney is likely to succeed on his claims in Counts I-IV of his Complaint that the postemployment restrictions Defendants assert are unenforceable.

District of Columbia courts have adopted the "modern and authoritative exposition" of the Restatement (Second) of Contracts when considering the enforceability of contractual restraints on postemployment competition. Ellis v. James V. Hurson Associates, Inc., 565 A.2d 615, 618 (D.C. 1989); see also Deutsch v. Barsky, 795 A.2d 669, 675 (D.C. 2002). Section 186 of the Restatement states, "A promise is unenforceable on grounds of public policy if it is unreasonably in restraint of trade." Restatement (Second) of Contracts § 186 (1981). According to Restatement section 188, a promise is "unreasonably in restraint of trade" if it falls in either of two categories: (1) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public, or (2) the restraint is greater than is needed to protect the promisee's legitimate interest. Restatement (Second) of Contracts § 188 (1981). Plaintiff Cheney is likely to succeed in showing the provisions at issue fit both categories and are therefore unenforceable.

4

### i. Enforcement of the Agreements Will Unduly Injure Mr. Cheney and the Public

Comment c to section 188 of the Restatement notes, "In the case of a post-employment restraint, the harm caused to the employee may be excessive if the restraint inhibits his personal freedom by preventing him from earning his livelihood . . . ; the likely injury to the public may be too great if it is seriously harmed . . . by the unavailability of the skills developed in his employment." Enforcement of the noncompetition provisions in this lawsuit will cause excessive harm to Mr. Cheney and the public.

First, Plaintiff Cheney has spent years (mostly prior to his employment by Defendants) developing expertise in intellectual property law. (See Cheney Decl. ¶¶ 1-4.) The "Non-Competition" paragraph would essentially prevent Mr. Cheney from earning a livelihood by restricting him from providing "analysis . . . of pending litigation and/or intellectual property issues " (See Cheney Decl., Ex. A, Employment Agreement at ¶ 1.4.)

The harm to the public through enforcement of the Employment and Subscription Agreements is also significant. When a contract restricts access to professional services, such as those provided by an attorney or a physician, the potential of harm to the public interest weighs particularly strongly against enforcement. See Restatement (Second) of Contracts, §188 Reporter's Note (public interest in access to professional services is "self-evident"). To prevent such harm, the District of Columbia has adopted Rule of Professional Conduct 5.6, which states in relevant part, "A lawyer shall not participate in offering or making . . . [an] employment, or other similar type of agreement that restricts the rights of a lawyer to practice after termination of the relationship . . ." D.C. R. of Prof. Conduct 5.6(a); see also Neuman v. Akman, 715 A.2d 127, 130 (D.C. 1998) (discussing public policy undergirding Rule 5.6).

Court decisions demonstrate "a general hostility" toward enforcing non-competition agreements against lawyers.  See Neuman, 715 A.2d at 131, quoting Legal Ethics Comm. of the D.C. Bar, Op. 181 (1987).  Courts reject such agreements because "[a]n agreement restricting the right of partners or associates to practice after leaving a firm not only limits their professional autonomy but also limits the freedom of clients to choose a lawyer."  Neuman, 715 A.2d at 130, quoting D.C. R. of Prof. Conduct 5.6, Comment 1.

Dowd & Dowd v. Gleason, 693 N.E.2d 358 (Ill. 1998) applied an ethical rule substantially identical to D.C.'s Rule 5.6 and is persuasive in this dispute.  See Neuman, 715 A.2d at 130 n. 5 (where there is "no meaningful variation in the language" of similar ethical rules in other states, D.C. court "freely consulted" sources applying those rules).  In Gleason, a professional corporation sought to enforce a contractual provision that purported to restrict an ex-employee attorney from "calling or contacting a client of the Corporation" after the attorney left the corporation.  Gleason, 693 N.E.2d at 369.  The court found the contractual provision "would violate the important considerations of public policy that underlie the prohibition found in Rule 5.6."  Id.  The Gleason court concluded that because of the conflict with Rule 5 6, the noncompetition covenant could not be enforced.  Id.

For the reasons stated in Gleason, the "Non-Competition" paragraph of the Employment Agreement is unenforceable.  The "Non-Hire" provision in the Defendants' Subscription Agreement with its clients is unenforceable as applied to Mr. Cheney for similar reasons.  The "Non-Hire" paragraph states that the client shall not contract with any ex-employee of the Defendants within one year of the employee's departure from the firm.  (See Cheney Decl., Ex B, Subscription Agreement at ¶ 4.)  The paragraph also states that the client will not contract with any ex-employee of the Firm within one year after the termination of the client's contract.

6

(Id.) Both of those provisions impermissibly limit "the freedom of clients to choose a lawyer." Compare Neuman, 715 A.2d at 130; see also Gleason, 693 N.E.2d at 369. Accordingly, Plaintiff Cheney is likely to succeed in proving the "Non-Hire" paragraph in the Subscription Agreement is unenforceable with respect to him.

