UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

CLARK S. CHENEY,                                    Case No.: 1:08-cv-01044-JDB

    Plaintiff,

v.

IPD ANALYTICS, L.L.C.,
INTELLECTUAL PROPERTY
DEVELOPMENT, INC., and
HOWARD BENJAMIN KRASS,

    Defendants.

_____

**DEFENDANTS' ERRATA FILING REGARDING DOCUMENT 9-2
REPLACING EX. "A" TO DEFENDANTS' MEMORANDUM
IN OPPOSITION TO PLAINTIFF CHENEY'S MOTION
FOR PRELIMINARY INJUNCTION**

    Defendants, IPD Analytics, L.L.C. ("IPD Analytics"), Intellectual Property Development, Inc., and Howard Benjamin Krass, make this Errata Filing to replace Document 9-2, Ex. "A" to Defendants' Memorandum in Opposition to Plaintiff Cheney's Motion for Preliminary Injunction (DE-9) in order to comply with FRCP 5.2(a).

Dated: July 9, 2008                              Respectfully submitted,

                                                      EPSTEIN BECKER & GREEN, P.C.
                                                      1227 25th Street, N.W., Suite 700
                                                      Washington, District of Columbia 20037
                                                      Telephone: (202) 861-0900
                                                      Telefax: (202) 296-2882
                                                      By:   /s/ Steven M. Umin
                                                           Steven M. Umin, Esq.
                                                           D.C. Bar Number 47985

    sumin@ebglaw.com
    Julianna S. Gonen, Esq.
    D.C. Bar Number 488759
    jgonen@ebglaw.com

RICHARD & RICHARD, P.A.
825 Brickell Bay Drive
Tower III - Suite 1748
Miami, Florida  33131
Telephone: (305) 374-6688
Fax: (305) 374-0384
By:   /s/ Dennis Richard
    Dennis Richard, Esq.
    dennis@richardandrichard.com
    (*Pro Hac Vice* Admission
    Florida Bar Number 148730)

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that on this 9th day of July, 2008, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  We also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

    Clark S. Cheney, Esq.
    Law Office of Clark S. Cheney
    *Pro Se Plaintiff*
    517 F Street, N.E.
    Washington, D.C. 2002
    Telephone: (202) 253-7195
    **Via U.S. Mail**

      /s/ Dennis Richard
    Dennis Richard, Esq.

H:\IPD Analytics\IPD-Cheney\Pleadings\errata filing re document 9-2_mtd.wpd

## **DECLARATION OF HOWARD BENJAMIN KRASS**

I, Howard Benjamin Krass, declare as follows:

1.  I am the Chief Executive Officer and General Manager of IPD Analytics, LLC ("IPD Analytics"), and the President of Intellectual Property Development, Inc.

*Business of IPD Analytics*

2.  IPD Analytics is in the business of publishing and selling, primarily to institutional investors, subscriptions to research reports on the status of patent litigation involving public companies. Such services are commonly known as "Wall Street newsletters." IPD Analytics publishes and sells subscriptions to three different newsletters, one related to the pharmaceutical and biotech industry, one related to the medical device industry, and one related to the technology, media, and telecom industry. A subscriber to an IPD Analytics' newsletter receives the same publication as all other subscribers to that newsletter. Subscribers to IPD Analytics' newsletters may call IPD Analytics' personnel in Florida with questions about what is reported in the newsletter, however the information they are given is not confidential or discrete as to a calling subscriber, but is given to any and all calling subscribers. There are subscribers to the published newsletters of IPD Analytics, in various places. However, there are and were no subscribers in Washington, D.C. Subscribers to IPD Analytics' newsletters may also call the offices of IPD Analytics, with any questions about a published newsletter. IPD Analytics makes the same information about its newsletters available to all subscribers, some of which compete with each other for investment capital as well as investment ideas.



EXHIBIT "A"

3. All subscribers to IPD Analytics' newsletters sign a Subscription Agreement in the form attached hereto as Ex. 1.

*Residence of Howard Benjamin Krass, IPD Analytics, LLC and
Intellectual Property Development, Inc.*

4. IPD Analytics has been in business for approximately five and one-half years, during which it has built its business to its current levels of newsletter subscribers. IPD Analytics obtains its subscribers by direct marketing, i.e., identifying institutional investors who are likely to be interested in subscribing to the newsletters it publishes and contacting them. IPD Analytics' subscriber list, and identification of which newsletter is subscribed to by which subscribers, is non-public, confidential, proprietary information developed by IPD Analytics over a period of years. IPD Analytics has devoted substantial resources since its inception to build the number of subscribers to each of its publications. Due to the economies of scale, and IPD Analytics' business model, the loss of a single subscriber, or a single subscription to any one of its three publications, would be a significant detriment to IPD Analytics.

