RECEIVED
U.S. COURT OF APPEALS
FOR THE D.C. CIRCUIT

2008 JUL 14 PM 4: 40

~~FILING DEPOSITORY~~

CLERK
US DISTRICT & BANKRUPTCY
COURTS

2008 JUL 14 PM 4: 40

RECEIVED

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Clark S. CHENEY,

Plaintiff,

v.

IPD ANALYTICS, LLC, *et al.*,

Defendants.

Case No. 1:08-cv-01044-JDB

## PLAINTIFF'S MEMORANDUM OPPOSING DEFENDANT'S MOTION TO DISMISS OR TRANSFER, ETC.

Pursuant to Local Rules of Civil Procedure 7(b), Plaintiff Clark S. Cheney respectfully submits

this memorandum opposing Defendants' Motion to Dismiss or Transfer Pursuant to the Contractual

Forum Selection Clause, for Lack of Personal Jurisdiction, or Improper Venue.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ................................................................................................................... 1

I.    This Court Has Personal Jurisdiction Over All of the Defendants ..................................... 1

      A. This Court Has Personal Jurisdiction Over IPD Analytics ........................................... 1

            1.    This Court Has General Personal Jurisdiction Over IPD Analytics........................ 1

                  a.    IPD Analytics Continuously and Systematically
                        Conducts Business in the District of Columbia................................................. 1

                  b. The Government Contacts Exception Does Not Apply to This Case .................... 5

            2.    This Court Has Specific Personal Jurisdiction Over IPD Analytics Under
                  D.C.'s Long-arm Statute .......................................................................................... 7

                  a.    Mr. Cheney's Claims Relate to IPD Analytics Recruiting Him
                        in the District of Columbia............................................................................... 7

                  b. Plaintiff's Claims Relate to IPD Analytics Contracting with Clients to
                     Supply Services in the District of Columbia..................................................... 9

                  c.    The "Plus-factors" in This Case Render IPD Analytics Subject to
                        Personal Jurisdiction Here for Tortious Acts Outside This District ................. 10

            3.    This Court Has Personal Jurisdiction Over IPD Analytics Under ERISA ............... 11

      B. This Court Has Personal Jurisdiction Over Intellectual Property Development........................... 11

            1.    Intellectual Property Development Has Previously Availed Itself of
                  Courts and Counsel in This Jurisdiction ............................................................... 11

            2.    The Contacts of IPD Analytics Should Be Imputed to Intellectual Property Development.... 13

      C. This Court Has Personal Jurisdiction Over Mr. Krass ............................................... 13

            1.    This Court Has Personal Jurisdiction Over Mr. Krass Under ERISA..................... 13

            2.    This Court Has Personal Jurisdiction Over Mr. Krass Under the D.C. Long-arm Statute......14

            3.    The Contacts of IPD Analytics and Intellectual Property Development
                  Should Be Imputed to Mr. Krass Personally ......................................................... 15

      D. Asserting Personal Jurisdiction Over All Defendants Comports with
         Fair Play and Substantial Justice............................................................................... 16

II.   This Court Is the Proper Venue for This Lawsuit ......................................................... 16

      A. Venue Is Proper Under 28 U.S.C. § 1391................................................................... 16

      B. Venue Is Proper Under ERISA, 29 U.S.C. § 1132...................................................... 18

III.  Venue in This District Is Proper Notwithstanding the Purported Forum Selection Clause............... 19

A. This Court Is the Proper Venue to Try All of Mr. Cheney's Claims Together ............................ 20

   1. Most of Plaintiff's Claims Are Beyond the Scope of the Purported Forum Selection Clause 20

      a. Mr. Cheney's Challenge of the Subscription Agreement
Does Not "Arise Out of" the Employment Agreement ................................................... 21

      b. Mr. Cheney's State Law Claims Do Not "Arise Out of" the Employment Agreement ...... 21

      c. Mr. Cheney's Breach of Contract Claim Does Not "Arise Out of"
the Employment Agreement ............................................................................................. 22

      d. Mr. Cheney's ERISA Claims Do Not "Arise Out of" the Employment Agreement .......... 24

   2. The Interests of Justice and the Convenience of the Parties and Witnesses Require
Trial of All Claims in This District, Mr. Cheney's Chosen Forum ........................................ 25

      a. Transferring a Minority of Mr. Cheney's Claims Would Be
Contrary to the Interests of Justice ............................................................................... 26

      b. Transfer Would Not Produce a Net Increase of Convenience
for the Parties or Witnesses ........................................................................................... 27

B. Venue Is Proper in This District Because the Forum Selection Clause is Unenforceable ............ 27

   1. Enforcement of the Forum Selection Clause Would Contravene
a Strong Public Policy Here ..................................................................................................... 27

   2. Enforcing the Forum Selection Clause for a Minority of Mr. Cheney's Claims Is
Unreasonable and Unjust ......................................................................................................... 28

   3. Enforcing the Forum Selection Clause Will Effectively Deprive Mr. Cheney,
a Pro se Plaintiff, of His Day in Court .................................................................................... 29

C. Venue Is Proper in This District Because the Forum Selection Clause Is Invalid for
Fraud and Overreaching ............................................................................................................... 30

   1. The Forum Selection Clause Is the Result of Fraud ............................................................. 30

   2. The Forum Selection Clause Is the Result of Overreaching ................................................ 30

CONCLUSION ........................................................................................................................................ 32

## TABLE OF AUTHORITIES

### Cases

Adam v. Saenger, 303 U.S. 59, 67-68 (1938) .................................................................................12

Allen v. Russian Federation, 522 F.Supp.2d 167, 193-94 (D. D.C. 2007) ................................19

Armco Inc. v. North Atlantic Ins. Co. Ltd., 68 F.Supp.2d 330, 338 (S.D. N.Y. 1999) .......................22, 30

Bostic v. Ohio River Co. Basic Pension Plan, 517 F.Supp. 627 (S.D. W.Va. 1981)...................19

Brown v. Artery Organization, Inc., 654 F.Supp. 1106 (D. D.C. 1987).......................................6

*Byrd v. Admiral Moving & Storage, 355 F.Supp.2d 234, 237 (D. D.C. 2005)................28, 29

Calder v. Jones, 465 U.S. 783, 790 (1984)..........................................................................14, 16

Chase v. Pan-Pacific Broadcasting, Inc., 617 F. Supp. 1414, 1420 (D. D.C. 1985)....................6

Coats v. Penrod Drilling Corp., 5 F.3d 877, 882-83 (5th Cir. 1993).............................................9

Combs v. Adkins & Adkins Coal Co., 597 F.Supp. 122, 125 (D. D.C. 1984).............................11

Continental Cas. Co. v. State of New York Mortg. Agency, No. 94 C 1463,
    1994 WL 532271, *9-10 (N.D. Ill. Sep 26, 1994)......................................................12, 13

*Covington & Burling v. Int'l Marketing & Research, Inc., 2003 WL 21384825
    (D.C. Super. Ct. April 17, 2003)...................................................................................15

D'Onofrio v. SFX Sports Group, Inc., 534 F.Supp.2d 86, 89-90 (D. D.C. 2008)................4, 10

Donatelli v. National Hockey League, 893 F.2d 459 (1st Cir.1990) ..........................................13

Donovan v. Grim Hotel Co., 747 F.2d 966, 974 (5th Cir. 1984)................................................14

Dooley v. United Technologies Corp., 786 F.Supp. 65, 75 n. 9 (D. D.C. 1992).........................6

Elemary v. Philipp Holzmann A.G., 533 F.Supp.2d 116, 128 n. 8 (D. D.C. 2008) ......................6

Faretta v. California, 422 U.S. 806, 834 (1975)........................................................................27

FC Investment Group LC v. IFX Markets, Ltd., No. 07-7037,
    2008 WL 2468431 (D.C. Cir. Jun 20, 2008) ...................................................................6

FC Investment Group LC v. Lichtenstein, 441 F.Supp.2d 3, 11 (D. D.C. 2006) ................17, 18

Fed. Land Bank of St. Paul v. Fed. Land Bank of Tex., Nos. 87-0085, 87-0601,
    1987 WL 10518, *4 n. 10 (D. D.C. April 30, 1987)..........................................................6

Fletcher v. District of Columbia, 481 F.Supp.2d 156, 169-70 (D. D.C. 2007) .......................7, 8

Florida Bar v. Consolidated Business & Legal Forms, Inc., 386 So.2d 797 (Fla. 1980)...........31

*Flynn v. Ohio Building Restoration, Inc., 260 F.Supp.2d 156, 170 (D. D.C. 2003) ........11, 14

*Flynn v. Veazey Const. Corp., 310 F.Supp.2d 186, 193-94 (D. D.C. 2004)...........................27

General Contracting & Trading Co., LLC v. Interpole, Inc., 940 F.2d 20, 23 n. 4 (1st Cir. 1991)............12

General Environmental Science Corp. v. Horsfall, 753 F.Supp. 664, 668 (N.D. Ohio 1990) ...................26

Gullion v. JLG Serviceplus, Inc., No. 06-1015, 2007 WL 294174 (S.D. Tex. Jan. 29, 2007)............21, 22

Helmer v. Doletskaya, 393 F.3d 201, 205 (D.C. Cir.2004) ........................................................7

Holford v. Exhibit Design Consultants, 218 F.Supp.2d 901, 904 (W.D. Mich. 2002)...............25

I.A.M. Nat. Pension Fund Plan A v. Technical Tape, Inc., No. 87-2451,
    1988 WL 13287 (D. D.C. 1988)....................................................................................18

I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc., 699 F.2d 1254, 1257-58 (D.C. Cir.1983)... 11, 14, 18

iii

Illinois v. Allen, 397 U.S. 337, 350-351 (1970) ................................................................28

Imation Corp. v. Quantum Corp., No. 01-1798, 2002 WL 385550, (D. Minn. March 8, 2002) ................26

Int'l Painters & Allied Trades Indust. Fund v. Tri-State Interiors, Inc.,
    357 F.Supp.2d 54, 55 (D. D.C. 2004) .......................................................................26

Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.,
    248 F.3d 1333 (Fed. Cir. 2001) ...............................................................................12

Intellectual Property Development, Inc. v. UA-Columbia Cablevision of Westchester, Inc.,
    336 F.3d 1308 (Fed. Cir. 2003) .........................................................................11, 12

*Jacobsen v. Oliver, 201 F.Supp.2d 93 (D. D.C. 2002)..............................................................5

Koteen v. Bermuda Cablevision, Ltd., 913 F.2d 973, 975 (D.C. Cir. 1990)..............................13

Kulko v. Superior Court, 436 U.S. 84, 92 (1978).........................................................................1

Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993) .....1

*Lex Tex Ltd., Inc. v. Skillman, 579 A.2d 244 (D.C. 1990) .........................................................5

*Lulling v. Barnaby's Family Inns, Inc., 482 F.Supp. 318 (D.C. Wis. 1980) ...........................29

McFarland v. Yegen, 699 F.Supp. 10, 13 (D. N.H. 1988) ........................................................18

Meyers v. Smith, 460 F.Supp. 621, 624 (D. D.C. 1978)...............................................................4

*Neuman v. Akman, 715 A.2d 127, 130-31 (D.C. 1998) ...................................................27, 28

Nicolas v. MCI Health and Welfare Plan, 453 F.Supp.2d 972, 974 (E.D. Tex. 2006)..............24, 25

Overstock.com, Inc. v. Furnace Brook, LLC, 420 F.Supp.2d 1217, 1218 (D. Utah 2005)........................12

*Pegasus Transp., Inc. v. Lynden Air Freight, Inc., 152 F.R.D. 574, 577 (N.D. Ill. 1993) ................26, 28

*Phillips v. Audio Active Ltd., 494 F.3d 378 (2nd Cir. 2007)................................20, 21, 24, 25

Plum Tree, Inc. v. Stockment, 488 F.2d 754, 757-58 (3d Cir.1973) .......................................25

Radtke v. Caschetta, No. 06-2031, 2007 WL 2071700, *4 (D. D.C. July 17, 2007)....................9

Red Sage Ltd. P'ship v. Despa Deutche Sparkassen Immobilien-Anlage-Gasellschaft,
    254 F.3d 1120, 1131 (D.C. Cir. 2001).......................................................................28

Rochon v. F.B.I., 691 F.Supp. 1548, 1559 (D. D.C. 1988)...........................................................3

*Sanchez v. AT&T Corp., No. 98-2123, 1999 WL 1427692 (S.D. Fla. Nov. 2, 1999).........................8, 9

Schmidt v. Am. Inst. of Physics, 322 F.Supp.2d 28, 32 (D. D.C. 2004) ................................17

*Sheraton Operating Corp. v. Just Corporate Travel, 984 F.Supp. 22, 25 (D. D.C. 1997)......................25

Shoppers Food Warehouse v. Moreno, 746 A.2d 320, 335 (D.C. 2000) ......................................7

Smith v. Jenkins, 452 A.2d 333, 337 (D.C. 1982)........................................................................8

Smith v. Lucent Technologies, Inc., No. 02-0481, 2004 WL 515769 (E.D. La. March 16, 2004) ......23, 24

Snider v. Lone Star Art Trading Co., Inc., 672 F.Supp. 977, 980 (E.D. Mich. 1987) ...............29

*The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972).....................................27, 29, 30

Turner & Newall, PLC v. Canadian Universal Ins. Co., 652 F.Supp. 1308, 1311 (D.D.C.1987)..............25

Varsic v. United States District Court, 607 F.2d 245, 248 (9th Cir. 1979).................................18

Vision Technology Design & Mfg., Inc. v. General Wire Spring Co., No. 07-412,
    2007 WL 2069945, *6-8 (E.D. Cal. 2007)................................................................26

## Statutes

28 U.S.C. § 1391(b)(1) .................................................................................................17
28 U.S.C. § 1391(b)(2) ............................................................................................ 17, 18
28 U.S.C. § 1391(c) .....................................................................................................17
28 U.S.C. § 1404(a) .......................................................................................... 25, 27, 28
29 U.S.C. § 1132(c) .....................................................................................................11
29 U.S.C. § 1132(c)(2)............................................................................................ 18, 26
29 U.S.C. §§ 1001 et seq. ("ERISA")....................................... 11, 13, 18, 24, 25, 26
D.C. Code § 13-423(a)(1) ..................................................................................... 7, 9, 14
D.C. Code § 13-423(a)(2) ...............................................................................................9
D.C. Code § 13-423(a)(4) ................................................................................10, 11, 12, 15
Fla. Sta. Ann. § 48.193(1)(a).........................................................................................9

## Treatises

C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3847 .............................................25

## Ethics Opinions

Legal Ethics Comm. of the D.C. Bar, Op. 181 (1987)....................................................... 27, 31

## Rules of Professional Conduct

D.C. R. Prof. Conduct 1.8(g).........................................................................................30
D.C. R. Prof. Conduct 5.4...............................................................................................31
*D.C. R. Prof. Conduct 5.6........................................................................................ 27, 31
Fla. R. Prof. Conduct 1.8(h).........................................................................................30
Fla. R. Prof. Conduct 4-5.4...........................................................................................31
Fla. R. Prof. Conduct 4-5.6...........................................................................................31

**INTRODUCTION**

Notwithstanding Defendants' efforts to cloud the waters of jurisdiction and venue with innumerable shades of grey (see Kulko v. Superior Court, 436 U.S. 84, 92 (1978)), the facts show that this Court clearly has personal jurisdiction over the Defendants and that this Court is the appropriate venue to try this lawsuit.

## I. This Court Has Personal Jurisdiction Over All of the Defendants

Defendants argue that this Court has no personal jurisdiction over them, stating that they are "not authorized to do business in the District of Columbia" and that they do not "regularly do business with the District of Columbia." (Def.Mot. Dismiss (DE 8), p. 7.) However, as described below, (1) IPD Analytics has continuous and systematic contacts with the District of Columbia, including its admitted practice of sending its employees to courts in this jurisdiction; (2) Intellectual Property Development has twice initiated litigation at a court located in this district; and (3) Mr. Krass has engaged in continuous and systematic recruiting activities in this district. These and other facts related herein[1] show that this Court has personal jurisdiction over all three Defendants. This Court must accept as these factual allegations as true. See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).

### A. This Court Has Personal Jurisdiction Over IPD Analytics

#### 1. This Court Has General Personal Jurisdiction Over IPD Analytics

##### a. IPD Analytics Continuously and Systematically Conducts Business in the District of Columbia

Since its inception in 2003, IPD Analytics has had continuous and systematic contacts with the District of Columbia. These contacts include: (1) sending employees to personally "observe federal court hearings concerning patents involving public companies" in forums in the District of Columbia (Krass

---

[1]    Plaintiff believes his Complaint (DE 1) gave Defendants sufficient notice of the jurisdictional facts elaborated upon in this opposition brief. Should the Court disagree, Plaintiff respectfully requests leave to amend his Complaint consistent with this brief.

Decl. (DE 8-2), ¶ 7); (2) recruiting attorneys within the District of Columbia (Cheney Decl. July 14, 2008, ¶¶ 5-10); and (3) staffing key positions within the company with members of the D.C. Bar. (id. ¶ 17, 23).

First, Defendant Howard Krass, IPD Analytics' CEO, admits that IPD Analytics sends its employees to personally "observe federal court hearings concerning patents involving public companies" in the District of Columbia. (See Krass Decl. (DE 8-2), ¶ 7.) However, Defendants omit any discussion of the systematic role that these contacts play in IPD Analytics' business. One of the main reasons clients subscribe to IPD Analytics is for legal analysis of hearings and trials in patent lawsuits. Clients use this analysis to arrange their investments before the court announces the outcome of the hearing or trial.

Defendants believe that their attorney employees can provide better predictions of the outcomes of cases by observing judges in person. (Cheney Decl. July 14, 2008, ¶ 5.) Thus, watching arguments in the District of Columbia is a systematic part of the legal services Defendants provide. IPD Analytics sends attorneys to Washington, D.C., more often than to any other jurisdiction. (Id. ¶ 11.) Mr. Krass tells clients his employees' experience as former law clerks provides them with a special analytical advantage when they watch hearings in D.C. (Id. ¶ 5.)

When an IPD Analytics attorney is assigned to attend a hearing in Washington, he or she writes a legal analysis of the hearing immediately following hearing's conclusion, while he or she is still physically present in the District. (Id. ¶ 12.) This report is then immediately distributed to clients by email. (Id.) IPD Analytics endeavors to transmit this information to its clients before news from the hearing permeates the market generally. (Id.) Also, an IPD Analytics attorney often will talk with clients on the telephone about the hearing while the attorney is still in the District. (Id.)

Defendants characterize their attendance at hearings in Washington as merely "occasional[ ]." (Def.Mot. Dismiss (DE 8), p. 11.) Plaintiff respectfully disagrees. IPD Analytics has spent tens of thousands of dollars sending attorney employees to the District of Columbia nearly every month since the inception of IPD Analytics in 2003. (Cheney Decl. July 14, 2008, ¶ 14.) Many trips are several days long. (Id. ¶ 15.) IPD Analytics sends employees to the U.S. Supreme Court, the U.S. Court of Appeals

for the District of Columbia, the U.S. Court of Appeals for the Federal Circuit, the U.S. International Trade Commission, and this Court, all of which are located in this judicial district. (Id. ¶ 16.)

In fact, less than 24 hours after Defendants represented to this Court that they "are not authorized to do business in the District of Columbia" (Def.Mot. Dismiss (DE 8), p. 7), Mr. Cheney personally observed and photographed two IPD Analytics employees at two different courts in the District of Columbia taking notes on two different lawsuits for IPD Analytics. (Cheney Decl. July 14, 2008, ¶¶ 26, 27.) These activities are precisely the kind of continuous, systematic contacts that subject a defendant to general personal jurisdiction in the forum.

IPD Analytics literally draws upon the resources of courts in this jurisdiction for its own financial benefit. IPD Analytics therefore should have reasonable anticipation that it can be haled into Court here. See Rochon v. F.B.I., 691 F.Supp. 1548, 1559 (D. D.C. 1988).

Second, IPD Analytics continuously and systematically recruits within the District of Columbia. IPD Analytics has a stated goal of hiring attorneys that have clerked at the U.S. Court of Appeals for the Federal Circuit because of the unique experience those clerks gain in patent law and in understanding the operations of the Federal Circuit, the court for all patent appeals. (Cheney Decl. July 14, 2008, ¶ 5.) All of the attorneys that write reports for IPD Analytics are former Federal Circuit clerks.[2] (Id.) Mr. Krass touts that experience to prospective clients as providing an analytical edge. IPD Analytics sends its employees to law clerk reunions and other bar events in the District of Columbia to recruit. (Id. ¶ 7.)

To elaborate, IPD Analytics has sent attorneys to recruit at the annual Federal Circuit law clerk reunion in Washington, D.C., each year since beginning business in 2003. (Id.) An IPD Analytics attorney recruited Mr. Cheney at the 2005 Federal Circuit law clerk reunion. (Id. ¶ 19.) After the Defendants hired Mr. Cheney, Mr. Krass assigned Mr. Cheney to recruit at the 2006 Federal Circuit law clerk reunion and the 2006 Federal Circuit Judicial Conference, both of which were in Washington, D.C.

---

[2]    Indeed, it was Mr. Cheney's experience as a Federal Circuit law clerk that prompted IPD Analytics to begin recruiting Mr. Cheney in 2005.

(Id. ¶ 8.) The Defendants' pattern has continued consistently for more than five years. In fact, after the Defendants terminated Mr. Cheney's employment, Mr. Cheney met an IPD Analytics attorney recruiting at a Washington, D.C., reception for former Federal Circuit law clerks in May of this year. (Id.)