The "Non-Solicitation" paragraph in the Employment Agreement similarly violates important public policies and should be declared unenforceable. In Jacob v. Norris, McLaughlin & Marcus, 607 A.2d 142, 147 (N.J. 1992), a law firm sought to enforce a provision that would penalize an ex-employee attorney if he or she "solicits other professional and/or paraprofessional employees of the Law Firm" to join the ex-employee. Citing Opinion 181 of D.C. Bar Legal Ethics Committee, the Jacob court concluded that Rule 5.6 protects "not only . . . lawyers' interactions with their clients, but also includes [lawyers'] interactions with colleagues." Jacob, 607 A.2d at 153. The court held that the contractual penalty for soliciting employees, whether professional or not, was contrary to public policy and therefore unenforceable. Id.

Any possible interest the Defendants may have in restraining Plaintiff Cheney from competing or soliciting others is outweighed by the well-recognized public policy of allowing clients to engage counsel of their choice. Accordingly, Mr. Cheney is likely to succeed in showing that the "Non-Competition" and "Non-Solicitation" paragraphs of the Employment Agreement and the "Non-Hire" paragraph in the Subscription Agreement are as unenforceable as the agreements in Gleason and Jacob.

### ii. The Employment and Subscription Agreements Are Overbroad

In addition to the important policy considerations identified above, this Court has another independent ground upon which to find the paragraphs at issue at are unenforceable: If the Court finds the competitive restrictions in those paragraphs to be unreasonably broad, it may find the

paragraphs unenforceable "without the necessity of weighing the countervailing interests of the promisor and the public." Restatement (Second) of Contracts at § 188, Comment d.

A non-competition clause may be overbroad in at least three ways: by type of activity, by geographical area, or by time. If the postemployment restriction proscribes *types of activity* more extensive than necessary to protect those engaged in by the employer, "it goes beyond what is necessary to protect [the employer's] legitimate interests and is unreasonable." See id. Second, if a non-compete provision "covers a *geographical area* more extensive than necessary to protect [the employer's] interests, it is also unreasonable." See id., emphasis added. Finally, if the restraint is to last *longer* than necessary, "taking account of such factors as the permanent or transitory nature of technology and information, it is unreasonable." See id.

The provisions in the Employment and Subscription Agreements that Defendants threaten to enforce are overbroad in all three ways addressed by the Restatement. For example, as to the type of restricted activity, the "Non-Competition" paragraph in the Employment Agreement purports to restrain Mr. Cheney from doing virtually anything that relates to intellectual property law, even for clients that have never done business with Defendants. (See Cheney Decl., Ex. A, Employment Agreement at ¶ 1.4.) Further, the "Non-Hire" paragraph purports to restrain clients from engaging Plaintiff Cheney for any purpose, including for legal advice. (See Cheney Decl., Ex. B, Subscription Agreement at ¶ 4.) Defendants cannot justify such blanket restrictions.

Second, as to locale, the "Non-Competition" paragraph purports to restrain Mr. Cheney from competing "in any State of the United States, or in any country in the world." (See Cheney Decl., Ex. A, Employment Agreement at ¶ 1.4.) The paragraph also attempts to prevent competition in any place where the Defendants have even "propose[d] to engage in Business." (Id., emphasis added.) Plaintiff Cheney is engaged in the practice of law in Washington, DC,

more than 1,000 miles from the Defendants. Defendants have no justifiable need to prevent Mr. Cheney from competing in such a distant market, let alone in "any country in the world."

Third, as to duration, the "Non-Competition" paragraph purports to restrain Mr. Cheney from competing for one year from his termination. (See Cheney Decl., Ex. A, Employment Agreement at ¶ 1.4.) The clients for whom the parties compete are stock traders whose prospects rise and fall from minute to minute. The value of the information Defendants provide diminishes exponentially as it rapidly permeates the market. Taking into account the "transitory nature of . . . [the] information" at issue, as the Restatement requires (see Restatement (Second) of Contracts at § 188, Comment d ), Defendants have no justifiable need to restrain Mr. Cheney for the comparative eternity (in stock market terms) of an entire year. The "Non-Solicitation" paragraph is even less justified, purporting a restriction against recruiting for two years with no explanation about why such a lengthy restriction (or any restriction at all) is necessary. (See Cheney Decl., Ex. A, Employment Agreement at ¶ 1.5.)

As demonstrated by the foregoing, Plaintiff Cheney likely will succeed in obtaining a declaratory judgment that the "Non-Competition" and "Non-Solicitation" provisions of the Employment Agreement and the "Non-Hire" provision in the Subscription Agreement are unenforceable, both for violating public policy and for unreasonable breadth. Accordingly, this factor tips in favor of issuing a preliminary injunction to protect Mr. Cheney and his clients.