5. IPD Analytics' subscription newsletter business is based on volume. Building up the number of subscribers to IPD Analytics' published newsletter has been critical to IPD Analytics achieving the business operation it has today.

6. I am a resident of Sunny Isles, Florida, a suburb of Miami, Florida. Since the inception of IPD Analytics 5 ½ years ago, I was in Washington, D.C. only once, for about 24 hours. I have no employees, papers, bank accounts, real or personal property, and pay no taxes in the District of Columbia. I do not solicit any business in the District of Columbia.

I do not derive substantial revenue from goods used or consumed, or services rendered, in the District of Columbia. I do not engage in any persistent course of conduct in the District of Columbia.

7. IPD Analytics is a Florida limited liability company with its only office at 1170 Kane Concourse, Suite 300, Bay Harbor Islands, FL 33154. IPD Analytics has no employees, papers, bank accounts, real or personal property, pays no taxes, and is not authorized to do business in the District of Columbia. IPD Analytics does not solicit any business the District of Columbia. IPD Analytics does not derive substantial revenue from goods used or consumed, or services rendered, in the District of Columbia. IPD Analytics does not engage in any persistent course of conduct in the District of Columbia, with the possible exception of having employees from Florida occasionally observe federal court hearings concerning patents involving public companies.

8. Intellectual Property Development, Inc. is a Florida corporation with its only office at 1170 Kane Concourse, Suite 300, Bay Harbor Islands, FL 33154. Intellectual Property Development, Inc. has no employees, papers, bank accounts, real or personal property, pays no taxes, and is not authorized to do business in the District of Columbia. Intellectual Property Development, Inc. does not solicit any business the District of Columbia. Intellectual Property Development, Inc. does not derive substantial revenue from goods used or consumed, or services rendered, in the District of Columbia. Intellectual Property Development, Inc. does not engage in any persistent course of conduct in the District of Columbia.

*Clark S. Cheney*

9.     Upon accepting employment with IPD Analytics, in February, 2006, Mr. Cheney moved to Florida where he worked for IPD Analytics until he announced that he was leaving Florida in February of 2008.

10.    Mr. Cheney was employed in Florida by IPD Analytics under an employment contract pursuant to which he was paid hundreds of thousands of dollars by IPD Analytics which he accepted. A copy of that employment contract is attached hereto as Ex. 2.

11.    As an analyst employed in Florida by IPD Analytics, Mr. Cheney was given specialized on-the-job training by me and other employees of IPD Analytics. That training included education in portfolio management, investment theory, investment hedge concepts, and the institutional investment business generally. Such training is important to a meaningful understanding of what institutional investors are looking for in a Wall Street newsletter. Mr. Cheney's training, as an employee of IPD Analytics, also included writing styles for such a newsletter in order to cater to the needs of institutional investors, both in style and substance.

12.    The IPD Analytics' newsletters do not identify the analysts who contribute content to them. It has been about five months since Mr. Cheney left the employ of IPD Analytics, in Florida. During that period no subscriber to any newsletter of IPD Analytics has raised any concerns about whether Mr. Cheney is still an employee of IPD Analytics, or is still contributing to its published newsletters.

*IPD Analytics' 401K Plan*

13. I am the sole trustee of the IPD Analytics 401K plan. That plan is administered and managed from Florida, and all of my decisions concerning that plan are made in Florida.

14. Subsequent to the termination of his employment with IPD Analytics, Mr. Cheney requested that his account in the 401K plan be transferred to Missouri, as a "rollover." A copy of Mr. Cheney's request, signed by him on March 10, 2008 and countersigned by me on March 18, 2008, is attached hereto as Ex. 3.

I, Howard Benjamin Krass, hereby declare under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing declaration is true and correct.

Dated: July 7, 2008

_____
HOWARD BENJAMIN KRASS
Declarant

H:\IPD Analytics\IPD-Cheney\Pleadings\declaration of howard krass_mtd.wpd

# IPD Analytics, LLC

## IPD Analytics Patent Litigation Monitor
## Subscription Agreement

IPD Analytics, LLC ("IPD Analytics") offers investment professionals research and reports related to patent litigation. IPD Analytics shall provide its basic services to the undersigned according to the terms and conditions listed below.

**Terms and Conditions**

    1.    Subscription: The undersigned ("Subscriber") agrees to become a subscriber to IPD Analytics Patent Litigation Monitor service for the Healthcare sector ("the Service"). The Service shall consist of research and reports related to ongoing patent litigation involving pharmaceutical technology as well as telephone discussions with IPD Analytics analysts. The reports shall cover cases chosen at IPD Analytics' discretion. IPD Analytics expects that the Service shall provide an average of three (3) reports per month. The initial term of the Service shall be six (6) months from the execution of this Agreement.