In addition to in-person recruiting activities like those above, the Defendants and their employees solicit former Federal Circuit law clerks by telephoning their law offices in the District of Columbia. (Cheney Decl. July 14, 2008, ¶ 9.) The Defendants have contacted at least eight former law clerks in that manner. (Id. ¶ 10.) Upon information and belief, discovery in this lawsuit will reveal Defendants have had even more recruiting contacts in the District of Columbia.

Third, IPD Analytics avails itself of the benefits of this District through two key employees who are members of the D.C. Bar. (Id. ¶¶ 17, 23.) These employees have positions of responsibility and control.[3] Through these key employees, Defendants avail themselves of the privileges afforded to members of the bar, such as priority seating at crowded hearings. (Id. ¶¶ 13, 25.) This Court has personal jurisdiction over members of the D.C. Bar (see Meyers v. Smith, 460 F.Supp. 621, 624 (D. D.C. 1978) ("An attorney, an officer of the court, should not be free to escape the jurisdiction" of the court where he is admitted)), and IPD Analytics should be no less subject to personal jurisdiction in this Court when it avails itself of Bar privileges through its employees.

Defendants argue this Court should decline to exercise general personal jurisdiction over them as the Court declined to do in D'Onofrio v. SFX Sports Group, Inc., 534 F.Supp.2d 86, 89-90 (D. D.C. 2008). Plaintiff respectfully disagrees. The facts of this lawsuit are readily distinguished from D'Onofrio. In D'Onofrio, the defendants did not regularly do business with the District of Columbia and did not solicit business within the District. See id. In contrast, Defendants in this case regularly do

---

[3]     IPD Analytics employs less than 20 people. Under Mr. Krass, three lead attorneys are responsible for the three technology areas for which the company provides legal analysis. Two of these three attorneys are members of the D.C. Bar. (Id. ¶¶ 17, 23.) When Mr. Cheney was employed by IPDA, three key positions were staffed by members of the D.C. Bar.

business within the District of Columbia and regularly do solicit potential employees here, as described above.

### b.   The Government Contacts Exception Does Not Apply to This Case

The Defendants argue that their attendance at court hearings falls under the so-called "government contacts" exception to personal jurisdiction. (Def. Mot. Dismiss (DE 8), p. 11.) Plaintiff respectfully disagrees. An examination of relevant case law shows the exception does not apply to IPD Analytics' activities. For example, in Lex Tex Ltd., Inc. v. Skillman, 579 A.2d 244 (D.C. 1990), a client sued its Pennsylvania-residing patent attorney in the District of Columbia, claiming personal jurisdiction based on the attorney's appearance before the Patent Office in D.C. Id. at 250. The attorney claimed the government contacts exception covered his Patent Office appearance. Id. The court disagreed, holding that "one can hardly demand the right to come to the District of Columbia to pursue activities exclusively on behalf of an out-of-state principal and expect to be absolutely immune from suit here . . ." Id. Like the patent attorney in Lex Tex, the Defendants in this lawsuit come to D.C. courts not to pursue their own rights, but to obtain revenue from clients who pay them for services performed here. (Cheney Decl. July 14, 2008, ¶ 30.) The government contacts exception does not cover such activities. See Lex Tex, 579 A.2d at 250 (exception does not cover lawyer's appearance "on his client's behalf, not his own").

Similarly, Jacobsen v. Oliver, 201 F.Supp.2d 93 (D. D.C. 2002), touched on the government contacts exception and found that it did not apply to "legal advice regarding an ongoing lawsuit in the District" (see id. at 105 n. 8, 106). In Jacobsen, the defendant attorneys provided legal advice concerning a D.C. lawsuit to California residents who were not parties to the lawsuit. Id. at 106. The attorneys formulated the advice in, and communicated the advice from, their Pennsylvania office. Id. This Court concluded that the attorneys' actions were sufficiently connected to this forum to exercise personal jurisdiction over them. Id.

The Defendants in this lawsuit have even less ground to avoid jurisdiction than the defendants in Jacobsen. Unlike the advice given in Jacobsen, IPD Analytics attorneys formulate and communicate legal

5

advice while physically present in the District of Columbia. (Cheney Decl. July 14, 2008, ¶ 12.)

Providing legal advice to paying clients is a business transaction that does not fall under the government

contacts exception. See Brown v. Artery Organization, Inc., 654 F.Supp. 1106 (D. D.C. 1987)

("transaction of business in the District of Columbia between a principal and its agent is itself

jurisdictionally significant, even though the contacts between either or both of them and the government

are excludable under the government contacts doctrine."), citing Chase v. Pan-Pacific Broadcasting, Inc.,

617 F. Supp. 1414, 1420 (D. D.C. 1985); accord Fed. Land Bank of St. Paul v. Fed. Land Bank of Tex.,

Nos. 87-0085, 87-0601, 1987 WL 10518, *4 n. 10 (D. D.C. April 30, 1987); see also Dooley v. United

Technologies Corp., 786 F.Supp. 65, 75 n. 9 (D. D.C. 1992) (this Court is "hesitant to apply the

[government contacts] doctrine here where the defendants' contacts were in pursuit of a proprietary

interest"), separate holding abrogated by FC Investment Group LC v. IFX Markets, Ltd., No. 07-7037,

2008 WL 2468431 (D.C. Cir. Jun 20, 2008).

     The case Defendants cite to invoke the government contacts exception is inapposite to the facts of

this lawsuit. (See Def. Mot. Dismiss (DE 8), p. 11, citing Elemary v. Philipp Holzmann A.G., 533

F.Supp.2d 116, 128 n. 8 (D. D.C. 2008) (citation corrected).) Elemary concerned a contractor's visits to

D.C. "an average of once a year to meet with State Department officials" to discuss the contractor's own

contractual interests. See Elemary, 533 F.Supp.2d at 128 n. 8. The present lawsuit differs from Elemary

in at least two determinative aspects. First, IPD Analytics employees do not travel to this district to

pursue their own rights or the rights of their employer; they come because clients pay them for the

services they render here. Second, employees of IPD Analytics are in D.C. closer to an average of once a

month, not the average of once a year as in Elemary. In view of the foregoing precedents, the government

contacts exception cannot shield Defendants from personal jurisdiction in this District.

### 2. This Court Has Specific Personal Jurisdiction Over IPD Analytics Under D.C.'s Long-arm Statute

Even if this Court did not have general jurisdiction over IPD (which it does), there are ample grounds for specific jurisdiction under the District of Columbia long-arm statute. See D.C. Code § 13-423.

### a. Mr. Cheney's Claims Relate to IPD Analytics Recruiting Him in the District of Columbia

Section 13-423(a)(1) of D.C.'s long-arm statute provides personal jurisdiction over Defendants "transacting any business in the District of Columbia." See D.C. Code § 13-423(a)(1). This Court has noted that this provision is to be given "an expansive interpretation that is coexistent with the due process clause." Fletcher v. District of Columbia, 481 F.Supp.2d 156, 169-70 (D. D.C. 2007), quoting Helmer v. Doletskaya, 393 F.3d 201, 205 (D.C. Cir.2004); see also Shoppers Food Warehouse v. Moreno, 746 A.2d 320, 335 (D.C. 2000) (interpreting D.C.'s long-arm statute "flexibly" to cover claims that "relate to" or have a "substantial connection with" the District).

IPD Analytics transacted business in this District when recruiting Mr. Cheney for employment, and Mr. Cheney's claims in this lawsuit relate to that transaction. To elaborate, in October 2005, IPD Analytics sent Charles Haisch as its agent to the annual Federal Circuit law clerk reunion held at the National Courts Building in Washington, D.C. (Cheney Decl. July 14, 2008, ¶ 19.) Mr. Haisch is an attorney employed by IPD Analytics, is an active member of the D.C. Bar, and is a former Federal Circuit law clerk. (Id. ¶ 17.) At the reunion, Mr. Haisch began courting Mr. Cheney for employment with IPD Analytics. Mr. Haisch met with Mr. Cheney in Washington, D.C., two more times over the next three months to discuss possible employment with IPD Analytics.[4] (Id. ¶¶ 20, 21.) When Mr. Haisch met Mr.

---

[4]     Mr. Haisch also attended and analyzed hearings in the District of Columbia on these occasions, and provided legal advice to IPD Analytics clients while he was present in the District. (Cheney Decl. July 14, 2008, ¶¶ 20, 21.) These are additional business transactions covered by D.C.'s long-arm statute. See D.C. Code § 13 423(a)(1).

7

Cheney at a Washington restaurant on January 12, 2006, Mr. Haisch encouraged Mr. Cheney to interview at IPD Analytics' office in Florida. (Id. ¶ 21.)

Also during this recruiting process, Mr. Krass spoke with Mr. Cheney on the telephone while Mr. Cheney was at his office and home in Washington, D.C. (Cheney Decl. July 14, 2008, ¶ 1.) Mr. Krass sent Mr. Cheney email while Mr. Cheney was in D.C. (Id. ¶ 2.) Mr. Krass also sent Mr. Cheney an offer of employment to Mr. Cheney's Washington, D.C. address. (Id. ¶ 3.) These interactions led to the Equity Agreement at issue in this lawsuit. (See Cheney Decl. (DE 2) June 18, 2008 at Ex. C.) Mr. Cheney entered into that agreement while he was present in and a citizen of Washington, D.C. (Cheney Decl. July 14, 2008, ¶ 3.) Where Defendants' business activities in the District "resulted in a contract executed in the District," their contacts with this forum "are sufficient to subject them to personal jurisdiction in this forum consistent with due process." Smith v. Jenkins, 452 A.2d 333, 337 (D.C. 1982). By engaging in these business activities, IPD Analytics "certainly could have anticipated being haled into court here." See Fletcher, 481 F.Supp.2d at 170.

IPD Analytics' recruitment of Mr. Cheney analogous to the facts of Sanchez v. AT&T Corp., No. 98-2123, 1999 WL 1427692 (S.D. Fla. Nov. 2, 1999). In Sanchez, a defendant Mexican corporation recruited in Florida to "avail itself" that jurisdiction's "large supply" of Spanish-speaking candidates. See id. at *7. After one such recruiting visit, the defendant in Sanchez invited the plaintiff to interview in Mexico. Id. at *6. The court concluded that the defendant's Florida recruiting was part of its "overall implementation" of its business goals, and therefore there was "a substantial connection between plaintiff's employment claims" and defendants' recruiting activities in Florida. Id. at *7.

In the present lawsuit, IPD Analytics has business goal of recruiting former Federal Circuit clerks. (Cheney Decl. July 14, 2008, ¶ 5.) Compare Sanchez at *7. To that end, it avails itself of the "large supply" of former Federal Circuit clerks practicing in the District of Columbia. (Cheney Decl. July 14, 2008, ¶ 6.) Compare Sanchez at *7. Like the plaintiff's claims in Sanchez, Mr. Cheney's claims arise from Defendants' recruiting activities in this District. Those activities therefore provide a sufficient

8

basis for personal jurisdiction under D.C.'s long-arm statute.[5]  Sanchez at *7; see also Coats v. Penrod Drilling Corp., 5 F.3d 877, 882-83 (5th Cir. 1993) (defendants' "recruitment and hiring of employees" in forum satisfied long arm statute).

### b. Plaintiff's Claims Relate to IPD Analytics Contracting with Clients to Supply Services in the District of Columbia

Section 13-423(a)(2) of D.C.'s long-arm statute provides personal jurisdiction over Defendants "contracting to supply services in the District of Columbia." See D.C. Code § 13-423(a)(2). Mr. Krass admits that IPD Analytics contracts with clients to provide written reports "related to ongoing patent litigation . . . as well as telephone discussions" with IPD Analytics employees. (See Krass Decl. (DE 12), ¶¶ 2-3, and Ex. 1 thereto at ¶ 1.) Mr. Krass also admits that one way IPD Analytics fulfills these contracts is to send employees to "observe federal court hearings concerning patents involving public companies" in forums in the District of Columbia. (See Krass Decl. (DE 12), ¶ 7.) Thus, through its subscriber contracts IPD Analytics is "contracting to supply services in the District of Columbia" within the scope of D.C.'s long-arm statute. See D.C. Code § 13-423(a)(2).

IPD Analytics employed Mr. Cheney to fulfill its obligations under its subscriber contracts and frequently sent him to Washington, D.C., to do so.[6] (Cheney Decl. July 14, 2008, ¶ 12.) Because Plaintiff's claims arise from his employment while fulfilling Defendants' service contracts in this forum, Defendants are properly subject to personal jurisdiction in this Court. See id.; Radtke v. Caschetta, No. 06-2031, 2007 WL 2071700, *4 (D. D.C. July 17, 2007) (finding personal jurisdiction where employer engaged in business activities in the District to fulfill service contract).

---

[5]     The Florida long-arm statute at issue in Sanchez (see Sanchez, 1999 WL 1427692, at *2, n. 1) was similar in all material aspects to D.C.'s long arm statute. Compare Fla. Sta. Ann. § 48.193(1)(a) with D.C. Code § 13-423(a)(1).

[6]     Sending attorneys to work in D.C., described more fully in section I.A.1.a. of this memorandum, also satisfies the "transacting business" finger of the long-arm statute. See D.C. Code § 13-423(a)(1); compare Radtke v. Caschetta, No. 06-2031, 2007 WL 2071700, *3 (D. D.C. July 17, 2007) ("defendants transacted business and apparently contracted to supply services in the District of Columbia").

### c. The "Plus-factors" in This Case Render IPD Analytics Subject to Personal Jurisdiction Here for Tortious Acts Outside This District

Section 13-423(a)(4) of D.C.'s long-arm statute provides personal jurisdiction over one

causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

See D.C. Code § 13-423(a)(4). Defendants do not dispute that Plaintiff has sufficiently pled "tortious injury in the District," nor can they, as Plaintiff is a resident here. Further, Defendants admit that Plaintiff has sufficiently pled acts by the Defendants "outside the District of Columbia." (See Def. Mot. Dismiss (DE 8), p. 8-9.) However, Defendants contend that the Complaint fails to satisfy D.C.'s long-arm statute because the so-called "plus factors" in Section 13-423(a)(4) (compare D'Onofrio, 534 F.Supp.2d at 93) are not present in this lawsuit. (See Def. Mot. Dismiss (DE 8), p. 8-9.) Plaintiff respectfully disagrees.

The "plus factors" are: (1) regularly doing or soliciting business in the District; (2) engaging in any other persistent course of conduct in the District; or (3) deriving substantial revenue from goods used or consumed, or services rendered, in the District of Columbia. See D.C. Code § 13-423(a)(4); D'Onofrio, 534 F.Supp.2d at 93. Plaintiff has already established above that IPD Analytics satisfies the first two plus factors because (1) it regularly does business in the District of Columbia when it sends attorney employees to the District to observe and analyze hearings; and (2) it persistently recruits former Federal Circuit law clerks in this District.

As for the third plus factor, IPD Analytics derives substantial revenue from services rendered in the District of Columbia. Mr. Krass has submitted a typical subscriber contract showing that IPD Analytics receives at least $3,000 per subscriber per month.[7] (See Krass Decl. (DE 12), Ex. 1 thereto at "Attachment A," ¶ "Payment.") IPD Analytics has over 100 subscribers, which means that IPD Analytics receives at least $300,000 dollars every month for its legal services. (Cheney Decl. July 14, 2008, ¶ 30.)

---

[7]     The contract Mr. Krass submitted discloses introductory rates only. After the introductory period, the cost of the service doubles. (Cheney Decl. July 14, 2008, ¶ 30.)

Not a month has passed since the business began in 2003 that IPD Analytics did not provide legal advice relating to lawsuits pending in the District of Columbia. (Id. ¶ 11.) Thus, IPD Analytics is "deriving substantial revenue from . . . services rendered, in the District of Columbia." See D.C. Code § 13-423(a)(4).

### 3.   This Court Has Personal Jurisdiction Over IPD Analytics Under ERISA

This Court also has personal jurisdiction over IPD Analytics under the Employee Retirement Income Security Act of 1974 (29 U.S.C. §§ 1001 et seq. ("ERISA")). Section 1132(e) of ERISA authorizes nationwide service of process upon ERISA violators. See 29 U.S.C. § 1132(e); Flynn v. Ohio Building Restoration, Inc., 260 F.Supp.2d 156, 170 (D. D.C. 2003). Where Congress has authorized nationwide service of process, a federal court may exercise personal jurisdiction over any United States resident properly served. Combs v. Adkins & Adkins Coal Co., 597 F.Supp. 122, 125 (D. D.C. 1984). Defendants do not dispute that IPD Analytics was properly served in Florida. Thus, this Court has personal jurisdiction over IPD Analytics as an employer under ERISA. See I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc., 699 F.2d 1254, 1257-58 (D.C. Cir.1983) (because party was properly served in New York, District of Columbia court could properly exercise personal jurisdiction over it under ERISA); Flynn, 260 F.Supp.2d at 170.

### B.   This Court Has Personal Jurisdiction Over Intellectual Property Development

#### 1.   Intellectual Property Development Has Previously Availed Itself of Courts and Counsel in This Jurisdiction

Defendants do not dispute that Plaintiff has sufficiently alleged injury to him in the District of Columbia by Intellectual Property Development. (See Def. Mot. Dismiss (DE 8), p. 12 n. 1.) Defendants instead contend that "Intellectual Property Development, Inc. has no contacts with the District of Columbia." (Id.) Plaintiff respectfully disagrees. Intellectual Property Development has filed and prosecuted at least two appeals at the U.S. Court of Appeals for the Federal Circuit, which is located in the District of Columbia. See Intellectual Property Development, Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d 1308 (Fed. Cir. 2003); Intellectual Property Development, Inc. v. TCI

11

Cablevision of California, Inc., 248 F.3d 1333 (Fed. Cir. 2001). At the time of those appeals, Intellectual Property Development was a so-called "patent troll" attempting to generate revenue by suing others for patent infringement.[8] (Cheney Decl. July 14, 2008, ¶ 28.) The listed appeals were not only an important part of Intellectual Property Development's business, they were its only business at the time. (Id.) The appellate lawsuits provide sufficient basis for personal jurisdiction over Intellectual Property Development in this Court at least under Section 13-423(a)(4) of D.C.'s long-arm statute. See D.C. Code § 13-423(a)(4); compare Continental Cas. Co. v. State of New York Mortg. Agency, No. 94 C 1463, 1994 WL 532271, *9-10 (N.D. Ill. Sep 26, 1994) (defendant's earlier, unrelated lawsuits in state courts were "evidence that it conducts an important part of its business" within the jurisdiction, subjecting defendant to personal jurisdiction in federal court).

When a party comes to the District of Columbia to avail itself of a court located here, "there is nothing arbitrary or unreasonable in treating him as being [here] for all purposes for which justice . . . requires his presence. It is the price which the state may exact as the condition of opening its courts." Adam v. Saenger, 303 U.S. 59, 67-68 (1938). By filing and prosecuting multiple appeals at the Federal Circuit, Intellectual Property Development has subjected itself to D.C. courts for the purposes of personal jurisdiction. General Contracting & Trading Co., LLC v. Interpole, Inc., 940 F.2d 20, 23 n. 4 (1st Cir. 1991) ("In the context of personal jurisdiction, it is settled that the concept of a 'state's courts' includes those federal courts located within the state.").

Further, Intellectual Property Development retained a law firm located in the District of Columbia to prosecute its appeal. See Intellectual Property Development, Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d at 1308 (listing Washington, D.C., counsel). Mr. Krass' declaration is notably silent about his contacts with the District of Columbia between 2000 and 2003—the years he was pursuing litigation through Intellectual Property Development in D.C. (See Krass Decl. (DE-12) at ¶¶ 6,

---

[8]    One federal court defines a patent troll as "somebody who tries to make a lot of money off a patent that they are not practicing and have no intention of practicing and . . . [have] never practiced." See Overstock.com, Inc. v. Furnace Brook, LLC, 420 F.Supp.2d 1217, 1218 (D. Utah 2005) (citations omitted).

8.) Undoubtedly, discovery will reveal he and Intellectual Property Development had substantial contacts with this District and with counsel in this District during that time. Retaining and interacting with counsel in D.C. yields personal jurisdiction at least under D.C.'s long arm statute. Koteen v. Bermuda Cablevision, Ltd., 913 F.2d 973, 975 (D.C. Cir. 1990). The notions of fair play and substantial justice will not be offended by exercising personal jurisdiction over Intellectual Property Development in these circumstances. See Koteen, 913 F.2d at 975; Continental Cas. Co., 1994 WL 532271 at *9-10.

## 2. The Contacts of IPD Analytics Should Be Imputed to Intellectual Property Development

The facts described above are sufficient for this Court to exercise personal jurisdiction over Intellectual Property Development, but another independent jurisdictional basis merits note. Plaintiff has asserted, and Defendant did not dispute, that Intellectual Property Development is a corporate shell that currently has no substantial business independent of IPD Analytics. (Compare Complaint (DE-1) at ¶ 4, with Def. Mot. Dismiss (DE 8), p. 12 n. 1.) Intellectual Property Development has no physical address other than the offices of IPD Analytics. (Cheney Decl. July 14, 2008, ¶ 29.) The two corporate entities are virtually indistinguishable, and Mr. Krass exercises total control over both. (Id.) For example, Mr. Krass used a shareholder in Intellectual Property Development as his agent in pre-litigation discussions with Mr. Cheney. (Id. ¶ 32.) This shows Mr. Krass mingles the resources of the two companies and allows a representative of one company to bind the other. In these circumstances, where unity of interest and control are complete and undisputed, the contacts giving rise to personal jurisdiction over IPD Analytics should be imputed to Intellectual Property Development. See generally Donatelli v. National Hockey League, 893 F.2d 459 (1st Cir.1990).