**B. Plaintiff and His Clients Will Be Irreparably Harmed Without Immediate Relief**

Under the Rules of Professional Conduct, Plaintiff Cheney is obligated to inform his clients of his departure from Defendants and of his new location and business. See Legal Ethics Comm. of the D.C. Bar, Op. 273 (1997), citing D.C. R. of Prof. Conduct 1.4, "Communication " If Plaintiff Cheney is unable to communicate his departure from Defendants' company, his

clients may assume that he is negligent in his communications and choose not to continue their relationship with him. See Legal Ethics Comm. of the D.C. Bar, Op. 221 (1991) ("client's decision on representation may well be affected by the attorney's unexplained failure to communicate regarding his or her departure"). Mr. Cheney may never be able to restore a relationship of trust with a client after such a misunderstanding.

Lack of communication with a client will irreparably harm not only Plaintiff Cheney's relationship with that client but also may irreparably harm Mr. Cheney's reputation with other potential clients. Compare Mbakpuo v. Ekeanyanwu, 738 A.2d 776, 783 (D.C. 1999) (affirming injunction where potential damage to attorneys' reputation would be irreparable harm); see also Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev., 963 F.Supp. 1, 5 (D.D.C. 1997) ("plaintiffs have demonstrated irreparable harm in damage to their business reputation"). For at least these reasons, the irreparable harm factor weighs in favor of ordering preliminary relief to protect Mr. Cheney.

Unfortunately, Plaintiff Cheney is not the only one who will be harmed unless this Court orders injunctive relief; Mr. Cheney's clients also risk irreparable harm. Mr. Cheney's clients mistakenly believe that the written legal opinions they are receiving from Defendants today come from Mr. Cheney. (See Cheney Decl ¶ 17.) This is so because Defendants provide written legal opinions to clients without identifying the attorney that authored the opinion. (See id. ¶ 9.)

Notwithstanding the fact the Mr. Cheney's name did not appear on the reports he wrote for clients, clients came to know through telephone conversations that Mr. Cheney was the author of all reports relating to Qualcomm and other specific companies. (Id. ¶ 12.) Mr. Cheney's clients came to rely on his expertise in those areas. (Id.) Today, those clients do not

10

know they are receiving written opinions prepared by a different, less experienced attorney. (Id. ¶¶ 3, 16-17) For example, on April 15, 2008, at 9:15 a.m., an analyst at Highline Capital called Mr. Cheney's cell phone for legal advice. (See Cheney Decl. ¶ 17.) Highline was one of Mr. Cheney's clients while he worked for Defendants. (Id.) The client had questions about a report he had received from the Defendants. (Id.) The client had assumed that Mr. Cheney had written the report and called Mr. Cheney with questions about it. (Id.)

The report that Highline Capital analyst read and called about was written by a different attorney. (See Cheney Decl. ¶¶ 16, 18.) That attorney is not a member of the Patent Bar, as is Mr. Cheney. (Id. ¶ 16.) Neither had the authoring attorney spent two years following the issues in the report, as had Mr. Cheney. (Id. ¶¶ 12, 16.) The authoring attorney also lacked Mr. Cheney's experience as a Patent Examiner at the U.S. Patent and Trademark Office. (Id. ¶ 12.) Highline Capital and other clients are unaware of these important factors because Defendants do not allow Plaintiff Cheney to inform them that he is no longer writing the reports they are reading.

This example shows that Plaintiff Cheney's clients may be irreparably harmed by placing an inappropriate level of confidence in the opinions they are reading. For this additional reason this Court should issue a preliminary injunction to allow Mr. Cheney to notify these clients of his departure.

### C. The Balance of Hardships Favors Allowing Plaintiff Cheney to Contact His Clients

In contrast with the harm to Plaintiff Cheney and his clients identified above, the requested preliminary relief would bring relatively little (if any) harm to Defendants or others. The requested injunction would allow Plaintiff Cheney to notify clients of his departure and allow clients to make an informed decision about their choice of counsel. Defendants can

continue to service clients that elect to stay with Defendants, to the extent that they can provide that service legally and ethically. Defendants have no cognizable claim to harm from the departure of clients that exercise their right to choose different counsel. Accordingly, the balance of hardships tips in favor of granting preliminary relief.

### D. A Well-defined Public Interest in Protecting Clients Favors Immediate Relief

This motion directly implicates an important public interest: the right of a client to have legal counsel of her choice. Neuman v. Akman, 715 A.2d 127, 130 (D.C. 1998) (discussing public policy undergirding restrictions on noncompetition contracts between attorneys); see also Dwyer v. Jung, 336 A.2d 498, 500 (N.J. Super. Ch. 1975) (voiding lawyers' contract because "client is always entitled to be represented by counsel of his own choosing."). A client's choice about counsel "must be honored out of 'that respect for the individual which is the lifeblood of the law.'" Faretta v. California, 422 U.S. 806, 834 (1975), quoting Illinois v. Allen, 397 U.S. 337, 350-351 (1970) (Brennan, J., concurring). "No concept of the practice of law is more deeply rooted." Dwyer, 336 A.2d at 500.