    2.    Payment Terms: For the initial term of the Agreement, the Subscriber or designated registered Broker Dealer agrees to pay IPD Analytics pursuant to Attachment A.

    3.    No Attorney-Client Relationship: Subscriber hereby acknowledges and agrees that none of IPD Analytics' activities create or constitute any attorney-client relationship between IPD Analytics, its principals, employees, shareholders, officers, directors, members, agents and/or affiliates ("IPDA") and the Subscriber. Subscriber understands and acknowledges that the research and reports it will be receiving pursuant to the Service will also be provided to other subscribers to the Service.

    4.    Non-Hire: During the term of this Agreement and for a period of one year thereafter the Subscriber shall not employ or contract with any current personnel of IPD Analytics or former personnel of IPD Analytics who had been employed by IPD Analytics within the one year period immediately preceding such employment or contract with undersigned. This article shall survive termination of this Agreement.

    5.    No Distribution: Subscriber agrees that title and all proprietary rights in the reports prepared by IPD Analytics shall remain vested in IPD Analytics. Subscriber further agrees that it will not copy, distribute or otherwise disseminate or communicate reports (or this Agreement or any information in this Agreement, including but not limited to pricing information) in any way other than for its own internal use. This article shall survive termination of this Agreement.

    6.    Users of the Service: Subscriber agrees to provide IPD Analytics with a list of all portfolio managers and/or analysts who will be receiving access to the Service and/or research and reports pursuant to the Service. Subscriber agrees to promptly notify IPD Analytics when this list is changed or updated. Information to be provided on this list shall include the items specified in Attachment A.

    7.    Renewal Policy: IPD Analytics' standard renewal procedure is to invoice Subscriber or its relevant broker dealer at the end of the initial Agreement term for the coming contract period. The Agreement shall automatically renew for an additional contract period as defined in the renewal invoice unless Subscriber notifies IPD Analytics in writing that it elects to discontinue the Service within fifteen (15) days of receipt of the renewal invoice. After the initial term, either party may terminate the Agreement with thirty days written notice to the other party. A pro-rata refund will be given for remaining full months of service left in the contract term.



EXHIBIT "1"

1177 Kane Concourse, Suite 300, Bay Harbor Islands, Florida 33154
Tel: (305) 662-8515 • Fax: (305) 993-1883 • E-mail: info@ipdanalytics.com

**IPD Analytics, LLC**                                                                 2
_____

8.  <u>Legal Disclaimer</u>: IPDA does not provide investment recommendations or advice and cannot be held liable by Subscriber for any losses that may relate to information obtained from IPDA. Further, Subscriber agrees not to pursue any legal action against IPDA in connection with the services described herein. The liability of IPD Analytics, LLC under this Agreement for any reason whatsoever, including, but not limited to, actions in negligence, contract, strict liability, breach of warranty or tort, shall not exceed $3000.00.

9.  <u>Notices</u>: All notices to IPD Analytics shall be sent to the address shown below or to such other address as IPD Analytics may request. All notices to Subscriber shall be sent to the address shown below or such other address as Subscriber may request.

10. <u>Entire Agreement</u>: This Agreement (including Attachment A and any future invoices) constitutes the entire understanding between the parties as to the related subject matter and supersedes any and all prior agreements, communications, representations, obligations and arrangements, whether written or oral, between the parties. Subscriber acknowledges that no reliance is placed on any prior representation not contained in this Agreement.

I, the undersigned, certify that I have the power to act on behalf of the firm listed below and that this is a legally binding contract between my firm and IPD Analytics, LLC.

Signed by

Fund manager/analyst: _____

Fund name: _____

Firm name: _____

Street: _____

City/State/Zip: _____

Phone: _____

Fax: _____

Date: _____

---

**IPD Analytics, LLC**

# IPD Analytics Patent Litigation Monitor
# Subscription Agreement

### ATTACHMENT A

PORTFOLIO MANAGERS AND ANALYSTS WHO WILL BE USING THE SERVICE*:

| | |
|---|---|
| Name _____ | Name _____ |
| Title _____ | Title _____ |
| Email _____ | Email _____ |
| Phone _____ | Phone _____ |
| Street _____ | Street _____ |
| City/State/Zip _____ | City/State/Zip _____ |
| | |
| Name _____ | Name _____ |
| Title _____ | Title _____ |
| Email _____ | Email _____ |
| Phone _____ | Phone _____ |
| Street _____ | Street _____ |
| City/State/Zip _____ | City/State/Zip _____ |

* additional users should be identified by attaching another copy of this document.