## C. This Court Has Personal Jurisdiction Over Mr. Krass

### 1. This Court Has Personal Jurisdiction Over Mr. Krass Under ERISA

This Court has personal jurisdiction over Mr. Krass at least under ERISA. Mr. Krass admits he is an employer and a trustee of the IPD Analytics 401(k) at issue in this lawsuit (see Krass Decl. (DE 12), ¶¶ 1, 13) and he does not dispute that he was properly served in Florida. Thus, this Court has personal

jurisdiction over him as an employer and fiduciary under ERISA. See section I.A.3 supra; I.A.M. Nat'l
Pension Fund v. Wakefield Indus., Inc., 699 F.2d 1254, 1257-58; Flynn, 260 F.Supp.2d at 170.

## 2. This Court Has Personal Jurisdiction Over Mr. Krass Under the D.C. Long-arm Statute.

Defendants represent that "Mr. Krass has no contacts with the District of Columbia." (Def. Mot.
Dismiss (DE 8), p. 12 n. 1.) Plaintiff respectfully disagrees. Mr. Krass admits he has been present in this
jurisdiction (Krass Decl. (DE 12) at ¶ 6), but has provided no explanation about the nature of that contact.
Further, Mr. Krass is silent about his contacts with this District from 2000-2003, years in which he
pursued lawsuits at a court located in this District. See section I.B.1. supra. As demonstrated herein,
Plaintiff has made a prima facie showing of personal jurisdiction over Mr. Krass. If Mr. Krass remains
silence about these alleged contacts, this Court should exercise jurisdiction over him.

As described in section I.A.2.a. of this brief, Mr. Krass has "transact[ed] business" in the District
within the scope of D.C.'s long-arm statute at least by recruiting Mr. Cheney. See D.C. Code
§ 13-423(a)(1). Mr. Krass knew that Mr. Cheney was a resident of the District of Columbia when he
recruited Mr. Cheney, and he knew he was recruiting Mr. Cheney for work that would involve significant
travel to this District. (Cheney Decl. July 14, 2008, ¶ 1.) Mr. Krass contacted Mr. Cheney on the
telephone at Mr. Cheney's office in Washington, D.C. and sent Mr. Cheney a written offer of
employment to Mr. Cheney's address in Washington, D.C. (Id. ¶¶ 1, 2.) Mr. Krass is the only person
within either defendant corporation with authority to hire an employee. (Id. ¶ 1.)

Under these circumstances, Mr. Krass' contacts with this forum give this Court jurisdiction over
him in his personal capacity. See Calder v. Jones, 465 U.S. 783, 790 (1984) (status as an employee "does
not somehow insulate" individual from jurisdiction); see also Donovan v. Grim Hotel Co., 747 F.2d 966,
974 (5th Cir. 1984) (finding personal jurisdiction over company officer, noting "an employer fairly may
be sued for employment practices in the forum in which he has recruited his employees and caused them
to undertake their work."); Flynn, 260 F.Supp.2d at 170 (whether or not defendant will be found liable in
personal capacity "is a separate issue from whether there exists jurisdiction" over individual).

14

Mr. Krass states in his declaration, "I do not derive substantial revenue from . . . services rendered[ ] in the District of Columbia." (Krass Decl. (DE 12), ¶ 6.) Plaintiff respectfully disagrees. As noted above in section I.A.2.c., IPD Analytics derives significant revenue from providing legal services in the District of Columbia. Mr. Krass obtains revenue from these services through salary as an IPD Analytics employee, through dividends as an IPD Analytics equity holder, and through his interest as a major shareholder of Intellectual Property Development, the parent corporation of IPD Analytics. (Cheney Decl. July 14, 2008, ¶ 30.) These revenues provide another basis for personal jurisdiction over Mr. Krass under D.C.'s long-arm statute. See D.C. Code § 13-423(a)(4).

### 3. The Contacts of IPD Analytics and Intellectual Property Development Should Be Imputed to Mr. Krass Personally

Mr. Krass is also subject to personal jurisdiction in this Court because he exerts a unity of interest and control over the two corporate Defendants, and the contacts of those Defendants with this forum should be imputed to him. See Covington & Burling v. Int'l Marketing & Research, Inc., 2003 WL 21384825 (D.C. Super. Ct. April 17, 2003). In Covington & Burling, a D.C. court found personal jurisdiction over two corporate officers in their individual capacity because they were "the only corporate officers" of the corporation, they "set company policies and procedures," and they had "involvement and supervision of all aspects of the company." Id. at *6.

Mr. Krass' relationship to the two corporate defendants here is directly analogous to Covington & Burling. Plaintiff is aware of no corporate officers in the two defendant companies other than Mr. Krass. (Cheney Decl. July 14, 2008, ¶ 29.) Mr. Krass sets all company policies for both companies and has supervision of all aspects of both companies. (Id.) For example, at Mr. Krass' direction, IPD Analytics has only one main phone number; its attorney employees do not have individual extensions. (Id.) This allows Mr. Krass to monitor each call that comes into the company. (Id.) All reports distributed by IPD Analytics from Mr. Krass' email account. (Id.) Mr. Krass personally controls all contact information for clients. (Id.) In such circumstances, Mr. Krass is "not insulated from this court's jurisdiction." Covington & Burling, 2003 WL 21384825 at *6.

## D. Asserting Personal Jurisdiction Over All Defendants Comports with Fair Play and Substantial Justice

Defendants argue that haling them into court in the District of Columbia would be unfair because (1) a D.C. lawsuit would burden Defendants residing in Florida; (2) the District of Columbia has "no interest" in this lawsuit; (3) Plaintiff's dispute relates only to events that occurred in Florida; and (4) some unidentified "social policies" will be "best served by Florida courts determining what happened in Florida." (See Def. Mot. Dismiss (DE 8), p. 13.)

Plaintiff respectfully disagrees on all counts. First, Defendants have previously litigated in Washington, D.C., for years by their own choice, and they send employees to this District nearly every month, often for several days at a time. As to Defendants' second point, the District of Columbia has a substantial interest in protecting Mr. Cheney's right as a member of the D.C. Bar to practice law. Further, when one of the District's citizens is fraudulently induced away from its borders, as was Mr. Cheney, the District has a substantial interest in vindicating that citizen when he returns and seeks redress through the District's courts.

Third, Defendants are incorrect in their assertion that this dispute relates only to events that occurred Florida. Mr. Cheney entered into the disputed Equity Agreement while physically present in Washington, D.C. (Cheney Decl. July 14, 2008, ¶ 2.) Further, Defendants do not dispute that Mr. Cheney, a current citizen of the District of Columbia, has pled ongoing harm to him in this District. As to Defendants' fourth point about a supposed social policy favoring "Florida courts determining what happened in Florida," the U.S. Supreme Court was unrestrained by any such policy in Calder v. Jones. There the Supreme Court affirmed a California court's assertion of personal jurisdiction over defendants in a lawsuit where all conduct giving rise to the complaint occurred in Florida. See 465 U.S. at 787, 789.

## II. This Court Is the Proper Venue for This Lawsuit

### A. Venue Is Proper Under 28 U.S.C. § 1391

Defendants contend that 28 U.S.C. § 1391 cannot supply proper venue in this District because the Defendants "[n]o defendants reside in the District of Columbia" and because "events or omissions giving

16

rise to the claims occurred in Florida, not the District of Columbia." (See Def. Mot. Dismiss (DE 8), p. 14.) Plaintiff respectfully disagrees with both contentions.

28 U.S.C. § 1391(b)(1) allows venue in "a judicial district where any defendant resides, if all defendants reside in the same State." Defendants admit that "all three defendants reside in Florida." (See Def. Mot. Dismiss (DE 8), p. 14.) Thus, the only question that remains under § 1391(b)(1) is whether any of the Defendants also resides in the District of Columbia. At least one of the Defendants, Intellectual Property Development, Inc., is a corporation. Corporate defendants may reside in multiple jurisdictions, and 28 U.S.C. § 1391(c) grants venue in any district in which the corporation is subject to personal jurisdiction. 28 U.S.C. § 1391(b)-(c); Schmidt v. Am. Inst. of Physics, 322 F.Supp.2d 28, 32 (D. D.C. 2004). As explained in section I.B. of this brief, this Court has personal jurisdiction over Intellectual Property Development at least because it has initiated litigation at a court located in this District. Accordingly, venue is proper in this Court at least under § 1391(b)(1).

Venue is also proper under 28 U.S.C. § 1391(b)(2). That section provides venue in "a judicial district in which a substantial part of the events . . . giving rise to the claim occurred." Id. In evaluating whether venue is proper under § 1391, this Court has held that it is inappropriate to ask which district is the "best" venue, or which venue has the most significant connection to the claim. FC Investment Group LC v. Lichtenstein, 441 F.Supp.2d 3, 11 (D. D.C. 2006). The proper question is "whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts." Id. In determining venue, a court should not focus only on those matters that are in dispute or that directly led to the filing of the action. Id. Rather, it should review "the entire sequence of events underlying the claim." Id.

As described in section I. of this brief, the sequence of events underlying Mr. Cheney's claims begins in this District. Defendants recruited Mr. Cheney in this District with a series of significant contacts, in person, on the telephone, and email, and through the mail. (Cheney Decl. July 14, 2008, ¶¶ 1, 2.) Mr. Cheney was in the District of Columbia when he entered into the equity agreement disputed in

17

this lawsuit. (Id. ¶ 1.) The Defendants regularly sent Mr. Cheney to Washington, D.C., to perform his duties. (Id. ¶ 12.) Mr. Cheney's performance of those duties should have yielded Mr. Cheney equity ownership in IPD Analytics under the Equity Agreement. (Cheney Decl. June 18, 2008 (DE 2) at Ex. C.)

This sequence of events argues even more persuasively for venue here than the facts in FC Investment Group v. Lichtenstein. In that case, transactions with a D.C. office by "telephone and facsimile alone" were enough for venue in this District. 441 F.Supp.2d at 9, 11. Venue is no less proper in this lawsuit under 28 U.S.C. § 1391(b)(2).

### B. Venue Is Proper Under ERISA, 29 U.S.C. § 1132

Defendants admit that under ERISA, 29 U.S.C. § 1132(e)(2), venue is proper in a district "where a defendant resides, or may be found." (See Def. Mot. Dismiss (DE 8), p. 15.)[9] The test for determining where an ERISA defendant may be "found" is soundly stated in Varsic v. United States District Court, 607 F.2d 245, 248 (9th Cir. 1979): "if personal jurisdiction is properly asserted over the [defendant], it is 'found' there" and venue is proper. The D.C. Circuit has adopted this test (see I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc., 699 F.2d at 1257), and the case cited by Defendants adopts this test. (See Def. Mot. Dismiss (DE 8), p. 15, citing McFarland v. Yegen, 699 F.Supp. 10, 13 (D. N.H. 1988) (citation corrected).) Thus, if this Court has personal jurisdiction over Defendants, Defendants must concede that venue is proper here for the ERISA claims. Plaintiff has shown by the facts in section I. of this brief that this Court has personal jurisdiction over all Defendants. Accordingly, venue is proper in this District under 29 U.S.C. § 1132(e)(2) at least on that basis. See I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc., 699 F.2d at 1257.

Defendants' argument that D.C. is not the venue where Defendants' ERISA breaches "occurred" (see 29 U.S.C. § 1132(e)(2)) is also unavailing. Defendants concede that in evaluating where an ERISA

---

[9]     Defendants appear to argue that venue in this District would somehow violate due process. (See Defs.' Mot. Dismiss (DE 8), p. 15.) However, in I.A.M. Nat. Pension Fund Plan A v. Technical Tape, Inc., No. 87-2451, 1988 WL 13287 (D. D.C. 1988), this Court explained, "The proper venue for suits in federal court is governed by federal statute and has no roots in due process. Venue is 'primarily a matter of choosing a convenient forum' and is unrelated to the jurisdiction of the Court over the parties or subject matter." Id. at *4 (citations omitted).

breach occurred, courts "look to where plan benefits are sent." (See Def. Mot. Dismiss (DE 8), p. 15.) For example, in Bostic v. Ohio River Co. Basic Pension Plan, 517 F.Supp. 627 (S.D. W.Va. 1981), the court adopted the "majority view" that in ERISA actions, the breach occurs—and therefore venue is proper—at "the place where pension benefits are received, which is plaintiff's residence." Id. at 636.

Defendants do not dispute that Mr. Cheney's residence is in Washington, D.C. They attempt to avoid venue by noting that Mr. Cheney's funds must pass through a bank in Missouri before he may exercise control over them. (Def. Mot. Dismiss (DE 8), p. 16.) That red herring does not change the fact that the funds belong to Mr. Cheney and he should have access to them in this District.[10]  Further, the COBRA notice that Defendants are required to provide (and which is part of ERISA) should have been sent to Mr. Cheney at his forwarding address in the District of Columbia. This is additional evidence that Defendants' ERISA breaches are occurring in this District, making venue here proper.

### III. Venue in This District Is Proper Notwithstanding the Purported Forum Selection Clause

Defendants' argue that a purported forum-selection agreement between the parties makes venue for this lawsuit improper in this District. (See Def. Mot. Dismiss (DE 8) at pp. 2-3, quoting "Employment Agreement," ¶ 1.8, in Ex. 1 to Krass Decl.) Venue is proper here if any one of the following are true: (1) the forum selection clause does not encompass all of the claims of the lawsuit and this Court is a proper venue to try all claims together; (2) the private and public interests dictate against enforcement of the forum selection clause; or (3) the forum selection clause is invalid. Because not only one—but all three—of the preceding conditions are true, venue is proper in this Court.

---

[10]      Through correspondence from counsel, Defendants allege they have attempted to transfer Mr. Cheney's funds. These alleged attempts were made after the lawsuit was filed and "Defendants cannot defeat personal jurisdiction by engaging in strategic post-Complaint behavior." Allen v. Russian Federation, 522 F.Supp.2d 167, 193-94 (D. D.C. 2007). Further, even if Defendants did release all of the funds in the account they hold for him, those funds lack additional required contributions, as pled in Count VIII of the Complaint. Breach in this District is ongoing because Mr. Cheney is entitled to receive those yet-to-be-contributed funds here. Bostic, 517 F.Supp. at 636.

### A. This Court Is the Proper Venue to Try All of Mr. Cheney's Claims Together

#### 1. Most of Plaintiff's Claims Are Beyond the Scope of the Purported Forum Selection Clause

First, even if the forum selection agreement were valid and enforceable, it would not even apply to most of Plaintiff's claims. By its own terms, the clause at most would cover "litigation . . . which arises out of this Agreement." (Employment Agreement at ¶ 1.8., emphasis added.) This language is bounded. It does not cover any "issue" Mr. Cheney may dispute with Defendants, as Defendants suggest in their motion. (See Def. Mot. Dismiss, pp. 2, 3.)

An opinion from the Second Circuit in Phillips v. Audio Active Ltd., 494 F.3d 378 (2nd Cir. 2007) is instructive here. The Phillips case concerned a forum selection clause in a recording artist's contract containing the same "arise out of" language at issue here. Id. at 389. The court determined that "arise out of" means "to originate from a specified source." Id. (emphasis added). Citing Supreme Court precedents, the court rejected the broad interpretation of the phrase that Defendants advance in this lawsuit:

> We do not understand the words "arise out of" as encompassing all claims that have some possible relationship with the contract, including claims that may only "relate to," be "associated with," or "arise in connection with" the contract.

Id. (citations omitted). The Phillips court decided that the artist's claims for copyright infringement (a federal cause of action) did not "arise out of" the recording contract, even though the allegedly infringed works were recorded under the contract. Id. Further, the Phillips court found that the artist's state law claims for unjust enrichment and unfair competition based on defendants' exploitation of recordings made under the contract also did not "arise out of" the recording contract. Id. Thus, despite the recording contract's forum selection clause, the Southern District of New York court was the proper venue for the artist's copyright infringement and state law claims. Id.

Tellingly, Defendants did not provide a claim-by-claim analysis with respect to the forum selection clause they assert. Such an analysis shows that the gravamen of the Complaint is well beyond the scope of the clause. Several of Mr. Cheney's claims concern three agreements that are distinct from

20

the Employment Agreement: the Subscription Agreement, the Offer Letter, and the IPD Analytics 401(k) Plan documents. None of those documents have a forum selection clause. Other claims Mr. Cheney raises do not implicate the existence of a contract at all.

### a. Mr. Cheney's Challenge of the Subscription Agreement Does Not "Arise Out of" the Employment Agreement

Count III of Mr. Cheney's Complaint (one of the Counts at issue in Mr. Cheney's motion for preliminary injunction) alleges that an anti-competitive clause in the IPD Analytics Subscription Agreement impinges on Mr. Cheney's right to practice law. The Subscription Agreement is completely unrelated to the Employment Agreement containing the purported forum selection clause. (See Krass Decl. (DE 12) at Ex. 1, "Subscription Agreement," which has text identical to copy in Cheney Decl. June 18, 2008 (DE 2) at Ex. C.) The Subscription Agreement itself contains no forum selection clause. (Id.) Mr. Cheney is not a party to any Subscription Agreement and was completely unaware of any Subscription Agreement at the time Defendants asked him to sign the Employment Agreement. (Cheney Decl. July 14, 2008, ¶ 3.) In light of these facts, Defendants' argument that Mr. Cheney "agreed" challenge the Subscription Agreement in Florida lacks merit.

### b. Mr. Cheney's State Law Claims Do Not "Arise Out of" the Employment Agreement

Plaintiff's Count I (for enforcement of rules of professional conduct), Count VI (for fraudulent inducement), and Count VII (for promissory estoppel), are analogous to the artist's state law claims for unjust enrichment and unfair competition in Phillips. They do not "arise out of" the Employment Agreement and therefore are not subject to the forum selection clause. See Phillips, 494 F.3d at 389.

Mr. Cheney's Counts I, VI, and VII are also similar to the claims for fraudulent inducement and oral breach of contract in Gullion v. JLG Serviceplus, Inc., No. 06-1015, 2007 WL 294174 (S.D. Tex. Jan. 29, 2007). Mr. Cheney's Counts I, VI, and VII "do not 'ultimately depend' on the existence of an Employment Agreement" and "the claims do not require an interpretation of the Employment Agreement." Id. at *6, 7. Thus, like the claims in Gullion, they are not within the scope of the

21

Employment Agreement's forum selection clause. Id.; see also Armco Inc. v. North Atlantic Ins. Co.
Ltd., 68 F.Supp.2d 330, 338 (S.D. N.Y. 1999) (claims for fraud surrounding contract formation "should
be viewed independently of that contract" and are therefore not subject to forum selection clause).

### c.   Mr. Cheney's Breach of Contract Claim Does Not "Arise Out of" the Employment Agreement

Even Mr. Cheney's Count V for breach of contract does not "arise out of" the Employment
Agreement.  Count V concerns Defendants' breach of their promise to provide Mr. Cheney with equity
ownership in IPD Analytics.  The Defendants formalized their promise of equity to Mr. Cheney in an
"Offer Letter" transmitted by email to Mr. Cheney on February 3, 2006.  (Cheney Decl., June 18, 2008
(DE 2) at Ex. C.)[11]  Evaluation of Defendants' failure to grant equity as promised in the Offer Letter
"do[es] not require an interpretation of the Employment Agreement."  Compare Gullion, 2007 WL
294174 at *7.  Accordingly, this breach of contract claim is not with the scope of the forum selection
clause in the Employment Agreement.

Defendants may attempt to argue that the Offer Letter and the Employment Agreement are
integrated documents, so that the forum selection clause in the latter applies to the former.  (See Krass
Decl. (DE 12) at Ex. 2, ¶ 1.9.)  This argument is without merit for several reasons.  First, the two
documents were executed separately.  The parties executed the Equity Agreement, of which the Offer
Letter was a part, on February 3, 2006.  (Cheney Decl., June 18, 2008 (DE) at Ex. C.)  Defendants did not
send the Employment Agreement to Mr. Cheney until February 6, 2006, and apparently Defendants
executed the Employment Agreement a month later on March 6, 2006.  (Krass Decl. (DE 12) at Ex. 2.)

Second, the Employment Agreement and the Equity Agreement involving the Offer Letter
became effective on different dates.  The Equity Agreement had no provision delaying its effective date,
and therefore became effective upon execution on February 3, 2006.  (Cheney Decl. June 18, 2008 (DE 2)

---

[11]     This "Offer Letter" is part of a larger transaction that Mr. Cheney's Complaint refers to as the Equity
Agreement.  (See Complaint (DE 1) at ¶ 18.)  The Employment Agreement introduces the designation "Offer Letter"
for one of the documents transmitted on February 3, 2006.  (See Krass Decl. (DE 12) at Ex. 2, ¶ "WHEREAS.".
¶ 1.9.)

at Ex. C.) In contrast, the Employment Agreement expressly states that it became "effective as of Employee's first day of employment," which was March 6, 2006. (Krass Decl. (DE 12) at Ex. 2.)

Third, the Employment Agreement expressly distinguishes itself from the Offer Letter. For example, the first paragraph of the Employment Agreement defines that document as "the Agreement." (Krass Decl. (DE 12) at Ex. 2.) The second paragraph expressly identifies the "offer letter" as a "separate" document. (Id. at ¶ "WHEREAS".) Paragraph 1.9 of the Employment Agreement uses capitalization to indicate the "Agreement" is defined differently from the "Offer Letter." (Id. at ¶ 19.)

Fourth, and significantly, even if the two documents are integrated for some purposes, the forum selection clause is expressly tied to only "litigation . . . which arises out of this Agreement," which the document defines as the Employment Agreement. (Id. at ¶ 1.8., emphasis added.) This interpretation is reinforced by paragraph 1.9 of the Employment Agreement, entitled "Entire Agreement; Amendments." (Id. at ¶ 1.9.) Paragraph 1.9 states that there is an additional agreement between the parties, referred to as the "entire understanding." (Id.) Paragraph 1.9 defines the "entire understanding" as containing three separate parts: "[t]his Agreement" (which is defined in the first paragraph to be the "Employment Agreement"), "the Offer Letter" (which is defined in the second paragraph as a "separate" document), and "the Recitals." (Id.) The purported forum selection clause expressly applies to only one of these three parts: "this Agreement," i.e., the Employment Agreement. (Id. at ¶ 1.8.)