The noncompetition restrictions Defendants seek to enforce are "injurious to the public interest" because they infringe on a client's choice of counsel. See id. Further, the non-solicit provision improperly restricts Plaintiff Cheney's "interactions with colleagues" in contravention of public policy. See Jacob v. Norris, McLaughlin & Marcus, 607 A.2d 142, 153 (N.J. 1992).

### III.   Plaintiff's Requested Relief

Because Mr. Cheney has made a sufficient showing on each of the four preliminary injunction factors, Plaintiff respectfully requests that this Court enter an order that:

1) Plaintiff Clark Cheney may contact all clients who have received legal analysis from him during his employment at IPD Analytics, LLC, and

   a)  inform the clients of his departure;

b) inform the clients that the "Non-Hire" paragraph of their Subscription Agreement with Defendants is unenforceable as applied to retaining Clark Cheney for legal advice;

c) provide the clients with a copy of the Court's preliminary injunction order;

d) request a response from clients about whether they wish to continue to receive legal analysis from Clark Cheney.

2) Plaintiff Cheney may provide a copy of the Court's preliminary injunction to any employee or past employee of IPD Analytics, LLC, and may

a) seek assistance from the employee in gathering client files and other necessary information for clients that elect to continue to receive legal analysis from Plaintiff;

b) solicit any professional or non-professional employee or past employee of IPD Analytics, LLC, to join Plaintiff Cheney in his legal practice.

3) Defendants IPD Analytics, LLC, Intellectual Property Development, Inc., and Howard B. Krass, shall

a) within three business days of the Court's order, provide Plaintiff Cheney with a list of all contact information for all clients who have received legal analysis from Plaintiff Cheney during his employment at IPD Analytics, LLC, organized by the service to which the client has subscribed. The list shall identify the client's business name, the name of the person at the client's business responsible for the client account, the names of all persons on the client account and which report(s) each person is authorized to receive, the names of all other persons related to the client account, the client's mailing address, the client's facsimile number, and email addresses, direct telephone numbers, and any telephone extensions for each person named on the account.

13

b) turn over to Plaintiff Cheney all client files for clients that elect to continue their relationship with Mr. Cheney within three business days of receiving written notice of such election. The files shall include copies of all written legal analysis the client received, all relevant documents upon which such legal analysis is based, and any other files reasonably necessary to continue servicing the client

c) within three business days of the Court's order, turn over to Plaintiff Cheney his work product files relating to any legal analysis the client received from Plaintiff Cheney, including all court documents that Plaintiff Cheney used in formulating his legal analysis.

Dated June _18_, 2008                            Respectfully submitted,


_Clark S. Cheney_
Clark S. Cheney, DC Bar No. 491919
Law Office of Clark S. Cheney
517 F Street, NE
Washington, DC 20002
(202) 253-7195

*Pro se Plaintiff*

14

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

JUN 1 8 2008

**Clerk,** U.S. District and
**Bankruptcy Courts**

Clark S. CHENEY,

      Plaintiff,

      v.

IPD ANALYTICS, LLC, *et al.*,

      Defendants.

Civil Action No. **08 1044**

## DECLARATION OF CLARK S. CHENEY

    I, CLARK S. CHENEY, declare as follows:

    1.    I am an active member in good standing of the Bar of the District of Columbia.
My D.C. Bar Number is 491919.

    2.    I am a Registered Patent Attorney, licensed to practice before the United States
Patent and Trademark Office.  My Patent Bar Number is 52,731.

    3.    My experience in intellectual property law began with employment as a Patent
Examiner at the United States Patent and Trademark Office in 1999.  I later worked as a law
clerk to a judge on the United States Court of Appeals for the Federal Circuit and in private
practice for several years as a patent prosecutor and patent litigator.

    4.    In late 2007 and early 2008, I was working as an associate attorney at Dewey
Ballantine, LLP (now Dewey & LeBoeuf, LLP), in Washington, DC.  During this time period
Howard Krass, Mark Mamolen, and others recruited me to work for IPD Analytics, LLC,
("IPDA") in Bay Harbor Islands, FL.

5.    IPDA contracts with clients to provide legal services for a set fee. Clients receive periodic reports that analyze lawsuits and other legal issues potentially affecting publicly traded companies. Clients also have telephone discussions with attorneys employed by IPDA.

6.    Howard Krass and I agreed on certain employment terms in writing on February 3, 2006. I have attached the emails containing those terms to this Declaration as Exhibit C.

7.    As a further condition of employment, Mr. Krass required me to sign an "Employment Agreement." I have attached the best available copy of the Employment Agreement to this Declaration as Exhibit A.

8.    I began working for IPDA in early March 2006.

9.    During my employment at IPDA, I conducted legal research and wrote reports for IPDA's three services, each of which focuses on a different technology area (Pharmaceutical, Medical Technology, and Technology/Media). My reports described currently pending lawsuits and presented my predictions (to the extent possible) of the outcomes of the lawsuits. IPDA sent my reports to clients without identifying me as the author.