PAYMENT

IPD Analytics typically charges a monthly fee for its Service per "seat" or manager/analyst using the Service. During the initial term, the charter subscriber will be charged an introductory rate for one seat only and any additional per seat charges will be waived.

The introductory rate for the initial term of six months is $18,000 based on a rate of $3,000 per month. Subscriber or designated registered Broker Dealer agrees to make full payment of $18,000 to IPD Analytics, LLC within two weeks of the execution date of this Agreement. Subscriber may pay by authorizing IPD Analytics to invoice a registered broker dealer for the amount for the benefit of subscriber or by paying IPD Analytics directly.

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AREEMENT (the "**Agreement**") is by and between **IPD ANALYTICS, L.L.C.**, a Florida corporation ("**Company**"), and **Clark S. Cheney** ("**Employee**") and will be effective as of Employee's first day of employment with the Company ("**Agreement Date**").

WHEREAS, the Company desires to retain Employee as an employee of the Company, and Employee desires to be so employed by the Company, subject to the terms, conditions and covenants set forth in a separate offer letter and additionally in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Employee hereby agree as follows:

1.1   Employment At Will. Employee's employment by the Company is at-will, and either Employee or the Company may terminate this Agreement and Employee's employment by the Company at any time and for any reason, whether with or without cause or with or without reason. The period of time from Employee's first day of employment with the Company to the date of termination of Employee's employment is hereinafter referred to as the "**Employment Term.**"

1.2   Confidential Information. As used herein, the term "**Confidential Information**" means all information of a confidential nature, whether tangible or intangible, in any form or medium provided, which is not generally known to the public and which relates to the business of the Company, including without limitation research, software and enhancements thereto, know-how, processes, trade secrets, manuals, confidential reports and client lists (including without limitation lists of clients and lists of potential clients of the Company). Employee acknowledges that the business of the Company is highly competitive and that the services to be performed by Employee for the Company are unique and that, contemporaneously with the Agreement Date, the Company will provide Employee with Confidential Information and/or initial specialized training. In consideration of the foregoing, Employee agrees that during his employment by the Company and thereafter, pursuant to this Section 1.2, Employee will hold all Confidential Information in strictest confidence and will:

(a)   not, without the Company's prior written consent, directly or indirectly use, copy or duplicate, or disclose or otherwise make available to any third party, any Confidential Information other than as necessary for Employee's performance of Employee's responsibilities as an employee of the Company; and

(b)   take such protective measures as may be reasonably necessary to preserve the secrecy and interest of the Company in the Confidential Information. If Employee becomes aware of any unauthorized use or disclosure of Confidential Information by any person or entity, Employee shall promptly and fully advise the Company of all facts known to Employee concerning such unauthorized use or disclosure.

Employment Agreement                           EXHIBIT 

Employee also agrees that in connection with this Section 1.2, Employee also will be bound by the provisions of Section 1.4. Employee further acknowledges and agrees that the Company's conduct in providing Employee with Confidential Information in exchange for Employee's agreement with this Section 1.2 gives rise to the Company's interest in restraining Employee from competing against the Company as set forth in Section 1.4, and that Employee's agreement to Section 1.4 is designed to enforce Employee's agreement in this Section 1.2.

At any time during the Employment Term or thereafter, upon the reasonable request of the Company and at the Company's expense, Employee shall provide reasonable assistance to the Company with respect to any litigation, arbitration or any other dispute with a third party concerning the unauthorized use or disclosure by such third party of any Confidential Information provided such litigation, arbitration or other dispute is commenced during the Employment Term. Upon termination of this Agreement for any reason whatsoever, or at any time requested by the Company, Employee shall promptly deliver or cause to be delivered to the Company any and all Confidential Information in Employee's possession, custody or control.