The facts here are similar to Smith v. Lucent Technologies, Inc., No. 02-0481, 2004 WL 515769 (E.D. La. March 16, 2004). That case concerned a contract that expressly referred to an earlier document ("the September Note") and contained an integration clause nearly identical to the clause in this lawsuit. Id. at *16. The contract also contained a forum selection clause that purported to cover claims "relating directly or indirectly to this Agreement." Id. at *17 (emphasis by court). The court found that the forum selection clause would not cover a dispute over the September Note, notwithstanding the integration clause, because the forum selection clause was expressly "confined to" disputes over the defined "Agreement." Id.

23

Defendants in this lawsuit have even less claim than the defendants in <u>Lucent</u> for expanding the forum selection clause they drafted. The clause in <u>Lucent</u> included the broader language "relating directly or indirectly" (<u>id.</u>); the contract Defendants drafted uses the much more limited phrase "arises out of." <u>See Phillips</u>, 494 F.3d at 389 (holding "arise out of" is narrower than "relate to"). Further, if the Defendants had intended the forum selection clause to cover either the Offer letter or the "entire understanding" formed in paragraph 1.9 of the Employment Agreement, they could have so stated expressly. For at least these reasons, Count V is not subject to the purported forum selection clause.[12]

### d. Mr. Cheney's ERISA Claims Do Not "Arise Out of" the Employment Agreement

Plaintiff's Counts VIII, IX, and X relate Defendants' violations of ERISA in relation to the IPD Analytics 401(k) plan. These Counts do not "arise out of" the Employment Agreement. For example, Mr. Krass' personal breach of his fiduciary duty as a plan trustee (Count IX) is not related to the Employment Agreement. Further, the IPD Analytics 401(k) plan was instituted in December 2006, nearly a year after Defendants asked Mr. Cheney to sign the Employment Agreement. (Cheney Decl. July 14, 2008, ¶ 4.) 401(k) plan benefits did not form any part of the consideration for Mr. Cheney's employment in February 2006. Thus, Defendants are incorrect to assert that "Mr. Cheney agreed" in the Employment Agreement to litigate in Florida "the issues he now presents" in relation to the 401(k) plan.

IPD Analtyics 401(k) plan is governed by a separate contract that has no forum selection clause. Even if it did, a forum selection clause cannot "override" ERISA's Congressionally enacted statutory framework "aimed at assisting employees" by providing expansive options for venue. <u>See Nicolas v. MCI Health and Welfare Plan</u>, 453 F.Supp.2d 972, 974 (E.D. Tex. 2006) (refusing to enforce forum selection clause in ERISA dispute because "Congress intended that the venue provision for ERISA claimants be broad").

---

[12]     A passage in the Offer Letter stating that execution of the Employment Agreement is a condition of employment is no more helpful for Defendants. (Cheney Decl., June 18, 2008 (DE 2) at Ex. C.) At best, that passage merely required Mr. Cheney to accept the forum selection clause in the Employment Agreement. As shown above, the clause still expressly would not cover disputes over the Offer Letter.

Further, Plaintiff's Count XI arises from a federal statutory requirement that Defendants provide COBRA notice to a terminated employee. This federal cause of action is similar to the artist's federal copyright claim in <u>Phillips</u>. <u>Compare Phillips</u>, 494 F.3d at 389. Because the forum selection clause would only cover a claim that specifically "originates from" the Employment Agreement, Plaintiff's COBRA claim is not subject to the clause. <u>See id</u>. Also, COBRA is part of ERISA (<u>see Holford v. Exhibit Design Consultants</u>, 218 F.Supp.2d 901, 904 (W.D. Mich. 2002)), and a forum selection clause cannot trump Congressional provisions for broad ERISA venue. <u>See Nicolas</u>, 453 F.Supp.2d at 974.

## 2. The Interests of Justice and the Convenience of the Parties and Witnesses Require Trial of All Claims in This District, Mr. Cheney's Chosen Forum

As demonstrated above, nine of Plaintiff's Counts, including some at issue in his preliminary injunction motion, are not within the scope of the purported forum selection clause, rendering venue proper in this forum. As for Plaintiff's remaining two Counts (Counts II and IV), the presence of a purported forum selection agreement does not conclusively require a court to dismiss those claims or to transfer them to Florida. This Court has explained,

> A contractual provision specifying the forum for any litigation arising out of the contract <u>cannot be decisive</u> on a motion to transfer. Congress set down in [28 U.S.C.] § 1404(a) the factors it thought should be decisive on a motion for transfer. Only one of these—the convenience of the parties—is properly within the power of the parties themselves to affect by a forum-selection clause. The other factors—the convenience of the witnesses and the interest of justice—are third party or public interests that must be weighed by the district court; they cannot be automatically outweighed by the existence of a purely private agreement between the parties.

<u>Sheraton Operating Corp. v. Just Corporate Travel</u>, 984 F.Supp. 22, 25 (D. D.C. 1997) (emphasis added), quoting <u>Turner & Newall, PLC v. Canadian Universal Ins. Co.</u>, 652 F.Supp. 1308, 1311 (D.D.C.1987) (quoting C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3847, quoting <u>Plum Tree, Inc. v. Stockment</u>, 488 F.2d 754, 757-58 (3d Cir.1973) (citation corrected)). Thus, under 28 U.S.C. § 1404(a), this Court must determine whether transferring Counts II and IV to Florida would advance the interests of justice and must examine how the transfer would affect parties and witnesses.[13]

---

[13]    Plaintiff focuses his arguments on transfer because "dismissal for improper venue pursuant to Fed. R. Civ. P. 12(b)(3) is inappropriate here given that plaintiff is proceeding <u>pro se</u> and because any venue error may be easily

### a. Transferring a Minority of Mr. Cheney's Claims Would Be Contrary to the Interests of Justice

Courts have held that "where a plaintiff's suit is truly broader than the forum selection clause," there is "no reason to require piecemeal resolution of [the] case in two courts" by transferring a minority of the claims that might properly subject to the clause. Pegasus Transp., Inc. v. Lynden Air Freight, Inc., 152 F.R.D. 574, 577 (N.D. Ill. 1993) (citing cases); accord Vision Technology Design & Mfg., Inc. v. General Wire Spring Co., No. 07-412, 2007 WL 2069945, *6-8 (E.D. Cal. 2007); see also Imation Corp. v. Quantum Corp., No. 01-1798, 2002 WL 385550, (D. Minn. March 8, 2002) (declining to transfer any claims where antitrust claims were "broader than the claims contemplated" by forum selection clause, even though narrower contract claims arguably were subject to forum selection clause); General Environmental Science Corp. v. Horsfall, 753 F.Supp. 664, 668 (N.D. Ohio 1990) (even if contract was "predicate" to some of Plaintiff's other claims, suit was "broader than the forum selection clause" so "Plaintiff's choice of forum prevails"). Thus, judicial economy is best served by keeping all of Mr. Cheney's claims together in this Court.

Further, Mr. Cheney's decision to file suit in Washington, D.C., "is due substantial deference and, unless the balance of convenience is strongly in favor of the defendants, should rarely be disturbed." Int'l Painters & Allied Trades Indust. Fund v. Tri-State Interiors, Inc., 357 F.Supp.2d 54, 55 (D. D.C. 2004) (citing cases). This Court gives Mr. Cheney's choice of forum "additional deference" because he is a resident here. Id. at 56.

Mr. Cheney's venue selection is given "even greater deference" because this case involves ERISA claims, and "ERISA's special venue provision, 29 U.S.C. § 1132(e)(2), reflects Congress' intention" to allow plaintiffs to bring collection suits "in their home districts." Int'l Painters, 357 F.Supp.2d at 55 (emphasis by court). "Indeed, under similar conditions, members of this court have cited ERISA's special venue provision in rejecting virtually every attempt to transfer ERISA actions under §

---

remedied by transferring the case 'in the interests of justice' to the proper forum pursuant to 28 U.S.C. § 1404(a)." See Byrd v. Admiral Moving and Storage, Inc., 355 F.Supp.2d 234, 237 (D. D.C. 2005).

1404(a)." Flynn v. Veazey Const. Corp., 310 F.Supp.2d 186, 193-94 (D. D.C. 2004) (listing cases). This triple deference is an additional reason Mr. Cheney's claims should not be transferred.

### b. Transfer Would Not Produce a Net Increase of Convenience for the Parties or Witnesses

The major witnesses in this lawsuit are Mr. Cheney, who resides in this District, and the Defendants, who reside in Florida. Dividing the litigation between two forums or transferring the lawsuit to Florida entirely would burden Mr. Cheney much more than the Defendants. Defendants have substantially more financial resources than Mr. Cheney. Defendants' revenues in the last two months exceed what Defendants paid Mr. Cheney over the last two years. (Cheney Decl. July 14, 2008, ¶ 30.) In the months since his unexpected termination, Mr. Cheney has had no income. (Id. ¶ 33.)

Further, Defendants' contacts with this District show that Defendants have no objections to traveling to D.C. courts or litigating with the District. (See section I. of this brief.) In contrast, Mr. Cheney has not returned to Florida since Defendants' terminated him. (Cheney Decl. July 14, 2008, ¶ 35.) In light of these circumstances, and considering the deference due Mr. Cheney's forum choice, the convenience of witnesses favors this District.

### B. Venue Is Proper in This District Because the Forum Selection Clause is Unenforceable

### 1. Enforcement of the Forum Selection Clause Would Contravene a Strong Public Policy Here

"A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972). This District has a strong public policy of protecting the right of clients to counsel of their choice and the right of members of its bar to practice law here. Neuman v. Akman, 715 A.2d 127, 130-31 (D.C. 1998) (discussing public policy undergirding restrictions on noncompetition contracts between attorneys); Legal Ethics Comm. of the D.C. Bar, Op. 181 (1987) (same); D.C. R. Prof. Conduct 5.6, Comment 1 (same); see also Faretta v. California, 422 U.S. 806, 834 (1975) (a client's choice about counsel "must be honored out of 'that

27

respect for the individual which is the lifeblood of the law,'" quoting Illinois v. Allen, 397 U.S. 337, 350-351 (1970) (Brennan, J., concurring)). As explained below, enforcing the forum selection clause by transferring any of Counts I-IV to Florida will contravene that strong policy.

Defendants maintain that, under Florida law, clients who received reports written by Mr. Cheney during his employment at IPD Analytics cannot now engage him for any purpose until they terminate their subscription with Defendants. (See Def. Opp. Prelim. Inj. (DE 9) at p.7 (stating Subscription Agreement is "reasonable and enforceable," citing Florida cases)). Defendants make no exception for IPD Analytics clients that would engage Mr. Cheney for the practice of law. Thus, according to Defendants' statements, transferring this lawsuit to Florida would result in clients being deprived of the ability to choose Mr. Cheney as their attorney. This Court cannot allow that result, and therefore it should not enforce the purported forum selection clause in the Employment Agreement.

Defendants argue that this District would reach the same result as Florida and cite Red Sage Ltd. P'ship v. Despa Deutche Sparkassen Immobilien-Anlage-Gasellschaft, 254 F.3d 1120, 1131 (D.C. Cir. 2001) for that proposition. (Def. Opp. Prelim. Inj. (DE 9), p. 7 n. 2.) Plaintiff respectfully disagrees. Red Sage involved a restrictive covenant on a lease for real estate, not an agreement affecting a client's right to counsel. District of Columbia courts would not enforce the Subscription Agreement and Employment Agreements in this lawsuit. See Neuman v. Akman, 715 A.2d at 130-31; see also Pl. Mot. Prelim. Inj. (DE 2), pp. 4-9. This Court will reach exactly the opposite result of the Florida outcome advanced by Defendants.

### 2. Enforcing the Forum Selection Clause for a Minority of Mr. Cheney's Claims Is Unreasonable and Unjust

Courts may not enforce a forum selection clause if "enforcement would be unreasonable and unjust." Byrd v. Admiral Moving & Storage, 355 F.Supp.2d 234, 237 (D. D.C. 2005). As noted in section III.A.2.a., several courts have found the Congressionally created "transferability" standard in 28 U.S.C. § 1404(a) does not allow transfer of a minority of a lawsuit's claims based on a forum selection clause. See, e.g., Pegasus Transp., Inc. v. Lynden Air Freight, Inc., 152 F.R.D. 574, 577 (N.D. Ill. 1993)

(citing cases). In similar circumstances, other courts have applied the judicially created "enforceability" standard in The Bremen to find a forum selection clause affecting only a minority of the claims expressly unenforceable.

For example, in Lulling v. Barnaby's Family Inns, Inc., 482 F.Supp. 318 (D.C. Wis. 1980), the court was faced with disputes arising from four agreements, only one of which had a forum selection clause. Id. at 320. The court held it was unreasonable to enforce the clause and did not dismiss or transfer any claims for improper venue. Id. at 320-21. Like Lulling, this lawsuit involves four documents: the Subscription Agreement, the 401(k) plan documents, the Offer Letter, and the Employment Agreement. Only one of these has a forum selection clause. As in Lulling, it would be unreasonable to enforce that clause against the minority of Mr. Cheney's claims to which it allegedly applies. Id.; see also Snider v. Lone Star Art Trading Co., Inc., 672 F.Supp. 977, 980 (E.D. Mich. 1987) (applying standard in The Breman, "[e]quity, as well as an efficient administration of justice" would not allow court to give forum selection clause in one contract "more controlling weight than the other five documents" lacking such a clause).

### 3. Enforcing the Forum Selection Clause Will Effectively Deprive Mr. Cheney, a Pro se Plaintiff, of His Day in Court

This lawsuit is not the first time this Court has considered whether a forum selection clause should be enforced to require a pro se plaintiff residing in this District to litigate in Florida. In Byrd v. Admiral Moving & Storage, 355 F.Supp.2d 234, the Court determined that "[b]ecause of the additional expense this pro se plaintiff would have to incur if suit were transferred to Florida, to do so could effectively deprive her of her day in court." Id. at 238. The same is true for Mr. Cheney. Although Mr. Cheney has been working diligently to establish his law practice in D.C. after Defendants terminated his employment, he has had no income for several months. (Cheney Decl. July 14, 2008, ¶ 33.) While Mr. Cheney can prosecute this lawsuit in this District using his own labor, he cannot afford to travel to Florida and retain local counsel as a lawsuit in Florida will require. Justice requires this Court to follow the analogous precedent of Byrd and decline to enforce the forum selection clause. Id.

29

### C. Venue Is Proper in This District Because the Forum Selection Clause Is Invalid for Fraud and Overreaching

An alternative basis for withholding effect from a forum selection clause arises when the clause is the result of "fraud or overreaching." The Bremen, 407 U.S. at 15. The forum selection clause in this lawsuit is the result of both.

#### 1. The Forum Selection Clause Is the Result of Fraud

Mr. Cheney has sufficiently pled in Count VI that the Defendants fraudulently induced him to leave his job at a D.C. law firm for employment by Defendants in Florida. The execution of the Employment Agreement was one result of this fraudulent inducement. Where a forum selection agreement is fraudulently induced, it cannot be enforced. See Armco, 68 F.Supp.2d at 340 (where fraud in contract formation is pled, "it is not unreasonable to assume" that drafter included forum selection clause "in order to further their alleged fraud," rendering clause invalid).

#### 2. The Forum Selection Clause Is the Result of Overreaching

The forum selection clause Defendants drafted is the result of overreaching. Defendants have a consistent pattern of attempting to avoid regulation for practicing law, and the forum selection clause is part of those overreaching efforts. The following facts establish that pattern:

- As described in Plaintiff's reply to his preliminary injunction motion, Defendants are practicing law in Florida.

- None of the IPD Analytics attorneys residing in Florida and writing reports for IPD Analytics there are members of the Florida bar. (Cheney Decl. July 14, 2008, ¶ 6.)

- Defendants attempt to disclaim liability to their clients for the practice of law using the Subscription Agreement (Krass Decl. (DE 12) at Ex. 1, ¶¶ 3, 8), in contravention of the rules of professional conduct in Florida and D.C. See Fla. R. Prof. Conduct 1.8(h); D.C. R. Prof. Conduct 1.8(g).

- The IPD Analytics Operating Agreement shows Defendants are sharing fees from their practice of law with a non-attorney corporation (Cheney Decl. July 14, 2008 at ¶ 31),

30

which jeopardizes their professional judgment and violates rules of professional conduct in Florida and D.C. <u>See</u> Fla. R. Prof. Conduct 4-5.4; D.C. R. Prof. Conduct 5.4; <u>Florida Bar v. Consolidated Business & Legal Forms, Inc.</u>, 386 So.2d 797 (Fla. 1980) ("There is no evidence that the respondent has made any attempt to balance the requirements of the Code of Professional Responsibility against its profit motives.")

- The Defendants attempt to restrain their clients' ability to retain the counsel of the clients' choice through the Subscription Agreement (Krass Decl. (DE 12) at Ex. 1, ¶ 4) and the Employment Agreement (<u>id.</u> at Ex. 2, ¶ 1.4), in contravention of the rules of professional conduct in Florida and D.C. <u>See</u> Fla. R. Prof. Conduct 4-5.6; D.C. R. Prof. Conduct 5.6.

- The Defendants attempt to restrain former employee attorneys in their right to practice law in the Subscription Agreement (Krass Decl. (DE 12) at Ex. 1, ¶ 4) and the Employment Agreement (<u>id.</u> at Ex. 2, ¶¶ 1.4, 1.5), in contravention of the rules of professional conduct in Florida and D.C. <u>See</u> Fla. R. Prof. Conduct 4-5.6; D.C. R. Prof. Conduct 5.6.

- The Defendants attempt to restrain former employee attorneys in their right to associate with others in the practice of law in the Employment Agreement (Krass Decl. (DE 12) at Ex. 2, ¶ 1.5), in contravention of the rules of professional conduct in Florida and D.C. <u>See</u> Fla. R. Prof. Conduct 4-5.6; D.C. R. Prof. Conduct 5.6; Legal Ethics Comm. of the D.C. Bar, Op. 181 (1987).

Defendants knew when they drafted the Employment Agreement that litigation with a former attorney employee would squarely raise the issue of whether the Defendants' business is the practice of law and whether Defendants are subject to regulation as attorneys. The forum selection clause is another manifestation of Defendants' efforts to avoid accountability for the practice of law. The Defendants recruited every former Federal Circuit clerk in their employ from outside Florida (Cheney Decl. July 14, 2008 at ¶ 6), and Defendants knew that those employees likely would relocate outside of Florida if they left the company. Defendants included a Florida forum selection clause in their employment agreements

31

to make it more difficult for an attorney who leaves their employ and jurisdiction to bring Defendants to account for their actions.

## CONCLUSION

As shown by the foregoing, this Court has personal jurisdiction over all Defendants in this lawsuit. Further, this Court is the appropriate venue to try all claims raised by Mr. Cheney in his Complaint. To dismiss or transfer any of Mr. Cheney's claims would result in judicial inefficiency, cause injustice to Mr. Cheney, and violate the public policies of this District. Accordingly, the Defendants' motion to dismiss or transfer the lawsuit should be denied.

Dated July _14_, 2008

Respectfully submitted,

Clark S. Cheney, DC Bar No. 491919
Law Office of Clark S. Cheney
517 F Street, NE
Washington, DC 20002
(202) 253-7195

*Pro se Plaintiff*

32

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this __14__ day of July, 2008, I filed the foregoing document with the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record identified below in the manner specified.

### ATTORNEYS FOR DEFENDANTS

Steven M. Umin, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, District of Columbia 20037
**Via U.S. Mail**

Dennis Richard, Esq.
RICHARD & RICHARD, P.A.
825 Brickell Bay Drive
Tower III - Suite 1748
Miami, Florida 33131
**Via U.S. Mail**

*Clark & Cheney*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CLERK
US DISTRICT & BANKRUPTCY
COURTS

2008 JUL 14 PM 10: 33

RECEIVED

Clark S. CHENEY,

Plaintiff,

v.

IPD ANALYTICS, LLC, *et al.*,

Defendants.

Case No. 1:08-cv-01044-JDB

**PROPOSED ORDER**

Upon consideration of Defendants' Motion to Dismiss or Transfer Pursuant to the Contractual Forum Selection Clause, for Lack of Personal Jurisdiction, or Improper Venue (DE-8) and Plaintiff's opposition thereto, the Court hereby DENIES Defendants' Motion.

IT IS SO ORDERED,

_____
Date

_____
United States District Court Judge

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this __14__ day of July, 2008, I filed the foregoing document with the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record identified below in the manner specified.

### ATTORNEYS FOR DEFENDANTS

Steven M. Umin, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, District of Columbia 20037
**Via U.S. Mail**

Dennis Richard, Esq.
RICHARD & RICHARD, P.A.
825 Brickell Bay Drive
Tower III - Suite 1748
Miami, Florida 33131
**Via U.S. Mail**

*Clark A. Cheney*

RECEIVED
COURT OF APPEALS
OR THE D.C. CIRCUIT

08 JUL 14 PM 4: 40

ILING DEPOSITORY

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CLERK
US DISTRICT & BANKRUPTCY
COURTS

2008 JUL 14 PM 4: 43

RECEIVED

Clark S. CHENEY,

　　　　Plaintiff,

　　　　　　v.

IPD ANALYTICS, LLC, *et al.*,

　　　　Defendants.