10.    During my employment at IPDA, I participated in telephone conversations with IPDA clients nearly every day. When introducing me to clients on the telephone, Mr. Krass informed clients that I am a patent attorney. Mr. Krass also described my past experience as a patent examiner, a Federal Circuit law clerk, and patent litigator. After Mr. Krass introduced me to a client, he would often ask me to handle later calls from the client on my own.

11.    In telephone conversations with clients, I would (1) answer questions about reports I had written; (2) apply law to actual and hypothetical facts and draw legal conclusions; and (3) tailor my responses to the particular concerns of the client.

2

12.    Notwithstanding the fact my name did not appear on the reports I wrote, at least some clients came to know through telephone conversations that I was the author of all reports relating to Qualcomm and other specific companies. Clients came to rely on my expertise in those areas.

13.    At least some clients asked for me by name when calling IPDA with questions. Clients also sent questions to my individual email address at IPDA or called me on my cell phone. I responded to all inquiries made to me personally and often responded to inquiries made through other IPDA personnel.

14.    I am aware that IPDA requires each client to sign a form contract titled "Subscription Agreement." I have attached the best available copy of the form contract to this Declaration as Exhibit B.

15.    On February 19, 2008, Defendants terminated my legal employment. I believe my termination was wrongful for the reasons described in the Complaint filed in this action.

16.    I understand that after my termination an attorney named Malan Rampton assumed my duties at IPDA. Mr. Rampton is not a Registered Patent Attorney, is not licensed to practice before the United States Patent and Trademark Office, has not worked as a Patent Examiner, and does not have the same experience that I do on the legal matters I analyzed during my employment at IPDA.

17.    At least some clients mistakenly believe that the written legal opinions they currently are receiving from IPDA are written by me. For example, on April 15, 2008, an investor at Highline Capital called my cell phone seeking legal advice. I had provided written and oral legal analysis to individuals at Highline Capital many times while I worked for IPDA.

3

The caller had questions about a report he had received from IPDA. The caller had assumed that I had written the report and had called me with questions about it.

18.     It is my understanding that the report that Highline Capital read and called about was written by Mr. Rampton.

19.     I believe that Mr. Krass and IPDA may be obfuscating my departure from IPDA clients. I have formulated this belief based on my experience at IPDA after another attorney resigned. After the attorney resigned, Mr. Krass instructed me and other IPDA personnel not to tell clients about the attorney's departure. Mr. Krass also instructed us to tell any client that inquired that the attorney was not involved in preparing any legal analysis the clients received and that the client's service would continue unchanged.


I, CLARK S. CHENEY, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing declaration is true and correct.

Dated June _13_, 2008

CLARK S. CHENEY

4

# Exhibit A

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AREEMENT (the "**Agreement**") is by and between **IPD ANALYTICS, L.L.C.**, a Florida corporation ("**Company**"), and **Clark S. Cheney** ("**Employee**") and will be effective as of Employee's first day of employment with the Company ("**Agreement Date**").

WHEREAS, the Company desires to retain Employee as an employee of the Company, and Employee desires to be so employed by the Company, subject to the terms, conditions and covenants set forth in a separate offer letter and additionally in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Employee hereby agree as follows:

1.1     Employment At Will.  Employee's employment by the Company is at-will, and either Employee or the Company may terminate this Agreement and Employee's employment by the Company at any time and for any reason, whether with or without cause or with or without reason.  The period of time from Employee's first day of employment with the Company to the date of termination of Employee's employment is hereinafter referred to as the "**Employment Term**."

1.2     Confidential Information.  As used herein, the term "**Confidential Information**" means all information of a confidential nature, whether tangible or intangible, in any form or medium provided, which is not generally known to the public and which relates to the business of the Company, including without limitation research, software and enhancements thereto, know-how, processes, trade secrets, manuals, confidential reports and client lists (including without limitation lists of clients and lists of potential clients of the Company).  Employee acknowledges that the business of the Company is highly competitive and that the services to be performed by Employee for the Company are unique and that, contemporaneously with the Agreement Date, the Company will provide Employee with Confidential Information and/or initial specialized training.  In consideration of the foregoing, Employee agrees that during his employment by the Company and thereafter, pursuant to this Section 1.2, Employee will hold all Confidential Information in strictest confidence and will:

(a)     not, without the Company's prior written consent, directly or indirectly use, copy or duplicate, or disclose or otherwise make available to any third party, any Confidential Information other than as necessary for Employee's performance of Employee's responsibilities as an employee of the Company; and

(b)     take such protective measures as may be reasonably necessary to preserve the secrecy and interest of the Company in the Confidential Information.  If Employee becomes aware of any unauthorized use or disclosure of Confidential Information by any person or entity, Employee shall promptly and fully advise the Company of all facts known to Employee concerning such unauthorized use or disclosure.

08 1044

**FILED**

JUN 1 8 2008

**Clerk, U.S. District and Bankruptcy Courts**

Employee also agrees that in connection with this <u>Section 1.2</u>, Employee also will be bound by the provisions of <u>Section 1.4</u>. Employee further acknowledges and agrees that the Company's conduct in providing Employee with Confidential Information in exchange for Employee's agreement with this <u>Section 1.2</u> gives rise to the Company's interest in restraining Employee from competing against the Company as set forth in <u>Section 1.4</u>, and that Employee's agreement to <u>Section 1.4</u> is designed to enforce Employee's agreement in this <u>Section 1.2</u>.