1.3   Ownership of Inventions and other Rights. Employee hereby agrees that any and all inventions (whether or not an application for protection has been filed under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protected under copyright laws), Moral Rights (as defined below), trademarks, trade names, trade dress, trade secrets, publicity rights, know-how, ideas (whether or not protected under trade secret laws), and all other subject matter protected under patent, copyright, Moral Right, trademark, trade secret, or other laws, including, without limitation, all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, artwork, software, software enhancements or upgrades, modifications, processes, business methods additions, techniques, programming, applets, scripts, and designs, which have been or are developed, generated or produced by Employee in the scope of Employee's employment by Company, solely or jointly with others, at any time during the Employment Term, shall be the exclusive property of the Company, subject to the obligations of Section 1.2 with respect to Confidential Information, and Employee hereby forever waives and agrees never to assert against the Company, its successors or licensees any and all ownership, interest, moral rights or similar rights with respect thereto. Employee hereby assigns to the Company all right, title and interest to the foregoing inventions, concepts, ideas and materials. Employee shall execute all papers, and otherwise provide assistance, at the Company's request and expense, during or subsequent to the Employment Term, to enable the Company or its nominees to obtain patents, copyrights and other appropriate legal protection for software, inventions or innovations in any country. For purposes of this Agreement, **"Moral Right"** means any right to claim authorship of a work, any right to object to any distortion or other modification of a work, and any similar right (including but not limited to any rights of paternity, integrity, disclosure and withdrawal), existing (or as may come into existence) under the law of any country or under any treaty.

1.4   Non-Competition. Employee agrees that during the Employment Term and for a period of one (1) year thereafter, for any reason, Employee will not, directly or indirectly, in any State of the United States, or in any country in the world where the Company engages or proposes to engage in Business as of the date of the termination of Employee's employment by the Company, (i) become employed by (either directly or indirectly) or in any other way provide services that compete with the Company's Business for any entity that was a customer of the

Company at any time during the Employment Term, (ii) compete with the Company in Business, or (iii) participate in the ownership, management, operation, financing, or control of, or be employed by or consult for or otherwise render services to, any person, corporation, firm, or other entity that competes with the Company in Business. For the purposes of this Section 1.4, "**Business**" shall mean (x) providing or planning to provide research and/or analysis, for investment purposes, of pending litigation and/or intellectual property issues, throughout the United States or in any country in the world, and (y) any other portion of the Company's business in which Employee actively participated or regarding which Employee received Confidential Information at any time before or during the Employment Term.

    1.5    Non-Solicitation/Non-Hire of Employees. Employee agrees that, during the Employment Term and for a period of two (2) years thereafter, Employee shall not, directly or indirectly, whether for Employee's account or for any other person or entity, (a) solicit for employment or hire, or attempt to solicit for employment or hire, any person who is employed by (or, but for the violation of this Agreement, would have been employed by) the Company, or (b) otherwise interfere with the relationship between any such person and the Company.

    1.6    Remedies. the Company and Employee hereby agree that it is impossible to measure solely in money the damages which will accrue to the Company by reason of Employee's failure to observe any of his obligations under this Agreement. Therefore, if the Company shall institute any action or proceeding to enforce such provisions, Employee hereby waives any claim or defense that there is an adequate remedy at law and agrees in any such action or proceeding not to interpose the claim or defense that such remedy exists at law. Without limiting any other remedies that may be available to the Company, Employee hereby specifically affirms the appropriateness of injunctive or other equitable relief in any such action, without the need to post any bond associated therewith.

    1.7    Partial Invalidity. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

    1.8    Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without regard to conflict of law principles. Any litigation or arbitration between the parties which arises out of this Agreement shall be instituted and prosecuted only in the appropriate state or federal court or other tribunal situated in Miami, Florida. Parties hereby submit to the exclusive jurisdiction of such courts and tribunals for purposes of any such action and the enforcement of any judgment or order arising therefrom. Parties hereby waive any right to a change of venue and any and all objections to the jurisdiction of the state and federal courts and other tribunals located in Miami, Florida.

    1.9    Entire Agreement; Amendments. This Agreement, the Offer Letter, and the Recitals contain the entire understanding of the parties hereto with regard to the subject matter contained herein, and supersede all prior agreements, understandings or letters of intent between

the parties hereto. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by each of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Agreement Date first written above.

THE COMPANY:

IPD ANALYTICS, L.L.C.

By: _____

Date: 3/6/06

EMPLOYEE:

Clark S. Cheney

_____

Date: February 6, 2006

-

Employment Agreement                                                                                          Page 4 of 4



**Instructions for completing**
**Termination and Retirement Withdrawal - Eligible for Rollover**

- *Use this form for termination and retirement withdrawals.*
  *For all other distributions complete the applicable Withdrawal form.*

---

**Deferred Distributions**
Section 1102 of the Pension Protection Act of 2006 requires plans to notify participants that they have the right to defer distributions as well as the consequences of making that choice. The investment options available under your group annuity contract as well as the fees related to the investment options are part of this consideration.

- For a description of the investment options available under your group annuity contract, including fees:
  Log onto www.jhpensions.com. Select: *Your contract reports - Investments - Contract investment options* and view *Selected investment options only*.
  Alternatively, participants may obtain this information by calling our toll free service line at 1-800-395-1113 to speak to a Client Account Representative.
- Participants who are interested in establishing a John Hancock Funds IRA/Roth IRA may obtain information about the IRA/Roth IRA, including a description of the investment options available and the applicable fees, by logging onto www.JHRollover.com or by calling 1-888-695-4472.
- Participants should also review their plan's Summary Plan Description (SPD) which may contain special provisions that may materially affect their decision to defer a distribution. For a copy of the SPD, please contact your Plan Sponsor.