Case No. 1:08-cv-01044-JDB

## DECLARATION OF CLARK S. CHENEY

　　　　I, CLARK S. CHENEY, have personal knowledge of the following, and declare as follows:

### IPD Analytics Recruitment of me and Others

　　　　1.　　　　I believe Mr. Krass is the only person within either IPD Analytics or Intellectual Property Development with the authority to hire an employee. When Mr. Krass began recruiting me to work for IPD Analytics in late 2005 and early 2006, he knew I was a resident of Washington, D.C. Mr. Krass also knew he was recruiting me for work that would involve significant travel to this District. Mr. Krass spoke with me on the telephone while I was at my office and home in Washington, D.C.

　　　　2.　　　　Mr. Krass sent me email while I lived in Washington, D.C. See Exhibit A, attached. Mr. Krass' agent Mark Mamolen also sent me email concerning "equity ownership" in IPD Analytics while I lived in Washington, D.C. See Exhibit B, attached. Mr. Krass sent me an offer of employment to my Washington, D.C. address. I entered into an agreement with Mr. Krass concerning equity ownership in IPD Analytics while I was physically present in and a

citizen of Washington, D.C.  See my Declaration of June 18, 2008 (DE 2), at Ex. C.  I also signed the Employment Agreement while physically in this District.

3.      I am not a party to any Subscription Agreement between IPD Analytics and its clients, although such agreements affect me.  I was completely unaware of any IPD Analytics Subscription Agreement at the time Defendants asked me to sign the Employment Agreement in February 2006.

4.      The IPD Analytics 401(k) plan was instituted in December 2006, nearly a year after Defendants asked me to sign the Employment Agreement.  401(k) plan benefits did not form any part of my decision to accept employment in February 2006.

5.      Mr. Krass told me that he only hires attorneys that have clerked at the U.S. Court of Appeals for the Federal Circuit.  Mr. Krass has told me and clients that he considers it a marketing advantage to be able to tell a client that all of IPD Analytics analysts are former Federal Circuit clerks.  Mr. Krass has told me that the unique experience former Federal Circuit clerks gain in patent law and in understanding the operations of the Federal Circuit gives IPD Analytics an advantage over others analyzing court proceedings.  All of the attorneys that write reports for IPD Analytics are former Federal Circuit clerks.

6.      IPD Analytics recruits in Washington, D.C., because of the large number of former Federal Circuit clerks practicing in the District of Columbia.  IPD Analytics recruited every former Federal Circuit clerk in its employ from outside Florida.  None of the IPD Analytics attorneys residing in Florida and writing reports for IPD Analytics there are members of the Florida bar.

7.      IPD Analytics sends its employees to law clerk reunions and other bar events in the District of Columbia to recruit.  IPD Analytics has sent attorneys to recruit at the annual

2

Federal Circuit law clerk reunion in Washington, D.C., each year since beginning business in 2003.

8.    After IPD Analytics hired me, Mr. Krass assigned me to recruit at the 2006 Federal Circuit law clerk reunion and the 2006 Federal Circuit Judicial Conference, both in Washington, D.C. On May 19, 2008, I saw Molly Mosely-Goren recruiting for IPD Analytics at a reception for former Federal Circuit law clerks in Washington, D.C. Ms. Mosely-Goren is an employee of IPD Analytics.

9.    Mr. Krass and other IPD Analytics employees solicit former Federal Circuit law clerks by telephoning their law offices in the District of Columbia. For example, I was working at the Washington, D.C., office of Dewey Ballantine when IPD Analytics recruited me. During the recruiting process Mr. Krass and I spoke on the telephone several times while I was in my office at Dewey Ballantine office.

10.    I am personally aware of at least eight former Federal Circuit law clerks who have been solicited at their Washington, D.C., offices by Mr. Krass and others at IPD Analytics. For example, Charles Haisch and Malan Rampton were each working at the Washington, D.C., office of Fish and Richardson when Mr. Krass recruited them. While I could name other former clerks contacted in similar ways, I will refrain from doing so here to protect those attorneys' relationships with their current employers. However, should the Defendants dispute these facts, I will provide the additional names to the Court under appropriate protections of confidentiality.

**IPD Analytics Attends Hearings and Provides Legal Advice in Washington, D.C.**

11.    From my review of archives of IPD Analytics reports, I understand that not a month has passed since the business began in 2003 that IPD Analytics did not provide legal advice relating to lawsuits pending in the District of Columbia. I understand that IPD Analytics

3

has sent an employee to Washington, D.C., nearly every month since the inception of IPD Analytics in 2003. IPD Analytics sends attorneys to Washington, D.C., more often than to any other jurisdiction.

12.    IPD Analytics regularly sent me to Washington, D.C., to perform my duties. When I was there, I followed the same protocol as other IPD Analytics attorneys assigned to attend hearings in Washington D.C. That protocol included writing a legal analysis of the hearing immediately following hearing's conclusion, while I still physically present in the District. After I wrote this report in Washington, I forwarded it to Mr. Krass personally, who then immediately distributed to clients by email from his personal email address at IPD Analytics. IPD Analytics endeavors to transmit post-hearing updates to its clients before news from the hearing permeates the market generally. Also during these trips to D.C. I would often will talk with clients on the telephone about the hearing while I was still in the District. All IPD Analytics employees attending hearings in Washington, D.C., engaged in these same procedures.

13.    Some of the Federal Circuit hearings I attended for IPD Analytics were held in Courtroom 203 of the National Courts Building on Lafayette Square. Courtroom 203 is currently the Federal Circuit's smallest courtroom, and it routinely fills to capacity. In such circumstances, U.S. Marshalls invite members of the bar to sit in additional seating in front of the bar. I have taken advantage of this priority seating while attending hearings in Courtroom 203 on behalf of IPD Analytics.

14.    After each trip to Washington, I and other IPD Analytics employees submitted expense documentation to IPD Analytics for reimbursement. The total expenses for these trips among all employees is in the tens of thousands of dollars.

4

15.    I traveled to Washington, D.C., as an agent for IPD Analytics at least half a dozen times over the course of my employment. Many of my trips to the District, and the similar trips of other IPD Analytics employees, were several days long. For example, in September 2007, I attended many days of a hearing at the U.S. International Trade Commission (ITC) that lasted two weeks. Further, in March 2007, I attended both days of a different hearing at the ITC.

16.    IPD Analytics has sent employees to the U.S. Supreme Court, the U.S. Court of Appeals for the District of Columbia, the U.S. Court of Appeals for the Federal Circuit, the U.S. International Trade Commission, and this Court, all of which are located in this judicial district.

### Mr. Haisch's Contacts with Washington, D.C.

17.    Mr. Haisch is an employee of IPD Analytics, a former Federal Circuit law clerk, and a member of the D.C. Bar. Mr. Haisch is responsible for IPD Analytics' reports concerning pharmaceuticals.

18.    The activities of Charles Haisch during a four month time period from October 2005-January 2006 are typical of the frequency with which IPD Analytics sends employees to this District. They are also typical of the business IPD Analytics employees transact while here.

19.    Mr. Haisch came to a reunion for former Federal Circuit law clerks held at the National Courts Building in Washington, D.C., in October 2005.

20.    Mr. Haisch came to Washington, D.C., again on December 6, 2005, to watch and report on a Federal Circuit hearing involving patents on the drug Levaquin and to recruit me. See Exhibit C, attached. While he was still in the District, he distributed an update on the Levaquin hearing. See Exhibit D, attached. IPD Analytics had previously distributed a preview of the hearing written by Mr. Haisch. See Exhibit E, attached.

5

21.     Mr. Haisch came to Washington, D.C., again on a two-day trip in January, 2006, again to watch and report on Federal Circuit hearings and to recruit me. See Exhibit G attached. When Mr. Haisch met me at a Washington restaurant on January 12, 2006, Mr. Haisch encouraged me to interview at IPD Analytics' office in Florida.

22.     Mr. Haisch sent me two emails in January 2006 to recruit me. See Exhibits H and I attached. Mr. Haisch could reasonably foresee that I would receive these emails in Washington, D.C., because I am a resident here.

### Mr. Rampton's Contacts with Washington, D.C.

23.     Malan Rampton is an employee of IPD Analtyics, a former Federal Circuit clerk, and a member of the D.C. Bar. Mr. Rampton is responsible for IPD Analytics reports concerning electronics technology and media.

24.     Mr. Rampton attended several days of two-week ITC hearing in Washington, D.C., in September 2007.

25.     On January 16, 2008, Mr. Rampton attended the oral argument at the United States Supreme Court as an agent for IPD Analytics. Mr. Rampton obtained seating for this hearing by virtue of his membership in the Supreme Court Bar.

26.     On July 8, 2008, I personally observed Malan Rampton taking notes at a hearing at the U.S Court of Appeals for the Federal Circuit in Washington, D.C. I photographed Mr. Rampton as he exited the courthouse from the hearing. I have attached that photograph to this declaration as Exhibit J.

### Mr. Cohen's Contacts with Washington, DC

27.     On the same day I photographed Mr. Rampton (July 8, 2008), I personally observed Zach Cohen taking notes at a hearing at the U.S. International Trade Commission in

6

Washington, D.C. Mr. Cohen is an employee of IPD Analytics. I photographed Mr. Cohen at the Commission's building in Washington, D.C. I have attached that photograph to this declaration as Exhibit K.

## The Relationship Between the Defendants

28.    Mr. Krass has relayed to me his history with Intellectual Property Development, Inc. and IPD Analytics, LLC. I understand that Mr. Krass formed Intellectual Property Development, Inc., to buy patents and generate revenue by suing others for patent infringement. Mr. Krass told me that the appeals he prosecuted at the U.S. Court of Appeals for the Federal Circuit with Intellectual Property Development were central to that company's business. Mr. Krass told me that when he lost those appeals, Intellectual Property Development, Inc.'s business was essentially finished. Mr. Krass said he formed IPD Analytics, LLC, to satisfy investors that had lost money in Intellectual Property Development, Inc.

29.    Intellectual Property Development has no physical address other than the offices of IPD Analytics, LLC. I have observed Mr. Krass receiving mail for Intellectual Property Development, Inc., at the address for IPD Analytics, LLC. Mr. Krass exercises total control over both companies. I am aware of no corporate officers other than Mr. Krass in either IPD Analytics, LLC, or Intellectual Property Development, Inc. Mr. Krass sets all company policies for both companies and has supervision of all aspects of both companies. For example, at Mr. Krass' direction, IPD Analytics has only one main phone number; its attorney employees do not have individual extensions. Mr. Krass has told me this allows him to monitor each call that comes into the company. Mr. Krass personally controls all contact information for clients. Mr. Krass distributes all reports from his personal email address at IPD Analytics. See, for example,

7

Exhibits D, E, and F, attached. Mr. Haisch provided me with Exhibits D, E, and F on January 12, 2006 (before I was an IPD Analytics employee) without any request for confidentiality.

30.    I understand that IPD Analytics has over 100 subscribers. I understand these subscribers pay IPD Analytics on average $3,000 per month for the first six months of each subscriber's service and $6,000 per month thereafter. Mr. Krass obtains revenue from subscribers through salary as an IPD Analytics employee, through dividends as an IPD Analytics equity holder, and through his interest as a major shareholder of Intellectual Property Development, Inc., the parent corporation of IPD Analytics, LLC.

31.    In February 2008 Mark Mamolen gave me a copy of the IPD Analytics, LLC, Operating Agreement, which discloses that Intellectual Property Development, Inc, is the majority share holder of IPD Analytics, LLC.

32.    Mr. Krass used Mark Mamolen, a shareholder in Intellectual Property Development, Inc., but not an employee of IPD Analytics, as his agent in pre-litigation discussions with me.

### My Financial Condition

33.    IPD Analytics terminated my employment without prior notice. The lack of notice has made transition to new employment financially difficult. Although I have been working diligently to establish a law practice in Washington, D.C., since February 2008, I have had no income after my last check from IPD Analytics.

34.    I filed this lawsuit pro se because I cannot afford to hire outside counsel. I filed this lawsuit in this jurisdiction because I cannot afford to travel to Florida and retain local counsel in Florida.

35.    I have not returned to Florida since Defendants' terminated my employment.

8

I, CLARK S. CHENEY, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing declaration is true and correct.

Dated July __14__, 2008

CLARK S. CHENEY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ____14____ day of July, 2008, I filed the foregoing document with the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record identified below in the manner specified.

### ATTORNEYS FOR DEFENDANTS

Steven M. Umin, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, District of Columbia 20037
**Via U.S. Mail**

Dennis Richard, Esq.
RICHARD & RICHARD, P.A.
825 Brickell Bay Drive
Tower III - Suite 1748
Miami, Florida 33131
**Via U.S. Mail**

# Exhibit A

 **Windows Live™**

🔒 Print                                                                Close window

# RE: Confidential: References and Writing Sample

From: **Howard Krass** (hkrass@ipdanalytics.com)
Sent: Wed 1/18/06 6:26 PM
To: 'Clark Cheney' (clarkscheney@hotmail.com)

Clark,

It was really a pleasure meeting you.  I just got off the phone with Bob
King and he spoke very highly of you.  I have left a message with Catherine
and I hope to speak with her either tonight or tomorrow.  I will call you as
soon as I talk to her.

Everyone here was very impressed with you. I want to be able to make a
decision in the next few days so that we can move the process along.

Mark's email address is: mmamolen@msn.com

I look forward to speaking with you soon.

Thanks,

Howard

-----Original Message-----
From: Clark Cheney [mailto:clarkscheney@hotmail.com]
Sent: Wednesday, January 18, 2006 4:55 PM
To: hkrass@ipdanalytics.com
Subject: Confidential: References and Writing Sample

Hello Howard,

Thank you for hosting me for interviews this week.  I was very impressed
with each of the people I met.  I am convinced that IPD Analytics is
involved in an exciting venture.  As you requested, here are a couple of
personal references and a writing sample.

Regarding references, I worked with Catherine Agnoli at Parsons Behle &
Latimer in Salt Lake City.  Bob King worked with me at Dewey Ballantine in
Washington D.C. until he moved to Atlanta.

Catherine Agnoli
Parsons Behle & Latimer
201 South Main Street Suite 1800
Salt Lake City, UT 84111
Tel. 801-532-1234

Robert (Bob) King
Bank of America Plaza, Suite 4100
600 Peachtree Street, NE
Atlanta, Georgia 30308-2216
Tel. 404-888-4136

Regarding my writing sample, I have attached an article I wrote summarizing
the en banc Phillips decision on the day it was handed down.  The audience
was in-house patent counsel for patent litigation clients of Dewey

Ballantine.  I have redacted the name of the original addressee, but the
article was published by Dewey Ballantine and sent to our clients.

Thanks again for your time and consideration.

Sincerely,
Clark S. Cheney

P.S.  If you wouldn't mind passing along Mark's contact information, I would
like to thank him for inviting me to his home.

# Exhibit B

 Windows Live™

Close window

RE: Thank you

**From: Mark Mamolen** (mmamolen@msn.com)
Sent: Tue 1/24/06 3:02 PM
To: clarkscheney@hotmail.com

Thanks for the note. As you think about the opportunity at IPD, if there is anything you want to discuss related to the opportunity, please feel free to give me a call (305-672-0420). Frankly, I don't feel qualified to add much to your understanding of the patent litigation prognostication aspect of the situation, but I do believe I have good insight into IPD's economic potential potential (and the derivative potential benefit to you in both future income escalation and equity ownership). I also believe I have a feel for the personalities and professional culture of the firm. Enjoyed meeting you.Best of luck, whatever you decide.

Sincerely,Mark Mamolen

> From: "Clark Cheney" <clarkscheney@hotmail.com>
> To: mmamolen@msn.com
> Subject: Thank you
> Date: Wed, 18 Jan 2006 19:00:20 -0500
> >Hello Mark,
> >
> >It was such a pleasure to meet you on Monday evening.  Thanks for
> >your gracious hospitality in inviting me to your home.  I love the
> >esthetic you have created with your home, its landscaping, and the
> >bay.  And what can I say about your theater?  It was amazing!  I
> >enjoyed conversing with you at dinner as much as I enjoyed the
> >outstanding food.  I hope our paths will cross again, either in this
> >endeavor or in some other.
> >
> >Warmest regards,
> >Clark S. Cheney
> >
> >

# Exhibit C

 Windows Live™

Close window

🖨 Print

# RE: Lunch at 1:00 on Tuesday, Dec. 6 @ Ceiba

**From: Charles Haisch** (chaisch@mail.ipdanalytics.com)
Sent: Mon 12/05/05 11:34 AM
To: 'Clark Cheney' (clarkscheney@hotmail.com)


Clark,

That sounds fine.  Please remind me of your cell phone number.  I lost my
cell phone over the weekend and I do not know whether I will be able to
recover it before I leave for DC.  I will likely be using my back-up cell
phone (703-725-1691), so feel free to call me on that line if your plans
change.  Otherwise, I look forward to seeing you Tuesday afternoon at
1:00pm.

Best regards,

Charles

-----Original Message-----
From: Clark Cheney [mailto:clarkscheney@hotmail.com]
Sent: Monday, December 05, 2005 11:24 AM
To: chaisch@ipdanalytics.com
Subject: Lunch at 1:00 on Tuesday, Dec. 6 @ Ceiba

Hi Charles,

I have a reservation for us at 1:00 on Tuesday, December 6, at Ceiba.  Ceiba

is located on the corner of 14th and G.  Let's just meet at the restaurant.

I think our reservation time should allow for any long-winded arguments and
for you to talk with your office.  I'm looking forward to visiting with you.

Clark

# Exhibit D

## Joseph Bovino

**From:** Howard Krass [hkrass@ipdanalytics.com]

**Sent:** Wednesday, December 07, 2005 1:26 PM

**To:** Howard Krass

**Subject:** Levaquin (Ortho v. Mylan) Update: Federal Circuit Argument Appears to Favor Ortho

CONFIDENTIAL

Today (December 7, 2005), the U.S. Court of Appeals for the Federal Circuit heard oral arguments in the Ortho v. Mylan patent infringement lawsuit involving Mylan's ANDA for a generic version of Levaquin. We attended today's hearing. Our preliminary assessment is that Federal Circuit appears more likely than not to affirm the district court's decision in favor of Ortho.

BACKGROUND
Ortho's '407 patent claims levofloxacin. As we reported in our September 9, 2005 Levaquin report, Mylan admitted that its proposed product would infringe the '407 patent, but argued that the patent is invalid in view of the prior art (ofloxacin) and unenforceable because Ortho obtained the patent through inequitable conduct. In December 2004, the district court ruled in Ortho's favor on those issues. Mylan appealed to the Federal Circuit.

DISCUSSION
We have not had time to perform our normal post-oral argument review (including polling of ex-clerks of the judges who will decide the appeal). However, the oral argument proceeded generally as we had expected.

We will provide a more detailed report when our analysis is complete.

IPD Analytics, LLC
1177 Kane Concourse
Suite 300
Bay Harbor Islands, FL 33154
(305) 662-8515
(305) 993-1883-Fax
Email: hkrass@ipdanalytics.com
Website: www.ipdanalytics.com

Exhibit E

**IPD ANALYTICS**
**Pharmaceutical Patent Litigation Monitor**

# LEVAQUIN: FEDERAL CIRCUIT MORE LIKELY THAN NOT WILL AFFIRM DISTRICT COURT DECISION IN FAVOR OF ORTHO

**September 9, 2005**  Howard Krass (hkrass@ipdanalytics.com)  Joseph Bovino (jbovino@ipdanalytics.com)  **(305) 662-8515**

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
**REDISTRIBUTION IS STRICTLY PROHIBITED**

| | |
|---|---|
| **Parties:** | Ortho-McNeil (**JNJ**)[1] v. Mylan (**MYL**). |
| **Patents at Issue:** | U.S. Patent No. 5,053,407 (set to expire December 20, 2010). |
| **Lawsuit Status:** | In December 2004, Judge Irene Keeley of the West Virginia federal district court (Wheeling) decided in Ortho's favor that the '407 patent is valid and enforceable. Mylan appealed. The parties have completed their appellate briefing but the appeals court (the U.S. Court of Appeals for the Federal Circuit) has not scheduled the oral argument. |
| **Related Lawsuits:** | Judge Garrett Brown of the New Jersey federal district court is presiding over the following cases: Ortho v. Teva (**TEVA**); Ortho v. Sicor; Daiichi v. Hi-Tech Pharmacal (**HITK**); Ortho v. American Pharmaceutical Partners (**APPX**); and Ortho v. Ben Venue and Bedford.[2] |
| **First-to-File and Approval Status:** | **Oral Tablets**: Mylan has first-to-file status on the 250 and 500 mg dosages and Teva appears to have first-to-file status on the 750 mg dosage. FDA has granted effective approval to Teva's 750 mg ANDA. FDA has tentatively approved Mylan's ANDA, Teva's ANDA on the 250 and 500 mg dosages, and Reddy's' (**RDY**), Ranbaxy's (**RBXLF.US**) and Ivax's (**IVX**) ANDAs for the 250, 500 and 750 mg dosages. |
| | **Injectable Solutions**: Bedford appears to have first-to-file status on 5mg/ml and 25 mg/ml injectable solutions. FDA has tentatively approved Bedford's ANDA, Sicor's ANDA for 5mg/ml and 25mg/ml injectable solutions, and Sicor's NDA for a 5mg/ml levofloxacin and sodium chloride injectable solution. |
| | **Eyedrops**: Hi-Tech appears to have first-to-file status for a 0.5% levofloxacin ophthalmic solution. FDA has tentatively approved that ANDA.[3] |

---

**OVERVIEW:** Mylan has conceded that its proposed product would infringe Ortho's '407 patent, which claims the active ingredient in Levaquin (levofloxacin). This report focuses on Mylan's appeal of the district court's decision that the '407 patent is not invalid and is enforceable.