At any time during the Employment Term or thereafter, upon the reasonable request of the Company and at the Company's expense, Employee shall provide reasonable assistance to the Company with respect to any litigation, arbitration or any other dispute with a third party concerning the unauthorized use or disclosure by such third party of any Confidential Information provided such litigation, arbitration or other dispute is commenced during the Employment Term. Upon termination of this Agreement for any reason whatsoever, or at any time requested by the Company, Employee shall promptly deliver or cause to be delivered to the Company any and all Confidential Information in Employee's possession, custody or control.

1.3    <u>Ownership of Inventions and other Rights</u>.  Employee hereby agrees that any and all inventions (whether or not an application for protection has been filed under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protected under copyright laws), Moral Rights (as defined below), trademarks, trade names, trade dress, trade secrets, publicity rights, know-how, ideas (whether or not protected under trade secret laws), and all other subject matter protected under patent, copyright, Moral Right, trademark, trade secret, or other laws, including, without limitation, all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, artwork, software, software enhancements or upgrades, modifications, processes, business methods additions, techniques, programming, applets, scripts, and designs, which have been or are developed, generated or produced by Employee in the scope of Employee's employment by Company, solely or jointly with others, at any time during the Employment Term, shall be the exclusive property of the Company, subject to the obligations of <u>Section 1.2</u> with respect to Confidential Information, and Employee hereby forever waives and agrees never to assert against the Company, its successors or licensees any and all ownership, interest, moral rights or similar rights with respect thereto. Employee hereby assigns to the Company all right, title and interest to the foregoing inventions, concepts, ideas and materials. Employee shall execute all papers, and otherwise provide assistance, at the Company's request and expense, during or subsequent to the Employment Term, to enable the Company or its nominees to obtain patents, copyrights and other appropriate legal protection for software, inventions or innovations in any country. For purposes of this Agreement, **"Moral Right"** means any right to claim authorship of a work, any right to object to any distortion or other modification of a work, and any similar right (including but not limited to any rights of paternity, integrity, disclosure and withdrawal), existing (or as may come into existence) under the law of any country or under any treaty.

1.4    <u>Non-Competition</u>.  Employee agrees that during the Employment Term and for a period of one (1) year thereafter, for any reason, Employee will not, directly or indirectly, in any State of the United States, or in any country in the world where the Company engages or proposes to engage in Business as of the date of the termination of Employee's employment by the Company, (i) become employed by (either directly or indirectly) or in any other way provide services that compete with the Company's Business for any entity that was a customer of the

Company at any time during the Employment Term, (ii) compete with the Company in Business, or (iii) participate in the ownership, management, operation, financing, or control of, or be employed by or consult for or otherwise render services to, any person, corporation, firm, or other entity that competes with the Company in Business. For the purposes of this Section 1.4, "**Business**" shall mean (x) providing or planning to provide research and/or analysis, for investment purposes, of pending litigation and/or intellectual property issues, throughout the United States or in any country in the world, and (y) any other portion of the Company's business in which Employee actively participated or regarding which Employee received Confidential Information at any time before or during the Employment Term.

     1.5   Non-Solicitation/Non-Hire of Employees.  Employee agrees that, during the Employment Term and for a period of two (2) years thereafter, Employee shall not, directly or indirectly, whether for Employee's account or for any other person or entity, (a) solicit for employment or hire, or attempt to solicit for employment or hire, any person who is employed by (or, but for the violation of this Agreement, would have been employed by) the Company, or (b) otherwise interfere with the relationship between any such person and the Company.

     1.6   Remedies.  the Company and Employee hereby agree that it is impossible to measure solely in money the damages which will accrue to the Company by reason of Employee's failure to observe any of his obligations under this Agreement. Therefore, if the Company shall institute any action or proceeding to enforce such provisions, Employee hereby waives any claim or defense that there is an adequate remedy at law and agrees in any such action or proceeding not to interpose the claim or defense that such remedy exists at law. Without limiting any other remedies that may be available to the Company, Employee hereby specifically affirms the appropriateness of injunctive or other equitable relief in any such action, without the need to post any bond associated therewith.

     1.7   Partial Invalidity.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

     1.8   Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without regard to conflict of law principles. Any litigation or arbitration between the parties which arises out of this Agreement shall be instituted and prosecuted only in the appropriate state or federal court or other tribunal situated in Miami, Florida. Parties hereby submit to the exclusive jurisdiction of such courts and tribunals for purposes of any such action and the enforcement of any judgment or order arising therefrom. Parties hereby waive any right to a change of venue and any and all objections to the jurisdiction of the state and federal courts and other tribunals located in Miami, Florida.