**Participant Instructions for completing page 1**

**Section A - General Information**
Complete contractholder name, contract number, participant's name, social security number, address and date of birth.
**Payment Instructions** - Complete either Section B (for Direct Rollover) or Section C and Section D (to Participant Directly).
A total withdrawal will be processed unless a specific amount is entered.

**Section B - Payment Instructions for Direct Rollover**
**John Hancock Funds IRA/Roth IRA** - To rollover to a new John Hancock Funds IRA and/or Roth IRA please call the Retirement Income and Rollover Solutions Call Center at 1-888-MY-JH-IRA (1-888-695-4472). Rollovers into your John Hancock Funds IRA and/or Roth IRA will be sent via electronic funds transfer and must satisfy minimum initial investment requirements. For more information, please contact us at 1-888-MY-JH-IRA (1-888-695-4472) or visit www.JHRollover.com.

**IRA/Roth IRA** - The IRA account number must be provided. If the rollover distribution includes Roth 401(k) money that portion must be rolled over to a Section 401(a) plan that accepts Roth rollover contributions or to a Roth IRA. If more than one recipient plan or account are to receive the rollover, **provide an additional copy of page 1 with payment instructions.**

**Qualified Plan** - This includes direct rollover to another Section 401(a) plan, to a plan described in IRC Section 403(b) or to a governmental plan described in IRC Section 457(b). The name of the plan and if applicable, the account number must be indicated on page 1.
**Method of Payment** - Complete the applicable selection under Section 1 or Section 2.

**Section C - Payment Instructions to Participant Directly**
If you request any portion of a distribution that is an eligible rollover distribution to be directly paid to you, 20% mandatory federal income tax withholding will apply on distributions over $200.00 plus applicable state taxes. A 1099R form will be issued. The disbursement can only be made payable to the participant.
**Method of Payment** - Complete the applicable selection under Section 1 or Section 2.

    **Section 1 - Electronic Fund Transfer**
    This option is recommended for ALL distributions for more timely access to your funds. Choose this option for distributions amounts over $50,000.
    We will not deposit into a third party account.
        Direct Deposit   Your bank requires you to indicate whether this is a checking or savings account. Provide your bank's name, complete address,
                        ABA routing number (verify with bank) and your bank account number.
        Wire   Provide your bank's name, complete address, ABA routing number (verify with bank) and your bank account number.
               NOTE: The receiving bank may not accept wires or may charge a fee to accept the incoming wire, contact your bank if you have any questions.

    **Section 2 - Check** - Allow 5 - 10 business days for mailing.

**Section D - Tax Withholding**
**Federal Tax Withholding**
    Distributions of taxable contributions plus earnings on all contributions are subject to federal income tax. Federal law requires that 20% of the taxable amount of an eligible rollover distribution be withheld, unless payment is directly rolled over to another Section 401(a) qualified plan, Section 403(b) Plan, Governmental Section 457 Plan, or IRA. The amount withheld may not represent your entire tax bill. Please refer to the information provided by your Plan Administrator regarding these tax rules. Contact your tax advisor or IRS if you have any questions concerning withholding or these tax rules.

**State Tax Withholding**
    Enter state of residence at time of withdrawal, if state tax withholding should be taken for a state other than the one indicated in the Participant address.
    NOTE: If the field is not completed, it will default to state listed in Participant address in Section A.
    State income tax will be withheld from the taxable portion of your payment if you are a resident of Arkansas, Delaware, Iowa, Kansas, Maine, Maryland, Massachusetts, Nebraska, North Carolina, Oklahoma, Vermont or Virginia. If you are a resident of California or Oregon, state income tax will be withheld unless you check Box 1. Some other states allow voluntary tax withholding. Residents of those states that allow voluntary withholding may elect to have state income tax withheld from the taxable portion of your payment by checking Box 2 and entering the dollar amount or percentage to be withheld. If the amount or percentage indicated is less than the state tax minimum, the minimum will be withheld.
Additional information can be obtained by contacting your state's Department of Revenue.

**Section E - Participant Signature**
Ensure that the appropriate signature is on the form.
Your plan may require you to provide supporting documents or additional information before your request can be processed. Contact your plan administrator.
You have full access to your account through the participant Website - www.jhpensions.com or our toll-free service line 1-800-395-1113, while you are waiting for your withdrawal to be processed.