**CONCLUSIONS:** Mylan has appealed the district court's decisions that the asserted claims in the '407 patent were neither anticipated by, nor obvious in view of, the prior art. While both of these validity challenges are close, Ortho appears to have the advantage on both challenges.[4] In addition, the Federal Circuit likely will affirm the district

---

[1]     Other named plaintiffs are Johnson & Johnson Pharmaceutical Research & Development, LLC and Daiichi Pharmaceutical Co., Ltd. The plaintiffs are referred to as Ortho for convenience unless otherwise appropriate.

[2]     The Teva, Sicor, Hi-Tech and American Pharmaceutical cases are consolidated in one lawsuit. Teva agreed not to launch unless the Federal Circuit or the New Jersey district court decides that the '407 patent is invalid or unenforceable. The Ben Venue lawsuit has been concluded by consent judgment, with agreement that the '407 patent is infringed, valid and enforceable unless the Federal Circuit decides the patent is invalid or unenforceable.

[3]     Hi-Tech's ANDA is based on the NDA for Quixin rather than the Levaquin NDA.

[4]     Mylan only needs to win one of its validity challenges to prevail in the appeal.

court's decision that Mylan did not prove that Ortho committed inequitable conduct during the Patent Office proceedings leading to issuance of the '407 patent.

- **Briefing Favors Ortho on Both of Mylan's Validity Challenges.** Mylan has raised lack of novelty (anticipation) and obviousness validity challenges on appeal.

  o **Anticipation.** Mylan's anticipation challenge depends on the Federal Circuit's interpretation of the '407 patent claim scope. If the Federal Circuit decides that the claims are limited to purified levofloxacin, then Mylan will lose its anticipation challenge because no prior art discloses purified levofloxacin. If the Federal Circuit decides that the claims cover the levofloxacin in ofloxacin (a 50-50 mixture of levofloxacin and its mirror image compound, dextrofloxacin), then Mylan will win its anticipation challenge due to the prior art status of ofloxacin. Although the claim interpretation is a close question, going into the appellate oral argument we conclude that the Federal Circuit more likely than not will rule that the patent claims are limited to purified levofloxacin, and therefore affirm (in Ortho's favor) the district court's decision that the asserted claims are not invalid due to anticipation by ofloxacin.

  o **Obviousness.** Mylan's obviousness challenge presumes that the Federal Circuit affirms the district court's claim interpretation and therefore presumes that Mylan loses its anticipation challenge. The district court decided that Mylan proved that a person of ordinary skill in the art would have been motivated to separate ofloxacin to obtain levofloxacin and would have had a reasonable expectation of success in performing that separation. However, the district court also decided that levofloxacin has unexpected physical properties compared to ofloxacin: a substantially higher water solubility; and higher biological activity coupled with lower toxicity. Based on the evidence of unexpected results, combined with evidence of extraordinary commercial success, the district court ruled that Mylan had not proved obviousness by the required evidentiary standard of clear and convincing evidence.

    Mylan presented a strong obviousness case and Ortho countered with compelling evidence. The obviousness issue therefore is close. However, due to the district court's favorable factual findings, Ortho has the advantage on this issue. Going into the oral argument, we conclude that the Federal Circuit more likely than not will affirm (in Ortho's favor) the district court's ruling that Mylan failed to prove by clear and convincing evidence that the '407 patent is invalid due to obviousness.

- **The Federal Circuit Likely Will Affirm the District Court's Decision that the '407 Patent is Enforceable.** For a patent to be unenforceable due to inequitable conduct, the defendant must prove by clear and convincing evidence that the patent applicant (1) made a material misrepresentation or omission to the Patent Office examiner (2) with an intent to deceive the examiner. On appeal, Mylan argues that one of the inventors named on the '407 patent made materially misleading statements about levofloxacin's toxicity and solubility compared to ofloxacin's. The district court decided that the inventor's statements were not misleading and/or of low materiality, and also ruled that Mylan failed to show the inventor intended to mislead the Patent Office examiner. Trial evidence supporting the district court's decision included expert testimony that the disclosed toxicity tests were more accurate than undisclosed toxicity tests and that levofloxacin has advantages over ofloxacin for use in aqueous preparations. Based on Ortho's inventor's trial testimony, the district court decided there was no direct evidence of an intent to mislead and no evidence supporting an inference of such an intent. The Federal Circuit likely will affirm (in Ortho's favor) all of the district court's decisions relating to Mylan's inequitable conduct challenge.

- **Timing.** Oral argument typically takes place 2-4 months after briefing is complete. Briefing was complete in July 2005, so oral argument likely will be scheduled in 4Q 2005. The Federal Circuit normally issues its decisions from 2-12 months after oral argument. The Federal Circuit's decision therefore is likely to issue some time in 2006. We expect to be able to estimate the timing of the Federal Circuit's decision more precisely after observing the oral argument.

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

## I.    BACKGROUND

In this section we discuss the district court's decision on claim interpretation, validity and enforceability. Please refer to our June 7, 2004 and December 18, 2003 reports for additional background information, including information on ofloxacin and its enantiomers, levofloxacin and dextrofloxacin.

**The District Court's Decision.** Mylan admitted that its proposed product would infringe the '407 patent. The district court decided in Ortho's favor that Mylan had not proved the '407 patent was invalid or unenforceable and entered a final judgment in Ortho's favor.[5]

**Claim Interpretation.** As part of its analysis of Mylan's invalidity challenges, the district court interpreted the asserted claims in the '407 patent to determine their scope. The primary claim interpretation issue before the district court was whether the asserted claims are limited to purified levofloxacin or cover all levofloxacin, including levofloxacin as a 50-50 (racemic) mixture with dextrofloxacin. The district court agreed with Ortho's proposed claim interpretation and ruled that the claims cover optically active, substantially pure levofloxacin.

Ortho's Claim 2 is representative of the asserted claims. It read as follows:

2.    S(-)-[ofloxacin chemical formula] according to claim 1.[6]

The court's claim interpretation focused on the designation "S(-)" in the asserted claims. The court ruled that a person of ordinary skill in the art would interpret the use of "S," when used as a modifier of the chemical formula for ofloxacin, as referring to levofloxacin instead of dextrofloxacin. The court also ruled that a person of ordinary skill in the art would understand the use of "(-)" to mean "optically active." The district court then ruled that the optical activity limitation requires "substantially pure" levofloxacin with respect to dextrofloxacin.[7]

**Anticipation.** Mylan's anticipation argument was based on the prior art status of ofloxacin. Based on its decision that the claimed levofloxacin must be substantially pure with respect to dextrofloxacin, the court ruled that the 50-50 mixture of levofloxacin and dextrofloxacin making up ofloxacin could not "read on," and therefore could not anticipate, the claims in the '407 patent. The district court rejected Mylan's evidence introduced to show that levofloxacin inherently exists separately from and in greater amounts than dextrofloxacin in the body when ofloxacin is ingested, because the district court found more credible Ortho's evidence demonstrating that the enantiomers existed in association in a roughly 1 to 1 ratio (50-50) in the body. Thus, the district court determined that the ofloxacin prior art did not disclose the claimed levofloxacin explicitly or inherently and therefore did not anticipate and render invalid the '407 patent claims.

---

[5]     Mylan has not appealed the district court's decisions (in Ortho's favor) on other defenses it raised at trial, including prior invention by another, claim indefiniteness, and inequitable conduct based on withholding a prior art reference and based on statements concerning levofloxacin's comparative antibacterial activity.

[6]     Claim 1 recites a large genus of compounds using a structural formula.

[7]     The court arrived at its "substantially pure" interpretation of the claims based on (1) the definition of "optical activity" in a technical dictionary, which in relevant part states that optical activity requires unequal amounts of corresponding enantiomers, (2) statements in the '407 patent specification (the "teaching" portion of the patent that precedes the claims) that the compounds covered by the invention are optically active, (3) communications between Ortho and the Patent Office leading to issuance of the '407 patent (the patent "prosecution history") showing that the Patent Office examiner allowed the '407 patent to issue after expressly considering the patentability of the claims in view of ofloxacin, and (4) trial testimony by Ortho's expert that a person of ordinary skill in the art would have read the claims to mean levofloxacin with a high optical purity, which in turn requires a high degree of separation from dextrofloxacin.

**Obviousness.** Mylan also asserted that the '407 patent claims were invalid because levofloxacin would have been obvious in light of the prior art. The district court credited Mylan's evidence that a person of ordinary skill in the art would have been motivated to separate ofloxacin into its component enantiomers (based on two references teaching that such a separation would yield one enantiomer having biological activity superior to the other enantiomer), and that a person of ordinary skill in the art would have had a reasonable expectation of success in performing the separation (based on references disclosing methods that work to "resolve" ofloxacin into its enantiomers and evidence that four other companies successfully resolved ofloxacin within six months of Ortho's first separation).

However, the district court determined that levofloxacin had surprisingly advantageous properties compared to ofloxacin: levofloxacin has substantially greater water solubility than ofloxacin and this solubility was a "substantial improvement over the prior art"; Levaquin's commercial success was due to its active ingredient (substantially pure levofloxacin) rather than "clever marketing"; and Levaquin satisfied a long-felt need – safely treating gram-positive respiratory pathogens. The district court found that Mylan chose to make a generic version of levofloxacin (rather than ofloxacin) because of its superior properties and that others had praised the invention of levofloxacin as shown by industry and government awards given to Ortho and its inventors.

After weighing Mylan's evidence of obviousness against Ortho's evidence of non-obviousness, the district court decided that the evidence as a whole demonstrated that levofloxacin would not have been obvious in view of the prior art and that Mylan had failed to carry its burden of proving obviousness by clear and convincing evidence.

**Unenforceability and Inequitable Conduct.** Mylan asserted that the '407 patent is unenforceable because Ortho obtained the patent through inequitable conduct. Specifically, Mylan asserted that one of Ortho's inventors made misleading statements to the Patent Office examiner about the solubility and toxicity of levofloxacin compared to ofloxacin.

<u>Solubility</u>. Mylan argued that Ortho committed inequitable conduct by misleadingly stating to the Patent Office examiner that Ortho's researchers had surprisingly discovered that levofloxacin is ten times more soluble in water than ofloxacin at neutral pH. The district court determined that the statement was correct and that Ortho's failure to disclose that levofloxacin's solubility is not ten times higher than that of ofloxacin at *all* pH levels was not misleading because Ortho's statement was clearly limited to neutral pH.

Mylan also argued that Ortho's statement that the solubility of ofloxacin was "unsatisfactory" for aqueous preparations constituted inequitable conduct because evidence showed that ofloxacin could be used for aqueous preparations. The district court determined that Ortho's statement was a poor word choice but was not misleading, given another Ortho statement that ofloxacin had "relatively high water-solubility as compared with other synthetic antibiotics."

The court also concluded that there was no evidence of any intent to mislead the patent examiner regarding the solubility of levofloxacin.

<u>Toxicity</u>. Mylan asserted that Ortho committed inequitable conduct when it disclosed to the Patent Office examiner intravenous toxicity tests showing that levofloxacin was less toxic than ofloxacin, but failed to disclose oral toxicity tests showing that levofloxacin had the same or greater toxicity than ofloxacin. The district court determined that the oral toxicity tests were of low materiality and that Ortho did not intend to mislead the Patent Office, because the intravenous toxicity tests were more reliable than the oral toxicity tests.

Mylan also asserted that Ortho failed to report overlapping statistical confidence intervals for the intravenous toxicity tests. The district court determined that the failure to disclose the confidence

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

intervals was not misleading because Ortho provided the underlying data and because reporting toxicity without reference to confidence intervals was common, particularly in situations similar to that associated with levofloxacin where there were few data points or the overlap was small. The district court also concluded that there was no evidence of any intent to mislead the Patent Office regarding the toxicity of levofloxacin.

## II.    DISCUSSION

Although the anticipation and obviousness issues are both close, the parties' appellate briefing of the relevant issues appears favorable to Ortho on each issue. We therefore conclude, going into the oral argument, that the Federal Circuit more likely than not will affirm the district court's decision that the '407 patent is not invalid because the claims were neither anticipated nor obvious in view of prior art. Mylan's inequitable conduct argument is not as persuasive; we conclude that the Federal Circuit likely will affirm the district court's decision that the '407 patent is not unenforceable.

### A.    Claim Interpretation

**Legal Standard.** An invalidity analysis comparing the patent to prior art first requires claim interpretation (also called claim construction). The purpose of a court's claim interpretation analysis is to determine the meaning of disputed terms that a person of ordinary skill in the art would have given the term at the time of the invention. A patent's intrinsic record – the claims, specification, and prosecution history – usually provides the technological and temporal context to enable the court to ascertain the meaning of the claims. If necessary, the court may also consider extrinsic evidence, which includes (but is not limited to) expert testimony.

When reviewing the evidence, the court should recognize that the specification may expressly or indirectly define a disputed claim term. The court should also consider that possible embodiments of the invention given in the specification may shed light on the meaning of a disputed claim term. In so doing, however, the court may conclude that the scope of the claims cover different subject matter than is illustrated in the specific embodiments in the specification.

The court may also consider prior art references discussed during prosecution. These references may enlighten the meaning of a disputed claim term. The prior art is often a reliable source of the understanding of a person of ordinary skill in the art.

Claim interpretation is reviewed on appeal without deference to the district court's decision (*de novo*).

**Analysis.** Mylan argues that the claims in the '407 patent cover levofloxacin in any environment (including the levofloxacin present in ofloxacin). Mylan contends that the district court erred in its claim interpretation by adding the "substantial purity" and "optical activity" limitations to the claims. Ortho responds that those limitations were clearly intended by the inventors, as shown by the patent's specification, its prosecution history, and the expert testimony on the understanding of persons skilled in the art.

Based on the parties' arguments in their Federal Circuit briefs, this issue appears close but marginally favorable to Ortho's position. The primary flaw in Mylan's proposed claim construction appears to be that it reads the '407 patent claims without putting them into proper context. The patent's specification and prosecution history both appear to show that the invention was *purified* levofloxacin and not simply any amount of levofloxacin in any environment. Going into the oral argument we therefore conclude that the Federal Circuit more likely than not will decline to adopt Mylan's proposed claim interpretation and will affirm the district court's interpretation (in Ortho's favor) that the '407 patent claims are limited to levofloxacin that is substantially pure with respect to dextrofloxacin.

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

### B.    Invalidity

**Legal Standard.** The party challenging the validity of a patent has the burden of proving invalidity by clear and convincing evidence. Clear and convincing evidence is substantially greater than a preponderance of the evidence, but also substantially less than the criminal law standard of proof beyond a reasonable doubt.

A patent may be invalid in light of the "prior art" (for example, prior patents or printed publications) in one of two ways – the prior art can "anticipate" a patented invention or render it obvious. Anticipation of a patent claim occurs when a single prior art reference discloses every element of the challenged claim. Obviousness occurs when a person of ordinary skill in the art would have considered the claim to be obvious in view of the prior art.

#### 1.    Anticipation.

**Legal Standard.** Novelty is a basic requirement for patentability. Lack of novelty, or anticipation, occurs when each limitation in a challenged claim is disclosed, either expressly or inherently, in a single prior art reference. Inherent disclosure of a limitation in a prior art reference is assessed using a strict standard – to be inherently present, the limitation must be "necessarily present" or must be the "natural result" flowing from the explicit disclosure. "Necessarily present" does not mean occasionally, possibly or probably present. The Federal Circuit will affirm the district court's anticipation decision unless it concludes that the district court committed clear error in reaching its decision; clear error occurs when the district court applied an incorrect legal standard or made a clearly erroneous factual finding.

**Analysis.** Mylan's anticipation challenge depends on whether Mylan can persuade the Federal Circuit to reverse the district court's claim interpretation. If the Federal Circuit affirms the district court's claim interpretation, which limits the claims to purified levofloxacin, then Mylan will lose its anticipation challenge because no prior art discloses purified levofloxacin. If the Federal Circuit reverses the district court's claim interpretation and decides that the claims cover any amount of levofloxacin in any environment, then Mylan likely will prevail on its anticipation challenge because the '407 patent claims would "read on" the levofloxacin in ofloxacin.

Therefore, based on our conclusion that the Federal Circuit more likely than not will decide the claim interpretation issue in Ortho's favor, going into the oral argument we conclude that the Federal Circuit more likely than not will affirm the district court's decision (in Ortho's favor) that the '407 patent is not invalid due to anticipation.

#### 2.    Obviousness.

**Legal Standard.** A patent claim is not patentable if it is obvious. Obviousness occurs when a person of ordinary skill in the art would have considered the claim to be obvious at the time of the invention in view of the prior art. In considering whether a claim would have been obvious, so-called "secondary," or objective, factors of non-obviousness must be considered if introduced into evidence and can be important indicators of non-obviousness. The secondary factors include unexpected results, commercial success, long-felt need, copying, and third party praise.

The Federal Circuit will affirm a district court's obviousness conclusion unless it is based on an error of law. The Federal Circuit will accept a district court's fact findings underlying the obviousness conclusion (the prior art scope, differences between the invention and prior art, and the secondary factors of non-obviousness) unless they are clearly erroneous.

**Analysis.** Mylan's obviousness challenge is fairly persuasive. Ofloxacin is close prior art and the district court ruled that the prior art would have motivated a person of ordinary skill in the art to separate ofloxacin into its component enantiomers, and a person of ordinary skill would have been able to perform

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

that separation with a reasonable expectation of success. However, despite this substantial evidence of obviousness, the district court made numerous factual findings regarding secondary factors that support the district court's conclusion of non-obviousness in favor of Ortho. These factual findings include the unexpected properties of levofloxacin, Levaquin's commercial success, the long-felt need for an antibacterial quinolone that could safely combat gram-positive respiratory pathogens, Mylan's copying of levofloxacin, and the praise of levofloxacin by others. The briefing suggests that none of these factual findings is clearly erroneous. Thus, this appeal essentially presents a legal question whether the district court properly weighed Mylan's evidence of obviousness against Ortho's evidence of non-obviousness. This is a close question, but going into the oral argument our view is that the Federal Circuit more likely than not will affirm the district court's decision that Mylan failed to meet its burden of proving obviousness by clear and convincing evidence. The Federal Circuit therefore more likely than not will affirm the district court's decision (in Ortho's favor) that the '407 patent is not invalid due to obviousness.

## C.     Unenforceability Due To Inequitable Conduct

**Legal Standard.** Patent applicants (including inventors) are required to deal in good faith and candor with the Patent Office. A failure to comply with this duty constitutes inequitable conduct. If a patent was obtained through inequitable conduct, the patent remains valid but is unenforceable against anyone. In an inequitable conduct challenge, the infringement defendant must show clear and convincing evidence of threshold levels of (1) materiality – withheld or misleading information would have been material to a reasonable patent examiner on an issue of patentability; and (2) intent to deceive – the individual's withholding of information or provision of false or misleading information must have been motivated by an intent to mislead or deceive the patent examiner. Also, specific evidence of an intent to deceive or withhold is not required; intent may be inferred from the totality of the circumstances. Whether these threshold levels are met are issues of fact subject to review for clear error by the Federal Circuit.

If the infringement defendant proves threshold levels of intent and materiality, the court must then balance the level of intent and materiality to determine whether inequitable conduct occurred. In this balance, a high level of intent justifies the court in ruling that the applicant engaged in inequitable conduct even if the level of materiality is relatively low, and vice versa. Because the ultimate question of inequitable conduct is equitable in nature, the Federal Circuit will only reverse a district court's ultimate decision regarding an inequitable conduct charge if the district has abused its discretion.

**Analysis.** Mylan's appeal of the district court's inequitable conduct decision is particularly difficult because the district court ruled in Ortho's favor on both the materiality and intent "elements" (as compared to a situation where the district court rules in the challenger's favor on, for example, the materiality element). In our view, the Federal Circuit likely will affirm the district court's decision that Ortho's inventor's statements on solubility and toxicity were either not misleading or of low materiality. In addition, the Federal Circuit likely will accept the district court's factual findings that the inventor did not intend to mislead the Patent Office examiner regarding his statements regarding solubility or toxicity, and the absence of any intent to mislead is fatal to Mylan's challenge. Therefore, the Federal Circuit likely will affirm the district court's decision (in Ortho's favor) that the '407 patent is not unenforceable.

## D.     Timing

Oral argument typically takes place 2-4 months after briefing is complete. Briefing was complete in July 2005, so oral argument likely will be scheduled in 4Q 2005. The Federal Circuit normally issues its decisions from 2-12 months after oral argument. The Federal Circuit's decision therefore is likely to issue some time in 2006. We expect to be able to estimate the timing of the Federal Circuit's decision more precisely after observing the oral argument.

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

This document is for the exclusive use of the company receiving this report directly from IPD Analytics
REDISTRIBUTION IS STRICTLY PROHIBITED

### DISCLOSURE / DISCLAIMER

THIS REPORT IS NOT DIRECTED TO, OR INTENDED FOR DISTRIBUTION TO OR USE BY, ANY PERSON OR ENTITY WHO IS A CITIZEN OR RESIDENT OF, OR LOCATED IN ANY LOCALITY, STATE, COUNTRY OR OTHER JURISDICTION WHERE SUCH DISTRIBUTION, PUBLICATION, AVAILABILITY OR USE WOULD BE CONTRARY TO LAW OR REGULATION OR WHICH WOULD SUBJECT IPD ANALYTICS, LLC (COLLECTIVELY REFERRED TO HEREIN AS "IPD") OR ANY OF ITS SHAREHOLDERS, OFFICERS, DIRECTORS, MEMBERS, AFFILIATES, EMPLOYEES OR AGENTS TO ANY REGISTRATION OR LICENSING REQUIREMENT WITHIN SUCH JURISDICTION. ALL EXPRESSIONS OF OPINIONS IN THIS REPORT ARE SUBJECT TO CHANGE WITHOUT NOTICE AND IPDA DOES NOT UNDERTAKE TO UPDATE OR SUPPLEMENT THIS REPORT OR ANY OF THE INFORMATION CONTAINED HEREIN. THIS REPORT IS BASED SOLELY UPON PUBLICLY AVAILABLE INFORMATION OBTAINED BY IPDA FROM SOURCES BELIEVED BY IT TO BE ACCURATE AND RELIABLE. HOWEVER, SUCH INFORMATION IS PRESENTED "AS IS," WITHOUT WARRANTY OF ANY KIND. IPDA MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO ACCURACY, TIMELINESS OR COMPLETENESS OF ANY PORTION OF THE REPORT, ANY INFORMATION CONTAINED THEREIN, OR THE RESULTS TO BE OBTAINED FROM ITS USE; AND THE READER AGREES NOT TO MAKE ANY CLAIM BASED IN ANY WAY ON ANY INACCURACY IN THAT MATERIAL AGAINST IPDA, ITS AGENTS AND/OR SUPPLIERS.