     1.9   Entire Agreement; Amendments.  This Agreement, the Offer Letter, and the Recitals contain the entire understanding of the parties hereto with regard to the subject matter contained herein, and supersede all prior agreements, understandings or letters of intent between

the parties hereto. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by each of the parties hereto.


**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Agreement Date first written above.

THE COMPANY:

IPD ANALYTICS, L.L.C.


By:_____

Date:_____



EMPLOYEE:

Clark S. Cheney

*Clark S. Cheney*

Date: *February 6, 2006*

# Exhibit B

# IPD Analytics Patent Litigation Monitor

## Subscription Agreement

IPD Analytics, LLC ("IPD Analytics") offers investment professionals research and reports related to patent litigation. IPD Analytics shall provide its basic services to the undersigned according to the terms and conditions listed below.

**Terms and Conditions**

1.      Subscription:  The undersigned ("Subscriber") agrees to become a subscriber to IPD Analytics Patent Litigation Monitor service for the Healthcare sector ("the Service").  The Service shall consist of research and reports related to ongoing patent litigation involving pharmaceutical technology as well as telephone discussions with IPD Analytics analysts.  The reports shall cover cases chosen at IPD Analytics' discretion.  IPD Analytics expects that the Service shall provide an average of three (3) reports per month.  The "Initial term" of the S ervice shall be six (6) months from the execution of this Agreement   The "Term" of the service shall be fourteen (14) months from the execution of this Agreement.

2.      Payment Terms.  For the Term of the Agreement, the Subscriber or designated registered Broker Dealer agrees to pay IPD Analytics pursuant to Attachment A.

3       No Attorney-Client Relationship:  Subscriber hereby acknowledges and agrees that none of IPD Analytics' activities create or constitute any attorney-client relationship between IPD Analytics, its principals, employees, shareholders, officers, directors, members, agents and/or affiliates ("IPDA") and the Subscriber.  Subscriber understands and acknowledges that the research and reports it will be receiving pursuant to the Service will also be provided to other subscribers to the Service.

4.      Non-Hire:  During the Term of this Agreement and for a period of one year thereafter the Subscriber shall not employ or contract with any current personnel of IPD Analytics or former personnel of IPD Analytics who had been employed by IPD Analytics within the one year period immediately preceding such employment or contract with undersigned.  This article shall survive termination of this Agreement.



08 1044

FILED

JUN 1 8 2008

Clerk, U.S. District and
Bankruptcy Courts

5    No Distribution:  Subscriber agrees that title and all proprietary rights in the reports prepared by IPD Analytics shall remain vested in IPD Analytics.  Subscriber further agrees that it will not copy, distribute or otherwise disseminate or communicate reports (or this Agreement or any information in this Agreement, including but not limited to pricing information) in any way other than for its own internal use. This article shall survive termination of this Agreement.

6.    Users of the Service:  Subscriber agrees to provide IPD Analytics with a list of all portfolio managers and/or analysts who will be receiving access to the Service and/or research and reports pursuant to the Service. Subscriber agrees to promptly notify IPD Analytics when this list is changed or updated  Information to be provided on this list shall include the items specified in Attachment A.

7.    Renewal Policy:  IPD Analytics' standard renewal procedure is to invoice Subscriber or its relevant broker dealer at the end of the Agreement Term for the coming contract period.  The Agreement shall automatically renew for an additional contract period as defined in the renewal invoice unless Subscriber notifies IPD Analytics in writing that it elects to discontinue the Service within fifteen (15) days of receipt of the renewal invoice.  After the Initial Term, either party may terminate the Agreement with thirty days written notice to the other party   A pro-rata refund will be given for remaining full months of service left in the Term.

8    Legal Disclaimer:    IPDA does not provide investment recommendations or advice and cannot be held liable by Subscriber for any losses that may relate to information obtained from IPDA. Further, Subscriber agrees not to pursue any legal action against IPDA in connection with the services described herein.  The liability of IPD Analytics, LLC under this Agreement for any reason whatsoever, including, but not limited to, actions in negligence, contract, strict liability, breach of warranty or tort, shall not exceed $3000.00.

9.    Notices.    All notices to IPD Analytics shall be sent to the address shown below or to such other address as IPD Analytics may request.  All notices to Subscriber shall be sent to the address shown below or such other address as Subscriber may request.

10    Entire Agreement:    This Agreement (including Attachment A and any future invoices) constitutes the entire understanding between the parties as to the related subject matter and supersedes any and all prior agreements, communications, representations, obligations and arrangements, whether written or oral, between the parties.  Subscriber acknowledges that no reliance is placed on any prior representation not contained in this Agreement

I, the undersigned, certify that I have the power to act on behalf of the firm listed below and that this is a legally binding contract between my firm and IPD Analytics, LLC.

[signature block]


ATTACHMENT A


PORTFOLIO MANAGERS AND ANALYSTS WHO WILL BE USING THE SERVICE*:

[ID blocks]

* additional users should be identified by attaching another copy of this document

PAYMENT

IPD Analytics typically charges a monthly fee for its Service per "seat" or manager/analyst using the Service. During the term of this Agreement, the charter subscriber will be charged for one seat only and any additional per seat charges will be waived.