GP5024US (11/2007)

© 2007 John Hancock Life Insurance Company (U.S.A.) (John Hancock USA). All rights reserved.



EXHIBIT "3"

Authorized Plan Representative Instructions for completing page 2

### Section F - Withdrawal Details

Select either termination or retirement and input date when it occurred.

Enter date of final pay period for which contributions were withheld from participant's pay. The withdrawal will be processed after receipt of this final contribution.

Select the appropriate IRS distribution code. Roth distribution code must be used in conjunction with another distribution code. If an outstanding loan exists, the outstanding loan balance will be defaulted and may be treated as a distribution and subject to tax depending on distribution code chosen. You may want to contact your TPA for proper code to use.

Enter Vesting Percentages for employer money and select an option for any applicable unvested money.

For Partial withdrawals only, indicate the money type to be withdrawn and the amount. It is essential that you use the names that appear on the contract statements. Completing the investment option is not mandatory. If left blank, John Hancock USA's standard withdrawal order will be used.

Complete Employee After Tax Details if applicable.

If the distribution is payable to the plan trustee, John Hancock USA will issue the distribution without withholding any taxes. A 1099R Form will not be generated by John Hancock USA.

### Section G - Third Party Administrator (TPA) Withdrawal Fee - Based on TPA fee schedule approved by the Plan's Trustee or Named Fiduciary.

The Fee will be deducted using standard protocol from the participant's account balance at the time of withdrawal and will be paid to the TPA currently on record with John Hancock USA. John Hancock USA is not responsible for any uncollected fee amounts as a result of insufficient funds. These shortages will be reported on the transaction and summary confirmations.

### Section H - Authorized Plan Representative Signature

Ensure that the appropriate signature is on the form. Any changes to information provided on this form require proper authorization.

If Section E - Participant's Signature has been obtained separately, certification will be provided under the Authorized Plan Representative signature section.

© 2007 John Hancock Life Insurance Company (U.S.A.) (John Hancock USA). All rights reserved.



# Termination and Retirement Withdrawal - Eligible for Rollover

- To complete this form, please read the instruction page attached to this form.
- Participant completes page 1 of this form.
- Plan Representative reviews page 1 and completes page 2 of this form.

**Section A - General Information**

Contractholder Name (Employer Name): The Trustees of IPD Analytics 401(k)
Plan (the "Plan")
Contract Number: 65847

Participant Name (Last Name, First Name, Initial): Cheney, Clark S
Social Security Number: ___-__-4038

Participant Address (Mandatory for 1099R) - Number, Street, Apt, City, State, Zip Code: 517 F St NE, Washington, DC 20002

Date of Birth: Month __ Day __ Year 1975

Payment Instructions - Complete either Section B (for Direct Rollover) or Section C and Section D (to Participant Directly).
A total withdrawal will be processed unless a specific amount is entered. $ _____

**Section B - Payment Instructions for Direct Rollover** - Read important information on instruction page.

- [ ] IRA (described in IRC Section 408) John Hancock Funds IRA — Account No. _____
- and/or [ ] John Hancock Funds Roth IRA — Account No. _____
- [ ] IRA — Account No. _____
- and/or [X] Roth IRA Fidelity — Account No. 6016

OR

- [ ] Qualified Plan — The Trustees of _____ Plan

**Section 1 - Electronic Fund Transfer Information**
[X] Direct Deposit
OR
[ ] Wire - Verify with the receiving bank if they accept wires and/or charge a fee.

Bank Name: United Missouri Bank
Bank ABA Number: 5681
Bank Address - Number, Street, City, State, Zip Code: 928 Grand Ave, Kansas City, MO, 64106
Financial Institution, if different from Bank listed above: Fidelity Investments
Bank Account No.: xxxx-6016

[ ] Section 2 - Check Information - For distribution amounts over $50,000, use electronic fund transfer.

**Section C - Payment Instructions to Participant Directly**

Section 1 - Electronic Fund Transfer Information
[ ] Direct Deposit to my (select one) [ ] Checking or [ ] Savings Account
OR
[ ] Wire - Verify with the receiving bank if they accept wires and/or charge a fee.

Bank Name: _____
Bank ABA Number: _____
Bank Address - Number, Street, City, State, Zip Code: _____
Bank Account Number: _____

[ ] Section 2 - Check Information - For distribution amounts over $50,000, use electronic fund transfer.

**Section D - State Tax Withholding**

State of Residence: DC
1. [X] Do not withhold
2. [ ] Withhold $ _____ or _____ % of federal income tax amount or _____ % of total taxable amount.