THIS RESEARCH WAS PREPARED AND ISSUED BY IPDA FOR DISTRIBUTION SOLELY TO MARKET COUNTERPARTIES OR INTERMEDIATE OR PROFESSIONAL CUSTOMERS AND NOT FOR DISTRIBUTION TO THE GENERAL PUBLIC. THIS REPORT IS NOT AN OFFER TO BUY OR SELL ANY SECURITY AND IT DOES NOT CONSTITUTE INVESTMENT OR LEGAL ADVICE. INVESTMENT IN ANY OF THE ENTITIES REFERRED TO HEREIN MAY NOT BE SUITABLE FOR YOU. INVESTORS MUST MAKE THEIR OWN INVESTMENT DECISIONS IN CONSULTATION WITH THEIR PROFESSIONAL ADVISORS IN LIGHT OF THEIR SPECIFIC CIRCUMSTANCES. THE VALUE OF INVESTMENTS MAY FLUCTUATE AND INVESTMENTS THAT ARE DENOMINATED IN FOREIGN CURRENCIES MAY FLUCTUATE IN VALUE AS A RESULT OF EXPOSURE TO EXCHANGE RATE MOVEMENTS. INFORMATION ABOUT PAST PERFORMANCE OF AN INVESTMENT IS NOT NECESSARILY A GUIDE TO, INDICATOR OF, OR ASSURANCE OF, FUTURE PERFORMANCE. IPDA OR ONE OR MORE OF ITS SHAREHOLDERS, OFFICERS, DIRECTORS, MEMBERS, AFFILIATES, EMPLOYEES OR AGENTS MAY AT ANY TIME HOLD, INCREASE OR DECREASE POSITIONS IN SECURITIES OF ANY COMPANY MENTIONED HEREIN.

IPDA SHALL NOT IN ANY CIRCUMSTANCES BE LIABLE TO ANY RECIPIENT OF THIS REPORT OR ANY THIRD PARTY, WHETHER IN CONTRACT, TORT OR OTHERWISE, FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES OR LOSS ARISING FROM THIS REPORT OR RECIPIENT'S USE OF ANY INFORMATION IN THIS REPORT, INCLUDING, BUT NOT LIMITED TO, DAMAGES ARISING FROM ANY TYPE OR MANNER OF COMMERCIAL, BUSINESS OR FINANCIAL LOSS OCCASIONED BY, OR RESULTING FROM, ANY UNINTENTIONAL BREACH OF CONTRACT, NEGLIGENCE, OR ANY OTHER TORT ARISING FROM ANY AGREEMENT RELATING TO THIS REPORT.

IN THE EVENT THAT THE ABOVE DISCLAIMERS OF LIABILITY AND WARRANTIES ARE FOUND UNENFORCEABLE, THE LIABILITY OF IPDA ARISING FROM THIS REPORT, ANY AGREEMENT RELATED TO THIS REPORT OR RECIPIENT'S USE OF ANY INFORMATION IN THIS REPORT TO RECIPIENT OR ANY THIRD PARTY FOR ANY REASON WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, ACTIONS IN NEGLIGENCE, CONTRACT, STRICT LIABILITY, BREACH OF WARRANTY OR TORT, SHALL NOT EXCEED $100.00.

Exhibit F

**IPD ANALYTICS**
**Medical Technology Patent Litigation Monitor**

# CONOR: ITS PATENTS APPEAR EFFECTIVE AGAINST COPYING BUT THE COSTAR STENT MAY INFRINGE OTHER PATENTS

| September 13, 2005 | Howard Krass (hkrass@ipdanalytics.com)<br>Joseph Bovino (jbovino@ipdanalytics.com) | (305) 662-8515 |
|---|---|---|

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
**REDISTRIBUTION IS STRICTLY PROHIBITED**

| | |
|---|---|
| **Parties:** | Conor Medsystems (**CONR**) |
| **Patents Reviewed:** | Conor's U.S. patent nos. 6,241,762; 6,562,065; and 6,764,507. The patents are set to expire between 2018-2020. |
| | Angiotech Pharmaceuticals' (**ANPI**) U.S. patent nos. 5,616,608; 5,716,981; 6,403,635; 6,429,232; and 6,544,544. The patents are set to expire between 2014-2019. |
| | Boston Scientific's (**BSX**) U.S. patent nos. 5,733,925; 5,811,447; 5,922,021; 6,074,659; 6,120,536; 6,171,609; 6,251,920; 6,306,421; 6,515,009; 6,599,928; 6,663,881 and 6,783,543. The patents are set to expire between 2015-2021. |
| | Guidant's (**GDT**) U.S. patent nos. 5,514,154; 6,066,167; 6,432,133; 6,485,511; 6,596,022; and 6,689,159.[1] The patents are set to expire between 2012-2021. |
| | Johnson & Johnson's (**JNJ**) U.S. patent no. 5,895,406 (set to expire Dec. 20, 2016).[2] |
| | Medinol Ltd.'s U.S. patent nos. 5,733,303; 5,843,120; 5,972,018; 6,443,982; and 6,461,381. The patents are set to expire between 2014-2015. |
| | MicroCHIPS, Inc.'s U.S. patent nos. 5,797,898 and 6,656,162. The patents are set to expire between 2016-2020. |
| | Sorin Biomedica's U.S. patent nos. 6,309,414 and 6,616,690 (both set to expire Nov. 4, 2017). |
| **Lawsuit Status:** | None in the U.S. |

**OVERVIEW:** Conor's CoStar drug-eluting stent is in clinical trials. Conor has several patents covering aspects of the CoStar stent design.

This report focuses on Conor's potential ability to use its patents to block copies of the CoStar stent and Conor's potential infringement exposure to other companies' stent patents by the CoStar stent. Our analysis of Conor's potential patent infringement exposure is limited to stent patents identified in Conor's 2004 annual report and other stent patents asserted in the ongoing BSX-JNJ stent litigation; therefore, Conor may be exposed to infringement of other stent patents which we have not yet reviewed. Moreover, we focus primarily on issues associated with patent infringement rather than patent validity. We plan to report in the future on Conor's protection and exposure regarding patents covering stent delivery catheters and methods of manufacturing stents.

**CONCLUSIONS:** First, Conor's patents appear adequate to prevent copying of its CoStar stent. Second, the CoStar stent appears exposed to infringement of patents owned by Guidant, BSX, Medinol and Sorin. Third, even if a jury finds infringement, if the CoStar stent is shown to be clinically superior to other drug-eluting stents in some aspect, the courts will be more likely to permit ongoing manufacture and sale of the CoStar stent (requiring a reasonable royalty payment) due to the public interest in keeping a life-saving device on the market.

---

[1] The owner of the patents is Advanced Cardiovascular, which is a wholly-owned subsidiary of Guidant.

[2] The owner of the patent is Cordis, which is a wholly-owned subsidiary of JNJ.

- **Conor's Patents Appear Adequate to Prevent Copying of the CoStar Stent.** Conor's '762, '065 and '507 patents claim the mechanical design of the CoStar stent and issued after an apparently thorough Patent Office review. Conor's patents appear to effectively block potential competitors from copying the mechanical design of the CoStar stent.

- **The CoStar Stent May Infringe Other's Patents.** Conor's CoStar stent appears to be exposed to infringement of patents owned by BSX, Guidant, Medinol and Sorin. We have insufficient information about the CoStar stent to determine Conor's infringement exposure to MicroCHIPs. The CoStar stent appears not to infringe the patents we reviewed that are owned by Angiotech or JNJ.

- **Royalty Appears More Likely Than Injunction If the CoStar Stent is Superior to Available Alternatives.** Courts normally issue an injunction against continued manufacture and sale of an infringing device. However, an injunction is an equitable (fairness-based) remedy. Consequently, the courts have the authority to deny a patent owner's request for an injunction if the public interest would be harmed as a result of the injunction.

  - Although injunctions are almost always issued if a product infringes a valid and enforceable patent, the "public interest" exception may apply to the CoStar stent even if it is found to infringe one or more patents, as long as clinical trials show that the CoStar stent has superior outcomes for some patient population.

- **Timing of U.S. Lawsuits is Unknown.** Conor likely could obtain a dismissal of any U.S. patent infringement lawsuit while it manufactures and uses the CoStar stent in the U.S. solely for purposes related to obtaining FDA approval of the stent, because actions related to FDA approval satisfy a safe harbor provision in the patent statute. A U.S. patent infringement lawsuit would become "ripe" if and when FDA approval of the CoStar stent appears imminent.

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

# I.    BACKGROUND

We have reviewed more than 30 patents in the course of preparing this report.[3]  In order to avoid presenting an overwhelming amount of information, we do not provide any detailed information on those patents that the CoStar stent appears not to infringe.[4]  In addition, in the circumstance where a group of patents are closely related and more than one of the group appear to read on the CoStar stent, we provide information only on a single representative patent claim rather than one representative claim from each patent in the group.

This section first provides information on the CoStar stent and Conor's relevant stent patents.  We then provide information on other patents on a company-by-company basis.

## A.    Conor's CoStar Stent and Patents

**The CoStar Stent.**  The mechanical design of Conor's CoStar stent is a combination of "struts," "ductile hinges," "bridging elements," and "beneficial agent openings."  Those elements perform the following functions:

- Struts are rigid bars that do not significantly bend or deform when the stent diameter changes.  The struts are substantially parallel when the stent diameter is small and form V-shapes when the stent is expanded.

- Ductile hinges deform substantially when the stent diameter changes.  A ductile hinge is at the apex of the V-shape that is formed (with two struts as the sides of the V) when the stent expands.

- Bridging elements connect cylindrical strut structures.  Bridging elements add longitudinal flexibility to the stent, which is particularly important when a surgeon is inserting a stent.

- Beneficial agent openings are holes in the struts which can hold one or more polymer layers which contain one or more drugs.  The drug in the CoStar stent that is in clinical trials is paclitaxel (taxol).

The following figures show Conor's basic stent design and a side view of a portion of the CoStar stent:

**Conor Stent Design Elements**          **CoStar Stent Side View**





---

[3]        Conor identified most of the patents we reviewed for this report in its March 31, 2005 annual report.  We reviewed additional BSX and JNJ patents that are at issue in the BSX-JNJ litigation which we covered in our August 15, 2005 report.

[4]        We will discuss the details associated with our non-infringement conclusions upon request.

The following figures show the substantially parallel struts before expansion, the V-shapes formed after expansion, and an offset in the lines bisecting the V-shapes formed by the struts when the stent is expanded:

**CoStar Stent (Before Expansion**

**CoStar Stent (After Expansion)**




**Conor's Patents**. Conor's '762, '065 and '507 patents cover aspects of the design embodied by the CoStar stent. The broadest claims in Conor's '762, '065 and '507 patents contain the following limitations:

- '762 patent: A stent comprising (a) a plurality of struts joined together to form a substantially cylindrical device; and (b) a plurality of ductile hinges connecting the struts together, where (i) the ductile hinges have a substantially constant width along at least 1/3 of the total hinge length, (ii) the hinge width is smaller than the hinge thickness, and (iii) the hinge width is smaller than the strut width, (c) so that the ductile hinges experience plastic deformation and the struts are not plastically deformed as the stent is expanded.

- '065 patent: A stent comprising (a) a plurality of struts joined together to form a substantially cylindrical device which is expandable, where the struts are undeformed during expansion; (b) a plurality of ductile hinges connecting the struts, where the ductile hinges have a smaller cross sectional area than the struts; and (c) the struts include a plurality of holes for containing a beneficial agent.

- '507 patent: A stent comprising (a) a plurality of struts joined together to form a substantially cylindrical device which is expandable, where (i) adjacent struts are substantially parallel when the cylinder is at an unexpanded diameter and (ii) form V-shapes when the cylinder is expanded; and (b) a plurality of pivots joining the plurality of struts, where (i) one pivot joins each two adjacent struts and (ii) the pivots are each located offset from a line bisecting the V-shapes formed by the struts when the stent is expanded.

**B.    Angiotech Patents**

**Summary**. Conor identified five Angiotech patents as potentially covering its CoStar stent: U.S. patent nos. 5,616,608; 5,716,981; 6,403,635; 6,429,232 and 6,544,544. We currently conclude that the CoStar stent appears not to infringe any of those patents.

**C.    Boston Scientific Patents**

**Summary**. Conor identified ten BSX U.S. patents as potentially covering its CoStar stent: U.S. patent nos. 5,733,925; 5,811,447; 6,074,659; 6,171,609; 6,251,920; 6,306,421; 6,515,009; 6,599,928; 6,663,881 and 6,783,543. We reviewed two additional BSX patents (U.S. patent nos. 5,922,021 and 6,120,536) which are at issue in the BSX-JNJ stent litigation.

We currently conclude that that CoStar stent appears not to infringe the '925, '447, '659, '536, '421 and '881 patents. We provide information below on BSX's '021, '609, '920, '009, '928 and '543 patents.

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

The '609, '009 and '928 patents are closely related. We therefore review below one representative claim from the '609, '009 and '928 patents, as well as representative claims from the '021, '920, '543 patents.

- '928 patent: A method for maintaining vessel luminal area comprising inserting into a vessel an intravascular stent comprising a cytostatic agent that does not exhibit substantial cytotoxicity in an amount which allows for vascular repair and extracellular matrix production and reduces stenosis or restenosis upon placement of the stent.[5]

- '021 patent: A stent comprising (a) a plurality of expansion columns, with each expansion column comprising (i) an expansion strut, (ii) a joining strut, and (iii) expansion strut corners, (b) where the first expansion strut in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut in the adjacent expansion column.[6]

- '920 patent: A method of treating vascular trauma characterized by a decreased lumen diameter comprising administering a cytostatic dose of a therapeutic agent, where the cytostatic dose is effective to increase the level of TGF-beta so as to inhibit smooth muscle cell proliferation, inhibit lipid accumulation, plaque stability, or any combination thereof.[7]

---

[5]    The '009/'609/'928 patent specification (the "teaching" portion of the patent that precedes the claims) discloses that drug-eluting stents may be used to administer a cytostatic drug, including taxol (paclitaxel):

> One specific therapeutic method and dosage form of the present method involves the **placement of metallic, plastic or biodegradable intravascular stents comprising a biodegradable coating or a porous non-biodegradable coating, having dispersed therein the sustained-release dosage form.** ...  Preferably, in this embodiment of the invention, the therapeutic agent is cytochalasin, and most preferably is cytochalasin B, or a function equivalent analogue thereof.
>
> ...  For treatment of pathologically proliferating normal tissues ..., anti-proliferative agents are preferred (e.g., cytochalasins, **taxol**, ..., and the like).

[6]    The following figures from the '021 patent show expansion columns, expansion struts, joining struts, and expansion strut corners:

**Elements of the Stent Covered by the '021 Patent**




[7]    The specification of the '920 patent states that drug-eluting stents may be used in the claimed treatment method:

> A stent or shunt useful in the present method con comprise a biodegradable coating or porous non-biodegradable coating, having dispersed therein the sustained-release dosage form.

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

'543 patent: A stent comprising a plurality of (a) expansion struts that are substantially parallel to each other, (b) connector struts, and (c) a plurality of micro-holes that extend from the outer surface through the inner surface, where the micro-holes are configured to provide a plurality of reservoirs for a substance, and (d) a substance contained in the reservoirs.[8]

### D.    Guidant Patents

**Summary.**  Conor identified six Guidant patents as potentially covering its CoStar stent: U.S. patent nos. 5,514,154; 6,066,167; 6,432,133; 6,485,511; 6,596,022; and 6,689,159.

We currently conclude that that CoStar stent appears not to infringe the `154, `511 and `159 patents. We provide information below on Guidant's `167, `133 and `022 patents.

All of these Guidant patents are closely related and share a common specification. We therefore review below one representative claim from the `022 patent.

- `022 patent: A stent with (a) adjacent cylindrical elements having an undulating component, and (b) a plurality of interconnecting members, (c) where at least some of the interconnecting members have a cross-sectional width that is less than the cross-sectional width of the undulating component.[9]

---

[8]       The following figure from the `543 patent shows elements of the claimed drug-eluting stent design:

**Elements of the Drug-Eluting Stent Covered by the '543 Patent**



The patent specification reads as follows regarding micro-holes:

> The size of micro holes can be based on the physical dimensions of the expansion struts and connector struts. ... Micro holes can have substantially smaller widths or diameters than the widths of the expansion struts and connector struts in order to maintain structural integrity and radial strength of the stent. ... The distance between micro holes is selected to maintain the integrity of the stent while providing an optimal number of micro holes to provide a sufficient coating substance retaining capacity. Micro holes in connector struts can be made smaller than micro holes in expansion struts and vice versa.

> Micro holes can have more than one shape including circular, square, oval, ... polygonal or a combination thereof.

[9]       This figure from the `022 patent shows an undulating pattern in cylindrical elements:



This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

### E.    JNJ Patent

**Summary.** Conor did not identify any JNJ patents as potentially covering its CoStar stent. We added JNJ's U.S. patent no. 5,895,406 since JNJ asserted that patent against BSX's Taxus stent.

We currently conclude that that CoStar stent appears not to infringe the '406 patent.

### F.    Medinol Patents

**Summary.** Conor identified five Medinol U.S. patents as potentially covering its CoStar stent: 5,733,303; 5,843,120; 5,972,018; 6,443,982; and 6,461,381. We provide information below on those patents.

All of these Medinol patents are related and share an identical specification. We therefore review below one representative claim from the '303 patent.

- <u>'120 patent</u>: A stent having a patterned shape comprising (a) a plurality of first meanders which extend in a first direction on the cylinder of the stent, (b) a plurality of second meanders which extend in a different direction on the cylinder of the stent, (c) where the first and second meanders are formed with loops (d) and are interconnected so that at least one of the loops of each of the first meanders is disposed between each consecutive second meander to which the first meander is connected, (e) and at least one of the loops of each of the second meanders is disposed between each consecutive first meander to which it is connected, (f) so that the first and second meanders define a plurality of enclosed spaces on the cylinder of the stent.[10]

### G.    MicroCHIPs Patents

Conor identified two MicroCHIPs U.S. patents as potentially covering its CoStar stent: 5,797,898; and 6,656,162.

We currently conclude that that CoStar stent appears not to infringe the '898 patent. We provide information below on MicroCHIP's '162 patent.

---

[10]    The following figures from the Medinol patent specification shows all of the elements from the claim:




This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

- '162 patent: A device for the controlled release of one or more drugs comprising (a) an implantable stent, (b) at least two reservoirs in the stent, and (c) a release system contained in each of the reservoirs where the release system comprises one or more drugs for release.[11]

### H.    Sorin Patents

Conor identified two Sorin U.S. patents as potentially covering its CoStar stent: 6,309,414 and 6,616,690. We provide information below on these patents.

Sorin's '414 and '690 patents are closely related and share a common specification. We therefore review below one representative claim from the '414 patent.

- '414 patent: A stent having (a) a plurality of annular segments where each annular segment is connected to at least one other annular segment by at least one bridge connector, (b) where a first portion of at least one annular segment has a first cross-sectional shape and a second portion of the annular segment has a different cross-sectional shape, and (c) the first and second cross-sectional shapes are configured to optimize at least one characteristic of the stent selected from plastic deformability, resistance to the formation of areas of concentrated stress regions along the wall of the vessel where the stent is expanded, and resistance to bending.[12]

## II.    DISCUSSION

**Overview.** In this section we analyze Conor's ability to prevent others from copying the CoStar stent. We also discuss Conor's potential infringement exposure regarding the CoStar stent and specific stent patents identified by Conor.

We focus our analysis on infringement issues. Our infringement analysis is based on the broadest claims in each patent. However, the patents we reviewed often contain several dozen claims apiece. A patent owner may assert in litigation patent claims that contain additional limitations, and therefore have substantially narrower coverage than the broader, representative claims that we analyze in this report. Consequently, our assessments about the exposure of Conor's CoStar stent to potential infringement

---

[11]    The specification of the '162 patent describes active (electronically-controlled) and passive release systems. The patent describes a passive release system as comprising three elements:

> The microchip devices include (1) a substrate, (2) at least two reservoirs in the substrate containing the **molecules for release**, and (3) a **reservoir cap** positioned on, or within a portion of, the reservoir and over the molecules, so that the molecules are controllably released from the device by diffusion through or upon disintegration or rupture of the reservoir caps.

[12]    The following figure from the '414 /'690 patent specification shows the limitations in the claim:



This document is for the exclusive use of the company receiving this report directly from IPD Analytics
REDISTRIBUTION IS STRICTLY PROHIBITED

decisions on a patent should be used as a guide rather than the final word on the ultimate outcome of a patent lawsuit that may take years to litigate. We presume for purposes of this report that the patent claims that we reviewed are valid and enforceable.[13]

We limited our analysis of Conor's potential patent infringement exposure to the stent patents identified in Conor's 2004 annual report and other stent patents asserted in the ongoing BSX-JNJ stent litigation. Conor may be exposed to infringement of other stent patents which we have not yet reviewed. In the circumstance where a group of patents are closely related and more than one patent in the group appears to read on the CoStar stent, we provide information only on a single claim that is representative of the entire group of patents. In order to avoid an overwhelming amount of information, we do not provide any detailed information on those patents that the CoStar stent appears not to infringe.