The introductory rate for the Initial Term of six months is $18,000 based on a rate of $3,000 per month. The rate after the initial term is $36,000 based on a rate of $4,500 per month. Subscriber or designated registered Broker Dealer agrees to make full payment of $54,000 to IPD Analytics, LLC within six weeks of the execution date of this Agreement. Subscriber may pay by authorizing IPD Analytics to invoice a registered broker dealer for the amount for the benefit of subscriber or by paying IPD Analytics directly.

# Exhibit C



Windows Live™

■ Print                                                          ✕ Close window

## Re: IPD Analytics, LLC - Offer of Employment

From: **Howard Krass** (hkrass@ipdanalytics.com)
Sent: Fri 2/03/06 9:07 PM
To: Clark Cheney (clarkscheney@hotmail.com)

Clark,

Fantastic.  I will send you the Employment Agreement on Monday.  Please call
if you have any questions or need any help as you plan your move.  I am
around all weekend.  (305) 992-7292.

Howard


On 2/3/06 6:40 PM, "Clark Cheney" <clarkscheney@hotmail.com> wrote:

> Dear Howard,
>
> It is my honor to accept your offer as described in your message below.
> Thanks very much for your effort in putting it together. I'm excited to dig
> into the work at IPD Analytics, I'm excited to join the team that you have
> assembled, and I'm looking forward to getting to know you better as we work
> together.
>
> See you soon!
> Clark
>
>
>> From: "Howard Krass" <hkrass@ipdanalytics.com>
>> Reply-To: <hkrass@ipdanalytics.com>
>> To: "'Clark Cheney'" <clarkscheney@hotmail.com>
>> Subject: IPD Analytics, LLC - Offer of Employment
>> Date: Fri, 3 Feb 2006 18:23:19 -0500
>>
>> Clark Cheney
>> 517 F Street, NE
>> Washington, D.C.
>> 20002
>>
>> February 3, 2006
>>
>> Re:  Offer of Employment
>>
>> Dear Clark:
>>
>> We are pleased to offer you the position of Analyst with IPD
>> Analytics, LLC (the "Company").  As an Analyst, your base salary will be
>> two hundred thousand dollars ($200,000.00) per year, payable in accordance
>> with the Company's regular payroll practices.  Your compensation will be
>> subject to statutory deductions and withholding.
>>
>> As an employee of the Company you will be eligible to enroll in the
>> Company's benefit programs as they are established from time to time.  Your
>> current benefits will include healthcare (for you and a domestic partner)
>> and disability insurance. If you should have any specific questions
>> regarding our current benefit programs, please feel free to call Jackie
>> Monroe.  The Company will reimburse you for all expenses associated with
>> moving you from Washington, D.C. to Miami, Florida, up to a maximum of
>> $10,000.00.  If you choose, the Company will also reimburse you for all

08 1044

**FILED**

JUN 1 8 2008  6/27/2008 7 57 AM

Clerk, U.S. District and
Bankruptcy Courts

```
>> your
>> expenses associated with study for, being admitted to, and being a member
>> of
>> the Florida Bar, which shall mean a bar study course, all bar application
>> and testing fees, bar association dues, and approved continuing legal
>> education (CLE) courses.
>>
>> Upon acceptance of this offer you will receive a bonus in the amount
>> of ten-thousand dollars ($10,000).  Additionally, in the event that during
>> the term of your employment with the Company you purchase a full-time
>> residence you will receive a one-time bonus of twenty-thousand dollars
>> ($20,000).
>>
>> Upon your completion of employment with the Company for calendar
>> year 2006, you will also receive a bonus in an amount to be determined at
>> the discretion of the Company.  The target for your bonus at the end of
>> calendar year 2006 is fifty-thousand dollars ($50,000.00).  You will be
>> eligible for bonuses for future years in an amount to be determined at the
>> discretion of the Company.  It is contemplated that in the event you
>> achieve
>> a performance level comparable to the other Company Analysts, as part of
>> your bonus package for calendar year 2007, the Company will provide an
>> opportunity for you to obtain equity in the Company that would vest over
>> subsequent years.
>>
>> The Company is an at-will employer, which means that your employment
>> with the Company is for no specific period of time and may be terminated by
>> the Company or you at any time, with or without prior notice and with or
>> without cause.
>>
>> Your employment pursuant to this offer is contingent on your
>> execution of an Employment Agreement which is a condition of this offer and
>> of your continued employment with the Company.  You will also be required
>> to
>> provide the Company with legally acceptable proof of your identity and
>> authorization to work in the United States within three (3) days of your
>> start date, and your failure to do so may, at the Company's discretion,
>> render all terms of this offer of employment void and unenforceable.
>>
>> We are very excited about the prospect of you becoming a colleague
>> and we look forward to working with you.
>>
>> Sincerely,
>>
>>
>>
>> Howard B. Krass
>> CEO and President
>> IPD Analytics, LLC
>>
>
>
```