**Section E - Participant Signature**

For your protection, state law, where applicable, requires the following sentence to appear on this form. Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

Under penalties of perjury, I certify that:
1. The number shown on this form is my correct Taxpayer Identification Number (Social Security Number), and
2. I am a U.S. person (including a U.S. resident alien).

Signature of Participant: Clark S Cheney
Name: Clark S. Cheney
Date: 3/10/08

GP5024US (11/2007)
Page 1 of 2

©2007 John Hancock Life Insurance Company (U.S.A.) (John Hancock USA). All rights reserved.

| Participant Name (Last Name, First Name, Initial) | Social Security Number |
|---|---|
| Cheney, Clark S | |

### Section F - Withdrawal Details

☒ TE - Termination  Month `02`  Day `9`  Year `2008`

☐ RE - Retirement  Month ___ Day ___ Year ___

Final Contribution  Month `02`  Day `14`  Year `2008`

**Distribution Code - More than one box may be chosen.**

☐ 1 - Early Distribution

☐ 2 - Early Distribution (Exception)

☐ 7 - Normal Distribution

☐ B - Also check here if the distribution includes Roth 401 (k) contributions

☒ G - Direct Rollover to another Qualified Plan

☐ Code ___ Default Loan (Code dependent on age)

**Vesting percentage(s)**
The following money types will be 100% vested unless otherwise indicated below: QMAC, QNEC, SHMAC and SHNEC.
For all other employer money types, indicate the vesting percentage(s) below.

ER Match ___% Other ER Money ___%
Profit Sharing ___% Other ER Money ___%

**Employer Unvested Money** If no box is selected, money will remain in Participant's account with current investment instructions.
☐ Transfer to Cash Account  ☐ Refund to Plan Trustee  ☐ Pay outstanding John Hancock USA Charges  ☐ Leave in Participant account and transfer to default fund

**Complete the following for Partial withdrawals only**

Partial $ ___

| Money Type (Mandatory) | Investment Option (Optional) | $ | % | Amount or Percentage |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Employee After-tax Withdrawal Details**

For withdrawal of Employee after tax money, were any of the contributions made before 1987? ☐ No  ☐ Yes $ ___

Is the taxable portion to be determined under IRS pro-rating rules as required by IRC Section 72?
☐ Yes, the distribution will include a pro-rated portion of earnings which will be taxable.
☐ No, the amount of pre-1987 contributions being withdrawn at this time? $ ___

### Section G - Third Party Administrator (TPA) Withdrawal Fee

Flat Fee Amount $ ___  OR  Percentage of Invested Balance ___%  No Fee will be applied if this section is not complete.

### Section H - Authorized Plan Representative Signature

If the participant fails to sign Section E - Participant Signature (page 1 of this form), the authorized Plan representative below certifies, under penalties of perjury, that based on the plan sponsor's record, the number shown on this form is the correct taxpayer identification number (Social Security Number) of the participant and that the participant is a U.S. person (including a U.S. resident alien).

I certify that all the above information is complete and correct, that the required Participant elections and consent and, if applicable, spousal consent for married participants as required by IRC Sec. 417, have been properly obtained, and that the funds being withdrawn are not for the purpose of prohibited transactions as defined in IRC Sec. 4975. I also certify that all necessary and applicable information required to be furnished to the Participant under IRC Sec. 417 and an explanation of the direct rollover option and related tax rules required by IRC Sec. 402 have been provided. I hereby direct John Hancock USA to pay to the Third Party Administrator the above referenced fee, which will be deducted from the participant's account at the time of the distribution. I understand and agree that these fees will be deducted and held in John Hancock USA's general business account until paid to the Third Party Administrator. I hereby represent that this fee is in accordance with the fee schedule that has been approved by the plan's trustee or named fiduciary, is authorized under the terms of the plan and that the plan's trustee or named fiduciary has determined that the fee requested is reasonable. I also certify that, if applicable under the terms of the Plan, the Participant has waived the 30-day waiting period. On behalf of the Plan sponsor, the Plan and its related trust, and the Plan Trustee or named Fiduciary, I further agree to indemnify and hold harmless John Hancock USA, its employees, agents, directors, and officers from any liability, penalties, and taxes that may be incurred as a result of the requested distribution giving rise to one or more prohibited transactions or for implementing requests (including, if applicable, a direct rollover request) based solely on the instructions provided on this form, or if any of the certifications provided on this form are incorrect.

Signature of Authorized Plan Representative: *[signature]*   Name: HOWARD KRASS   Date: 3-18-08

GP5024US (11/2007)   Page 2 of 2

© 2007 John Hancock Life Insurance Company (U.S.A.) (John Hancock USA). All rights reserved.