**Summary.** As discussed below, Conor's patents appear sufficient to protect against copying of the CoStar stent. Conversely, the CoStar stent appears exposed to potential infringement decisions on patents owned by BSX, Guidant, Medinol and Sorin (but the CoStar stent does not appear to infringe any of the Angiotech or JNJ patents we reviewed).[14] However, if clinical trials show that the CoStar stent offers better patient outcomes than other available stents, the courts will be more likely to permit continued manufacture and sale of the CoStar stent (and requiring payment of a reasonable royalty to the patent owner) rather than enter an injunction that halts such manufacture and sale.

### A.    Conor's Ability to Prevent Copying of the CoStar Stent

**Legal Standard.** The patent owner has the burden of proving infringement by a preponderance of the evidence. A preponderance of the evidence is met when something is shown to be more likely than not.

An infringement analysis is performed on a claim by claim basis.[15] The analysis has two steps. The first step involves interpretation ("construction") of disputed terms in the asserted claim(s). The second step involves comparing the construed claim(s) to the accused product. Literal infringement occurs if every limitation in the claim corresponds to ("reads on") an element of the product.

**Analysis.** All three of Conor's primary stent patents (the '762, '065 and '507 patents) have claims that appear to provide useful protection against copying of the CoStar stent. However, the '065 patent may provide the broadest protection. The critical limitations in the broadest claim in that patent cover a stent comprising (a) struts that do not deform during expansion of the stent, (b) ductile hinges having a smaller cross sectional area than the struts, and (c) a plurality of holes in the struts that may contain a drug. In our view, the broadest claim in the '065 patent claims the critical design parameters of the CoStar stent without additional limitations that narrow the scope of coverage of the claim. Consequently, it appears that Conor has an effective blocking position against copying of the CoStar design.

### B.    Conor's Exposure to Other Stent Patents

As discussed below, the broad claims in patents owned by BSX, Guidant, Medinol and Sorin appear to read on the CoStar stent and therefore expose Conor to potential infringement liability. We review each company's patents in turn.

---

[13]    We cannot accurately assess the likelihood that a particular patent claim will be ruled invalid. The primary reason for this is that the specific validity challenges that an infringement defendant may raise in court are frequently different than what we might predict or expect.

[14]    Also, as discussed below, we have insufficient information about the CoStar stent to determine whether that stent may infringe MicroCHIP's '162 patent.

[15]    There is no difference in effect whether a device infringes one or more claims in a patent.

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

1.    **Potential Infringement of BSX Patents**

**Summary.** We currently conclude that the CoStar stent is exposed to potential infringement liability based on BSX's '021, '609, '920, '009, '928 and '543 patents. These six patents are from four groups (the '609, '009 and '928 patents are closely related).

**Analysis.** The following table summarizes the apparent correspondence between the limitations in representative claims in the patents and elements of the CoStar stent:

| BSX Patent | Claim | CoStar Stent |
|---|---|---|
| '928 patent | An intravascular stent comprising a cytostatic agent that does not exhibit substantial cytotoxicity | The CoStar stent uses paclitaxel, which the '928 patent describes as a cytostatic agent. |
|  | in an amount which allows for vascular repair and extracellular matrix production and reduces stenosis or restenosis upon placement of the stent. | We presume that the amount of paclitaxel in the CoStar stent performs these functions. |
| '021 patent | A stent comprising a plurality of expansion columns | Compare the CoStar stent figures on pages 3-4 with the BSX patent figures on pages 5-6. The rigid struts in the CoStar stent form a plurality of expansion columns. |
|  | with each expansion column comprising an expansion strut, a joining strut, and expansion strut corners | The rigid struts in the CoStar stent correspond to expansion struts (in the terminology of the '021 patent). The bridging elements in the CoStar stent correspond to the joining struts. The junction of the rigid struts and bridging elements in the CoStar stent correspond to expansion strut corners. |
|  | where the first expansion strut in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut in the adjacent expansion column. | The rigid struts in adjoining cylindrical elements of the CoStar stent appear to be offset. |
| '920 patent | Administering a cytostatic dose of a therapeutic agent | The CoStar stent administers paclitaxel, which the '920 patent describes as a cytostatic agent. |
|  | where the cytostatic dose is effective to increase the level of TGF-beta so as to inhibit smooth muscle cell proliferation, inhibit lipid accumulation, plaque stability, or any combination thereof. | We presume that the amount of paclitaxel in the CoStar stent performs these functions.[16] |

(continued on next page)

---

[16]    JNJ has argued in the BSX-JNJ stent litigation that BSX cannot prove that any drug in a drug-eluting stent performs the functions identified in the '920 patent. However, as we reported in our August 15, 2005 report, it appears more likely than not that BSX will be able to meet its burden of proof to show that the sirolimus in JNJ's Cypher stent performs the claimed functions. This outcome currently seems even more likely for the CoStar stent, since the '920 patent expressly discusses the use of paclitaxel as a preferred therapeutic agent.

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

| BSX Patent | Claim | CoStar Stent |
|---|---|---|
| '543 patent | A stent comprising expansion struts that are substantially parallel to each other | The rigid struts of the unexpanded CoStar stent appear to be substantially parallel. |
| | connector struts | The bridging elements in the CoStar stent correspond to the claimed connector struts. |
| | micro-holes that extend from the outer surface through the inner surface, where the micro-holes are configured to provide a plurality of reservoirs for a substance, | The holes in the struts of the CoStar stent correspond to the claimed micro-holes. |
| | and a substance contained in the reservoirs. | The holes in the CoStar stent are filled with polymer and paclitaxel. |

The table shows that the broad claims in the '928 patent (and by extension, the '609 and '009 patents), the '021 patent, and the '543 patent appear to read on the CoStar stent. We therefore conclude that BSX's '021, '609, '920, '009, '928 and '543 patents expose the CoStar stent to infringement liability.

### 2.    Potential Infringement of Guidant Patents

**Summary.** We currently conclude that the CoStar stent is exposed to potential infringement liability based on Guidant's '167, '133 and '022 patents.

**Analysis.** The '167, '133 and '022 patents are closely related. The following table therefore summarizes the apparent correspondence between the limitations in a representative claim in the '022 patent and elements of the CoStar stent:

| Guidant Patent | Claim | CoStar Stent |
|---|---|---|
| '022 patent | A stent with adjacent cylindrical elements having an undulating component | Compare the CoStar stent figures on pages 3-4 with the Guidant patent figures on page 6. The rigid struts in the CoStar stent are connected to form a series of cylindrical elements. The struts are connected in a way that appears to satisfy the "undulating" (back-and-forth) limitation. |
| | a plurality of interconnecting members | The bridging elements in the CoStar stent function as interconnecting members between adjacent cylindrical elements. |
| | where at least some of the interconnecting members have a cross-sectional width that is less than the cross-sectional width of the undulating component | The bridging elements in the CoStar stent appear to have a cross-sectional width that is substantially smaller than the cross-sectional width of the rigid struts (the structure corresponding to the undulating component). |

The table shows that the broad claim in the '022 patent (and by extension, the '167 and '133 patents) appears to read on the CoStar stent. We therefore conclude that Guidant's '022, '167 and '133 patents expose the CoStar stent to infringement liability.

### 3.    Potential Infringement of Medinol Patents

**Summary.** We currently conclude that the CoStar stent is exposed to potential infringement liability based on Medinol's '303, '120, '018, '982 and '381 patents.

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

**Analysis.** These five patents are closely related. The following table therefore summarizes the apparent correspondence between the limitations in a representative claim in the `120 patent and elements of the CoStar stent:

| Medinol Patent | Claim | CoStar Stent |
|---|---|---|
| `120 patent | A stent having a patterned shape comprising a plurality of first meanders which extend in a first direction on the cylinder of the stent | Compare the CoStar stent figures on pages 3-4 with the Medinol patent figures on page 7.<br>The rigid strut cylindrical elements of the CoStar stent appear to correspond to the "first meanders." The "first direction" is circumferential around the surface of the stent. |
| | a plurality of second meanders which extend in a different direction on the cylinder of the stent | The bridging elements of the CoStar stent appear to correspond to the "second meanders." The "second direction" is along the longitudinal axis of the stent. |
| | where the first and second meanders are formed with loops | The cylindrical elements of the CoStar stent are constructed with alternating left- and right-hand rigid struts which appear to correspond to the claimed loops. Similarly, the bridging elements of the CoStar stent have a serpentine structure that appears to correspond to the claimed loops. |
| | and are interconnected so that at least one of the loops of each of the first meanders is disposed between each consecutive second meander to which the first meander is connected and at least one of the loops of each of the second meanders is disposed between each consecutive first meander to which it is connected | The cylindrical elements and bridging elements of the CoStar stent appear to meet the interconnection and "interspersed loops" limitations. |
| | so that the first and second meanders define a plurality of enclosed spaces on the cylinder of the stent. | The rigid struts and bridging elements are connected in the CoStar stent in a way that appears to define enclosed spaces on the outer surface of the stent. |

The table shows that the broad claim in the `120 patent (and by extension, the `303, `018, `982 and `381 patents) appears to read on the CoStar stent. We therefore conclude that Medinol's `303, `120, `018, `982 and `381 patents expose the CoStar stent to infringement liability.

### 4. Potential Infringement of Sorin Patent

**Summary.** We currently conclude that the CoStar stent is exposed to potential infringement liability based on Sorin's `414 and `690 patents.

**Analysis.** These two patents are closely related. The following table therefore summarizes the apparent correspondence between the limitations in a representative claim in the `414 patent and elements of the CoStar stent:

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

| Sorin Patent | Claim | CoStar Stent |
|---|---|---|
| '414 patent | A stent having a plurality of annular segments where each annular segment is connected to at least one other annular segment by at least one bridge connector | Compare the CoStar stent figures on pages 3-4 with the Sorin patent figure on page 8. The rigid strut cylindrical elements of the CoStar stent appear to correspond to the "annular segments." Each cylindrical element of the CoStar stent is connected to at least one other cylindrical element by at least one bridge element. |
| | where a first portion of at least one annular segment has a first cross-sectional shape and a second portion of the annular segment has a different cross-sectional shape | The cross-section of the rigid struts in the CoStar stent is different than the cross-section of the ductile hinges in the stent. |
| | and the first and second cross sectional shapes are configured to optimize at least one characteristic of the stent selected from plastic deformability resistance to the formation of areas of concentrated stress regions along the wall of the vessel where the stent is expanded and resistance to bending | The differences in the cross-sections of the rigid struts and the ductile hinges of the CoStar stent appear to have been chosen to optimize the resistance to plastic deformation of the rigid struts. |

The table shows that the broad claim in the '414 patent appears to read on the CoStar stent. We therefore conclude that Sorin's '414 and '690 patents expose the CoStar stent to infringement liability.

## 5. Potential Infringement of MicroCHIP Patent

**Summary.** We currently cannot determine whether the CoStar stent may be exposed to potential infringement liability based on MicroCHIP's '162 patent.

**Analysis.** The following table summarizes the correspondence between the limitations in a representative claim in the '162 patent and elements of the CoStar stent:

| MicroCHIP Patent | Claim | CoStar Stent |
|---|---|---|
| '162 patent | A device for the controlled release of one or more drugs comprising an implantable stent | The CoStar stent is an implantable stent. |
| | at least two reservoirs in the stent | The CoStar stent has a plurality of holes that act as drug reservoirs. |
| | and a release system contained in each of the reservoirs where the release system comprises one or more drugs for release. | "Release system" likely will be interpreted by the court to include a substrate and a reservoir cap positioned on, or within a portion of, the reservoir and over the molecules. The court more likely than not will determine that a "reservoir cap" is a distinct material from the polymer/drug matrix found below the cap. There is insufficient information to confirm whether the CoStar stent uses a reservoir cap. |

The table indicates that whether the broad claim in the '162 patent reads on the CoStar stent depends on whether the CoStar stent uses a "reservoir cap" over the bulk polymer/drug matrix in the strut holes of the stent. There is insufficient information to confirm whether the CoStar stent uses such a reservoir cap. We

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

therefore cannot conclude whether or not MicroCHIP's '162 patent exposes the CoStar stent to infringement liability.

### C.    Low Likelihood of Injunction If the CoStar Stent has Superior Clinical Performance

Courts normally issue injunctions against future manufacture and sale of infringing products during the remaining term of the infringed patent(s). There is an exception to this normal outcome when the public interest would be substantially damaged by such an injunction.

Therefore, if clinical trials of the CoStar stent show that that device provides superior benefits to patients compared to the other available stents, a district court more likely than not would refuse to enter an injunction against ongoing manufacture and sale of the stents. However, in that scenario the court would then require Conor to pay the owner of the infringed patent(s) a reasonable royalty for all sales until the infringed patent(s) expired.

### D.    Timing

Conor likely could obtain a dismissal of any U.S. patent infringement lawsuit while it manufactures and uses the CoStar stent in the U.S. solely for purposes related to obtaining FDA approval of the stent because actions related to FDA approval satisfy a safe harbor provision in the patent statute. A U.S. patent infringement lawsuit would become "ripe" if and when FDA approval of the CoStar stent appears imminent.

This document is for the exclusive use of the company receiving this report directly from IPD Analytics
REDISTRIBUTION IS STRICTLY PROHIBITED

This document is for the exclusive use of the company receiving this report directly from IPD Analytics.
REDISTRIBUTION IS STRICTLY PROHIBITED

### DISCLOSURE / DISCLAIMER

THIS REPORT IS NOT DIRECTED TO, OR INTENDED FOR DISTRIBUTION TO OR USE BY, ANY PERSON OR ENTITY WHO IS A CITIZEN OR RESIDENT OF, OR LOCATED IN ANY LOCALITY, STATE, COUNTRY OR OTHER JURISDICTION WHERE SUCH DISTRIBUTION, PUBLICATION, AVAILABILITY OR USE WOULD BE CONTRARY TO LAW OR REGULATION OR WHICH WOULD SUBJECT IPD ANALYTICS, LLC (COLLECTIVELY REFERRED TO HEREIN AS "IPDA") OR ANY OF ITS SHAREHOLDERS, OFFICERS, DIRECTORS, MEMBERS, AFFILIATES, EMPLOYEES OR AGENTS TO ANY REGISTRATION OR LICENSING REQUIREMENT WITHIN SUCH JURISDICTION. ALL EXPRESSIONS OF OPINIONS IN THIS REPORT ARE SUBJECT TO CHANGE WITHOUT NOTICE AND IPDA DOES NOT UNDERTAKE TO UPDATE OR SUPPLEMENT THIS REPORT OR ANY OF THE INFORMATION CONTAINED HEREIN. THIS REPORT IS BASED SOLELY UPON PUBLICLY AVAILABLE INFORMATION OBTAINED BY IPDA FROM SOURCES BELIEVED BY IT TO BE ACCURATE AND RELIABLE, HOWEVER, SUCH INFORMATION IS PRESENTED "AS IS," WITHOUT WARRANTY OF ANY KIND; IPDA MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO ACCURACY, TIMELINESS OR COMPLETENESS OF ANY PORTION OF THE REPORT, ANY INFORMATION CONTAINED THEREIN, OR THE RESULTS TO BE OBTAINED FROM ITS USE, AND THE READER AGREES NOT TO MAKE ANY CLAIM BASED IN ANY WAY ON ANY INACCURACY IN THAT MATERIAL AGAINST IPDA, ITS AGENTS AND/OR SUPPLIERS.

THIS RESEARCH WAS PREPARED AND ISSUED BY IPDA FOR DISTRIBUTION SOLELY TO MARKET COUNTERPARTIES OR INTERMEDIATE OR PROFESSIONAL CUSTOMERS AND NOT FOR DISTRIBUTION TO THE GENERAL PUBLIC. THIS REPORT IS NOT AN OFFER TO BUY OR SELL ANY SECURITY AND IT DOES NOT CONSTITUTE INVESTMENT OR LEGAL ADVICE. INVESTMENT IN ANY OF THE ENTITIES REFERRED TO HEREIN MAY NOT BE SUITABLE FOR YOU. INVESTORS MUST MAKE THEIR OWN INVESTMENT DECISIONS IN CONSULTATION WITH THEIR PROFESSIONAL ADVISORS IN LIGHT OF THEIR SPECIFIC CIRCUMSTANCES. THE VALUE OF INVESTMENTS MAY FLUCTUATE AND INVESTMENTS THAT ARE DENOMINATED IN FOREIGN CURRENCIES MAY FLUCTUATE IN VALUE AS A RESULT OF EXPOSURE TO EXCHANGE RATE MOVEMENTS. INFORMATION ABOUT PAST PERFORMANCE OF AN INVESTMENT IS NOT NECESSARILY A GUIDE TO, INDICATOR OF, OR ASSURANCE OF, FUTURE PERFORMANCE. IPDA OR ONE OR MORE OF ITS SHAREHOLDERS, OFFICERS, DIRECTORS, MEMBERS, AFFILIATES, EMPLOYEES OR AGENTS MAY AT ANY TIME HOLD, INCREASE OR DECREASE POSITIONS IN SECURITIES OF ANY COMPANY MENTIONED HEREIN.

IPDA SHALL NOT IN ANY CIRCUMSTANCES BE LIABLE TO ANY RECIPIENT OF THIS REPORT OR ANY THIRD PARTY, WHETHER IN CONTRACT, TORT OR OTHERWISE, FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES OR LOSS ARISING FROM THIS REPORT OR RECIPIENT'S USE OF ANY INFORMATION IN THIS REPORT, INCLUDING, BUT NOT LIMITED TO, DAMAGES ARISING FROM ANY TYPE OR MANNER OF COMMERCIAL, BUSINESS OR FINANCIAL LOSS OCCASIONED BY, OR RESULTING FROM, ANY UNINTENTIONAL BREACH OF CONTRACT, NEGLIGENCE, OR ANY OTHER TORT ARISING FROM ANY AGREEMENT RELATING TO THIS REPORT.

IN THE EVENT THAT THE ABOVE DISCLAIMERS OF LIABILITY AND WARRANTIES ARE FOUND UNENFORCEABLE, THE LIABILITY OF IPDA ARISING FROM THIS REPORT, ANY AGREEMENT RELATED TO THIS REPORT OR RECIPIENT'S USE OF ANY INFORMATION IN THIS REPORT TO RECIPIENT OR ANY THIRD PARTY FOR ANY REASON WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, ACTIONS IN NEGLIGENCE, CONTRACT, STRICT LIABILITY, BREACH OF WARRANTY OR TORT, SHALL NOT EXCEED $100.00.

# Exhibit G

 Windows Live™

🖨 Print                                                                      Close window

## Lunch or Dinner Next Week?

From: **Charles Haisch** (chaisch@mail.ipdanalytics.com)
Sent: Fri 1/06/06 5:50 PM
To: clarkscheney@hotmail.com

Hey Clark,

I am going to be in DC on January 12 and 13 (Thursday and Friday) to attend oral arguments at the Federal
Circuit and I was wondering if you would be available to meet for lunch or dinner while I am in town. I will be
available for lunch on Thursday (1:00 or later), dinner on Thursday (anytime), or lunch on Friday (1:00 or later).
Let me know if any of these times work for you. You can pick the restaurant again.

Best regards,

Charles F. Haisch

Analyst

IPD Analytics LLC

1177 Kane Concourse, Suite 300

Bay Harbor Islands, Florida  33154

Tel: (305) 662-8515

Cell: (305) 788-8932

Fax: (305) 993-1883

E-mail: chaisch@ipdanalytics.com

# Exhibit H

 Windows Live™

Close window

Print

# Sorry I Missed Your Call

From: **Charles Haisch** (chaisch@mail.ipdanalytics.com)
Sent: Mon 1/23/06 10:43 AM
To: 'Clark Cheney' (clarkscheney@hotmail.com)

Clark,

Sorry I missed your call last night. I was giving my son a bath and didn't notice your voicemail until this morning. Jim mentioned that he spoke with you this morning so you've probably heard enough from us for one day. Feel free to give me a call if you have any questions, otherwise, I will try to give you a call later this week to see how you are getting along in the decision-making process.

Best regards,

Charles F. Haisch

Analyst

IPD Analytics LLC

1177 Kane Concourse, Suite 300

Bay Harbor Islands, Florida 33154

Tel: (305) 662-8515

Fax: (305) 993-1883

E-mail: chaisch@ipdanalytics.com

# Exhibit I

 Windows Live™

📄 Print                                                                                                                    Close window

## Real Estate Info

From: **Charles Haisch** (chaisch@mail.ipdanalytics.com)
Sent: Mon 1/30/06 12:41 PM
To: 'Clark Cheney' (clarkscheney@hotmail.com)

Clark,

I spoke with my wife, Jean, who discussed this with our real estate agent.
Our own home purchase was typical for South Florida:

The real estate commissions came out of the purchase price paid to the
seller.  The buyer and seller split the closing costs in a pretty much
common-sense way (buyer pays for mortgage fees, insurance, title, recording,
deed, etc.; seller pays for fees associated with paying off his own
outstanding mortgage, back taxes, etc.; buyer and seller split settlement
costs).

When I spoke with Jean, she also recommended our own experience renting an
apartment for 6 months while getting used to South Florida.  We almost
bought a house immediately upon moving down here, but in retrospect, we're
glad the deal fell through because we had more time to do our research on
the weekends and we found a better value for our money than had we rushed
into something.

Hope this helps.

Best regards,

Charles

# Exhibit J



# Exhibit K

