UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

CLARK S. CHENEY,                                    Case No.: 1:08-cv-01044-JDB

      Plaintiff,

v.

IPD ANALYTICS, L.L.C.,
INTELLECTUAL PROPERTY
DEVELOPMENT, INC., and
HOWARD BENJAMIN KRASS,

      Defendants.

_____

_____

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS OR TRANSFER PURSUANT
TO THE CONTRACTUAL FORUM SELECTION CLAUSE, FOR
LACK OF PERSONAL JURISDICTION, OR IMPROPER VENUE**

_____

## TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

REPLY ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    THIS CASE SHOULD BE DISMISSED OR TRANSFERRED PURSUANT TO THE CONTRACTUAL FORUM SELECTION CLAUSE, FOR LACK OF PERSONAL JURISDICTION, OR IMPROPER VENUE. . . . . . . . . . . . . . . . . . . . . . . 1

A.    Forum Selection Clause — The Plaintiff Agreed to Bring This Action Only In Courts in Miami, Florida. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.    There is No Merit To Mr. Cheney's Argument That Enforcement of The Forum Selection Clause Would Interfere With A Client's Choice of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.    The Forum Selection Clause Applies to *All* of Mr. Cheney's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3.    Litigating His Claims in the Southern District of Florida Will Not Deprive Mr. Cheney of His Day in Court. . . . . . . . . . . . . . . . . . . . . 12

4.    There is No Merit To Mr. Cheney's Argument That the Forum Selection Clause is Invalid for Fraud and Overreaching. . . . . . . . . . . . 15

B.    There is Neither General Nor Specific Jurisdiction Over These Defendants. . . . 15

1.    The Government Contacts Exception Applies to IPD Analytics' Observation of Federal Court Hearings in the District of Columbia. . . . 15

2.    IPD Analytics' Recruiting Activity In The District of Columbia Does Not Subject it To Personal Jurisdiction Under the District's Long-Arm Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3.    There is No Personal Jurisdiction Over IPD Analytics for Contracting With Clients to Supply Services in the District of Columbia. . . . . . . . . 19

4.    There is No Personal Jurisdiction Over Intellectual Property Development, Inc. or Howard Krass, Based On Prior Litigation in the District of Columbia or Imputation of Contacts. . . . . . . . . . . . . . . . . . 20

C.    Venue is Improper. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

SUMMARY CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*\*2215 Fifth Street Assoc., L.P. v. U-Haul Int'l, Inc.,*
148 F.Supp.2d 50 (D. D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Adams v. Saenger,*
303 U.S. 59 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Armco, Inc. v. North Atlantic Ins. Co., Ltd.,*
68 F.Supp.2d 330 (S.D. N.Y. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bonny v. Society of Lloyd's,*
3 F.3d 156 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Byrd v. Admiral Moving & Storage, Inc.,*
355 F.Supp.2d 234 (D. D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Carnival Cruise Lines, Inc. v. Shute,*
499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). . . . . . . . . . . . . . . . . . . . . . 14

*Coats v. Penrod Drilling Corp.,*
5 F.3d 877 (5th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*\*Commerce Consultants Int'l, Inc. v. Vetreire Riunite, S.p.A.,*
867 F.2d 697 (D.C. Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Diaz Contracting, Inc. v. Nanco Contracting Corp.,*
817 F.2d 1047 (3rd Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*D'Onofrio v. SFX Sport Group, Inc.,*
534 F.Supp.2d 86 (D. D.C. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Empson & Co. v. Mar-Salle Imports, Ltd.,*
1987 WL 12793 (D. D.C. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*\*Florida Bar v. AM Legal & Business Forms, Inc.,*
274 So.2d 225 (Fla. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*\*Florida Bar v. Consolidated Business and Legal Forms, Inc.,*
386 So.2d 797 (Fla. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

iv

**\*Florida Bar v. Town,**
    174 So.2d 395 (Fla. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**\*Furbee v. Vantage Press, Inc.,**
    464 F.2d 835 (D.C. Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Gasparini v. Pordomingo,*
    972 So.2d 1053 (Fla. 3d DCA 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*General Contracting & Trading Co., LLC v. Interpole, Inc.,*
    940 F.2d 20 (1st Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**\*Gipson v. Wells Fargo & Co.,**
    ___ F.Supp.2d ____, 2008 WL 2501149 (D. D.C. June 24, 2008). . . . . . . . . . . . . . . 8, 9

**\*Haynsworth v. The Corporation a/k/a Lloyds of London,**
    131 F.3d 956 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    885 F.2d 1149 (3rd Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Inv. Co. Inst. v. United States,*
    550 F.Supp. 1213 (D. D.C. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Jacobsen v. Oliver,*
    201 F.Supp.2d 93 (D. D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Klotz v. Xerox Corp.,*
    519 F.Supp.2d 430 (S.D. N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**\*Lambert v. Kysar,**
    983 F.2d 1110 (1st Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**\*Lentek Int'l, Inc. v. Greenspoon, Marder,**
    377 B.R. 396 (M.D. Fla. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Lex Tex Ltd. v. Skillman,*
    579 A.2d 244 (D.C. App. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**\*****Marra v. Papandreou**,
    59 F.Supp.2d 65 (D. D.C. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

*McGoldrick v. Datatrak Int'l, Inc.*,
    425 F.Supp.2d 893 (D. Minn. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). . . . . . . . . . . . . . . . . . . . . . . . . 3

**\*****Moncrief v. Lexington Herald-Leader Co.**,
    807 F.2d 217 (D.C. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Moses v. Business Card Exp., Inc.*,
    929 F.2d 1131 (6th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**\*****Neely v. Philadelphia Inquirer Co.**,
    62 F.2d 873 (D.C. Cir. 1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Nicolas v. MCI Health and Welfare Plan No. 501*,
    453 F.Supp.2d 972 (E.D. Tex. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

**\*****P & S Business Machines, Inc. v. Canon USA, Inc.**,
    331 F.3d 804 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Phillips v. Audio Active Ltd.*,
    494 F.3d 378 (2nd Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

*Prima Paint Corp. v. Flood and Conklin Mfg. Co.*,
    388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed. 1270 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Richards v. Duke University*,
    480 F.Supp.2d 222 (D. D.C. 2007), *summary aff'd*, 2007 WL 4589770 (D.C. Cir.
    2007), *cert den'd*, ___ U.S. ___, 128 S.Ct. 2438 (2008). . . . . . . . . . . . . . . . . . . . . . . . 19

*Sanchez v. AT&T Corp.*,
    1999 WL 1427692 (S.D. Fla. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Scherk v. Alberto-Culver Co.*,
    417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). . . . . . . . . . . . . . . . . . . . . . . . 3, 12

*Smith v. Lucent Tech., Inc.*,
    2004 WL 515769 (E.D. La. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*_Terra Int'l, Inc. v. Mississippi Chemical Corp._,
     119 F.3d 688 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*_The Bremen v. Zapata Off-Shore Co._,
     401 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). . . . . . . . . . . . . . . . . . . 3, 7, 11, 12, 15

*_U.S.F&G v. Petroleo Brasileiro S.A.-Petrobras_,
     2001 WL 300735 (S.D. N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATUTES

28 U.S.C. § 1391(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

28 U.S.C. § 1404(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. § 1406(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

29 U.S.C. § 1001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

29 U.S.C. § 1132(e)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 23

29 U.S.C. § 1161(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

District of Columbia Code § 13-423(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

District of Columbia Code § 13-423(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

District of Columbia Code § 13-423(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

## RULES

Federal Rule of Civil Procedure 12(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Federal Rule of Civil Procedure 12(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Florida Rules of Professional Conduct 4-1.6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**REPLY ARGUMENT**

I.    **THIS CASE SHOULD BE DISMISSED OR TRANSFERRED PURSUANT TO THE CONTRACTUAL FORUM SELECTION CLAUSE, FOR LACK OF PERSONAL JURISDICTION, OR IMPROPER VENUE**

    A.    **Forum Selection Clause — The Plaintiff Agreed to Bring This Action Only In Courts in Miami, Florida**

        1.    **There is No Merit To Mr. Cheney's Argument That Enforcement of The Forum Selection Clause Would Interfere With A Client's Choice of Counsel**

Mr. Cheney reasons that because defendants assert that under Florida law covenants not to compete are enforceable, "transferring this lawsuit to Florida would result in clients being deprived of the ability to choose Mr. Cheney as their attorney." Cheney Opp'n, p. 28 (DE-14, p. 34). The premise underlying Mr. Cheney's public policy argument is his assertion that the subscribers to IPD Analytics' newsletters were its clients, and IPD Analytics was their attorney. *See also* Compl., ¶ 1, p. 1 ("This lawsuit arises from Defendants' legal practice in Florida . . . .") (DE-1, p. 1).

IPD Analytics publishes a newsletter reporting on the status of patent litigation involving public companies. Krass Decl., ¶ 2, p. 1 (DE-8-2, p. 1). The subscribers to IPD Analytics' newsletters are not parties to the cases reported on in those newsletters, and cannot pick which patent cases IPD Analytics reports on in its newsletters. *Id*. at ¶ 2-3 (DE-8-2, pp. 1-2); Subscription Agreement at ¶ 1 ("The reports shall cover cases chosen at IPD Analytics' discretion.") (DE-8-2, pp. 1, 2, 6). IPD Analytics does not "represent" its subscribers before courts and does not give them legal advice or counsel as to *their* rights and obligations under the law — the basic definition of practicing law. *Florida Bar v. Town*, 174 So.2d 395, 396-97 (Fla. 1965); *Florida Bar v. AM Legal & Business Forms, Inc.*, 274 So.2d 225, 228 (Fla. 1973). Krass Suppl. Decl., ¶ 7, (Ex. "A" hereto).

That IPD Analytics employs lawyers as analysts to supply material for its newsletters, is not

equivalent to the practice of law. This is well illustrated by one of the cases Mr. Cheney cites, *Florida Bar v. Consolidated Business and Legal Forms, Inc.*, 386 So.2d 797 (Fla. 1980). In that case, a corporation owned by non-lawyers employed lawyers to provide legal services to the general public in exchange for a fee to be paid the corporation. These services included representing clients in certain proceedings for dissolution of marriage, personal bankruptcies, changes of name and adoptions. *Id*. at 798-99. When the defendant corporation would terminate one of its lawyer employees, it would require that lawyer to sign forms substituting other lawyers, who were employees of the defendant corporation, as counsel for the clients in pending proceedings, without the consent or knowledge of the clients. *Id*. at 800. The court distinguished the business of the defendant, which it found was the unauthorized practice of law *"from businesses who maintain lawyers as full time employees primarily to further a course of business other than the practice of law*." *Id*. at 798 (emphasis added).

Here, IPD Analytics employs lawyers to further its business of publishing a newsletter, copies of which are sold to multiple subscribers. Whether a lawyer-client relationship exists "hinges upon the client's reasonable 'belief that he is *consulting* a lawyer in that capacity and his *manifested intention* is to seek professional legal advice.'" *Lentek Int'l, Inc. v. Greenspoon, Marder*, 377 B.R. 396, 400 (M.D. Fla. 2007) (emphasis by court). Each subscriber signs a subscription agreement which clearly states on the first page:

> **No Attorney-Client Relationship**: Subscriber hereby acknowledges and agrees that none of IPD Analytics' activities create or constitute any attorney-client relationship between IPD Analytics, its principals, employees, shareholders, officers, directors, members, agents and/or affiliates . . . and the Subscriber. Subscriber understands and acknowledges that the research and reports it will be receiving pursuant to the Service will also be provided to other subscribers to the Service.

Krass Decl., ¶ 3, Subscription Agreement, ¶ 3 (DE-8-2, pp. 2, 6). Furthermore, as reflected in the last

sentence of the above quoted paragraph, the research and reporting is not for any particular subscriber. The newsletter is sent to all subscribers to the newsletter. Thus, a fundamental part of any attorney-client relationship is absent. Florida Rules of Professional Conduct 4-1.6, Comment ("A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to representation . . . .") There is no relationship between IPD Analytics and its subscribers other than publisher and subscriber. Krass Suppl. Decl., ¶ 7 (Ex. "A" hereto). Other than scale, this relationship is not unlike that between paid subscribers to a cable news network that employs full-time lawyers to analyze and report on pending legal cases. IPD Analytics' newsletters are targeted at institutional investors who compete with each other for investment capital and ideas. Krass Decl., ¶ 2 (DE-8-2, p. 1). An institutional investor who subscribes to an IPD Analytics' newsletter may have an advantage over one who does not but the latter can subscribe to the newsletter at any time, as the subscription agreements make clear. *Id*.

Against this backdrop, Mr. Cheney's public policy argument, that enforcement of the forum selection clause would interfere with a client's choice of counsel, is eviscerated. The real public policy at play here is the strong one favoring enforcement of forum selection clauses. *Furbee v. Vantage Press, Inc.*, 464 F.2d 835 (D.C. Cir. 1972); *Commerce Consultants Int'l, Inc. v. Vetrerie Riunite, S.p.A.*, 867 F.2d 697, 699-700 (D.C. Cir. 1989), *citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 3356, 87 L.Ed.2d 444 (1985), *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), and *The Bremen v. Zapata Off-Shore Co.*, 401 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).[1]

---

[1] IPD Analytics has no objection to Mr. Cheney's practicing law, as Mr. Cheney knows.  Defs.' Mem. in Opp'n to Pl.'s Cheney Mot. for Prelim. Inj., p. 5 (DE-9, p. 9). IPD Analytics objects to Mr. Cheney engaging in a competing business of publication and subscription sales of a newsletter generally reporting on patent litigation, for one year following his employment with IPD Analytics, five months of which have already elapsed. *Id*.

3

### 2.    The Forum Selection Clause Applies to *All* of Mr. Cheney's Claims

Mr. Cheney argues that "the forum selection clause does not encompass all of the claims of the lawsuit . . . ." Cheney Opp'n, p. 19 (DE-14, p. 25). He argues that "a claim-by-claim analysis with respect to the forum selection clause . . . shows that the gravamen of the Complaint is well beyond the scope of the [forum selection] clause." *Id.*, p. 20 (DE-14, p. 26). However, it takes more than a little massaging of the facts and the law for Mr. Cheney's analysis to yield the result he wants.

Mr. Cheney's massaging of the facts is manifest in his references to an "Equity Agreement" that, he asserts, was "executed separately" from the Employment Agreement containing the forum selection clause. *Id.*, p. 22. However, there is no separate contract called "Equity Agreement." This is what there is:

a.    An e-mailed letter from IPD Analytics to Mr. Cheney offering employment "*contingent on your execution of an Employment Agreement which is a condition of this offer* . . . ." Krass Suppl. Decl., ¶ 2 and referenced attachment (Ex. "A" hereto) (emphasis added). It is this e-mail that contains the reference to "equity," in the following sentence: "It is contemplated that in the event you achieve a performance level comparable to other Company Analysts, as part of your bonus package for calendar year 2007, the Company will provide an opportunity for you to obtain equity in the Company that would vest over subsequent years." *Id.*, p. 2;

b.    An e-mail response from Mr. Cheney accepting the offer, conditioned on his execution of an Employment Agreement. Krass Suppl. Decl., ¶ 2 and referenced attachment (Ex. "A" hereto) ("It is my honor to accept your offer *as described* in your message below.") (emphasis added); and

c.    The executed Employment Agreement incorporating the e-mailed offer letter. Employment Agreement, p. 1 (DE-8-2, p. 9) ("the Company desires to retain Employee as an

employee of the Company, and Employee desires to be so employed by the Company, *subject to the terms, conditions and covenants set forth in a separate offer letter* and additionally in this Agreement.") (emphasis added) (DE-8-2, p. 9).

Mr. Cheney's twisted parsing of the documents in his effort to portray the e-mailed offer letter as a separate "Equity Agreement" free of the forum selection clause in the Employment Agreement, is evident in his argument that: "The Equity Agreement had no provision delaying its effective date, and therefore became effective upon execution on February 3, 2006," while the "Employment Agreement expressly states that it became 'effective as of Employee's first day of employment,' which was March 6, 2006." Cheney Opp'n, pp. 22-23 (DE-14, pp. 28-29). However, the February 3, 2006 offer letter — the document Mr. Cheney calls "Equity Agreement" — says on its face that it will have no effect whatsoever until and unless Mr. Cheney executes an Employment Agreement. Krass Suppl. Decl., ¶ 2 and referenced attachment (Ex. "A" hereto) ("Your employment pursuant to this offer is contingent on your execution of an Employment Agreement which is a condition of this offer . . . .").

Mr. Cheney argues that the facts in this case "are similar to *Smith v. Lucent Tech., Inc.*" in which the court found a forum selection clause inapplicable to the claims. Cheney Opp'n, p. 23 (DE-14, p. 29). However, in *Smith* the contract containing the forum selection clause related to a "different subject matter" than the claims. 2004 WL 515769 at *16 (E.D. La.). Here, the subject matter of the contract and the claims are the same. For example, without his Employment Agreement containing the forum selection clause Mr. Cheney would not be able to make the following breach of contract claim in Count V of his Complaint:

18.    *On February 3, 2006*, Mr. Krass (on behalf of IPDA) and Mr. Cheney entered into a written contract, referred to herein as the Equity Agreement. Under the Equity Agreement, Mr. Krass and IPDA agreed, among other things, that Mr. Cheney would

receive equity ownership in IPDA as part of his bonus package for calendar year 2007.

\*                    \*                    \*

77.    Defendants entered into a contract with Mr. Cheney regarding equity ownership in IPDA.

78.    Defendants breached their contract with Mr. Cheney at least by failing to provide Mr Cheney with an opportunity to receive equity ownership in IPDA as part of Mr. Cheney's bonus for the 2007 calendar year.

Compl., Count V (Breach of Contract), ¶¶ 18, 77-78 (DE-1, pp. 4-5, 14) (emphasis added). The

February 3, 2006 document Mr. Cheney refers to as the "Equity Agreement" is the e-mail offering

employment "contingent on your execution of an Employment Agreement which is a condition of

this offer . . . ." Krass Suppl. Decl., ¶ 2 and referenced attachment (Ex. "A" hereto). Mr. Cheney did

execute the Employment Agreement. That agreement contains the forum selection clause. That

agreement makes his employment "subject to the terms, conditions and covenants set forth in [the]

separate offer letter" which is the document Mr. Cheney calls the "Equity Agreement."

All eleven counts of Mr. Cheney's complaint are connected to the forum selection clause.

Counts V, VI, and VII all allege the same "Equity Agreement," sometimes by contract, sometimes

by promise, and all seek the same relief, damages. Compl., Counts V-VII, pp. 14-16 (DE-1, pp. 14-

16).

Counts I through IV all seek a declaratory judgment related to the first two sentences of the

first paragraph of Mr. Cheney's Complaint, to wit: "This lawsuit arises from Defendants' legal

practice in Florida. Mr. Cheney seeks declaratory judgments that Defendants cannot prevent Mr.

Cheney from providing legal services in competition with Defendants." Compl., ¶ 1 (DE-1, pp. 1-2).

In Count I, Mr. Cheney alleges that under rules regulating lawyers he has an obligation to

communicate with the subscribers to IPD Analytics' newsletters. He calls those subscribers his

clients. Compl., Count I (DE-1, pp. 11-12). The relief Mr. Cheney seeks is "a judgment declaring

6

that the 'Non-Competition' paragraph of the Employment Agreement is unenforceable." Compl., Prayer for Relief, ¶ (a), p. 20 (DE-1, p. 20). That is the agreement that contains the forum selection clause. Employment Agreement, ¶ 1.8, p. 3 (DE-8-2, p. 11). In Count II, Mr. Cheney avers that the non-competition clause of the Employment Agreement constitutes an improper restriction on his ability to practice law. Compl., ¶ 62 (DE-1, p. 12). In Count III, Mr. Cheney claims that the provisions in the Subscription Agreements between IPD Analytics and its subscribers — that they will not contract with former employees of IPD Analytics within one year of the employee's departure or within one year of the termination of their subscription agreement — infringes on his "ability to practice law" and the right of the subscribers to IPD Analytics' newsletters "to counsel of their choice." Compl., ¶ 68 (DE-1, p. 13). Mr. Cheney's only interest in the subscription agreement is as a former employee of IPD Analytics pursuant to the Employment Agreement.

Finally, counts VIII through XI all relate to Mr. Cheney's claims that IPD Analytics violated the Employee Retirement Income Security Act of 1974 ("ERISA"). Mr. Cheney correctly cites *Nicolas v. MCI Health and Welfare Plan No. 501*, 453 F.Supp.2d 972 (E.D. Tex. 2006) as "refusing to enforce forum selection clause in ERISA dispute because 'Congress intended that the venue provision for ERISA claimants be broad.'" Cheney Opp'n, p. 24 (DE-14, p. 30). However, in so holding *Nicolas* stands alone and has been sharply criticized. Applying United States Supreme Court precedent in *The Bremen*, *supra*, the court in *Klotz v. Xerox Corp.*, 519 F.Supp.2d 430, 435-37 (S.D. N.Y. 2007) ruled:

> The vast majority of district courts have enforced forum selection clauses in ERISA plans . . . [citations omitted]. Plaintiff's sole authority for her contrary position is a district court decision from the Eastern District of Texas, which cited language from ERISA's general policy provision, 29 U.S.C. § 1001, and its legislative history to conclude that ERISA's venue provision supercedes private venue restriction clauses. *See Nicolas v. MCI Health and Welfare Plan No. 501*, 453 F.Supp.2d 972, 974 (E.D. Tex. 2006).

Although *Nicolas* correctly noted that Congress intended ERISA to "remove jurisdictional and procedural obstacles," *id*. at 974 . . ., and to provide beneficiaries with "ready access to the federal courts," *id*. . . ., nothing in ERISA's statutory text or legislative history evinces any intent by Congress to preclude private parties from limiting venue to one of the three forums permitted by the statute. . . .

\*               \*               \*

. . . In the absence of a clear directive from Congress, there is no reason to disturb the general presumption in favor of enforcing forum selection clauses, *see Phillips*, 494 F.3d at 390 (noting Supreme Court's "emphatic endorsement" of forum selection clauses, particularly since, unlike a mandatory arbitration clause, which wholly deprives parties of a federal judicial forum, a forum selection clause merely transfers the case from one federal court to another.)

The fora designated by the forum selection clause — courts situated in Miami, Florida — qualify as all "of the three forums permitted by the statute." The statute provides that an action under ERISA may be brought in a district "where the plan is administered, where the breach took place, or where a defendant resides, or may be found . . . ." 29 U.S.C. § 1132(e)(2). Here, the forum agreed to by the parties qualifies under all three of the forums permitted by the statute. The plan is administered in the Southern District of Florida. The breach allegedly took place in the Southern District of Florida. All of the defendants reside and may be found in the Southern District of Florida. Krass Decl. , ¶¶ 6-8, 13-14 (DE-8-2, pp. 2-3, 5). Indeed, this Court recently transferred venue of an ERISA claim to the federal district court in Minnesota where the plan was administered, the alleged breach of fiduciary duty took place, and all the defendants either reside or may be found. *Gipson v. Wells Fargo & Co.*, ___ F.Supp.2d ____, 2008 WL 2501149, \*5-6 (D. D.C. June 24, 2008) ("Courts assign special relevance to the district in which the plan is administered.").[2] In *Gipson*, the Plan was

_____

[2] While the plan here does not have a separate forum selection clause as in *Gipson*, it has a choice of law provision stating that "the Plan shall be construed, administered, and enforced in accordance with the provisions of applicable Federal Law and, to the extent applicable, the laws of the state in which the Trustee has its principal place of business." Krass Suppl. Decl., ¶ 9 (Ex. "A" hereto) Plan Excerpt attached thereto, § 15.08. That place is Florida. The Plan also provides that only employees of IPD Analytics may participate in the Plan. *Id*., § 2.02(a). Mr. Cheney was an employee of IPD Analytics by virtue of the Employment Agreement containing the forum selection clause.

administered and managed in Minneapolis, Minnesota which was also where claims for benefits must be filed, where documents and information about the Plan can be obtained, and where the Plan Trustee is located.  *Id*. at *1. Here, all of those things are true of Miami, Florida.  Krass Suppl. Decl., ¶ 9 (Ex. "A" hereto).[3/]

In his effort to escape his agreement to litigate other than where he filed, Mr. Cheney heavily relies on the decision in *Phillips v. Audio Active Ltd.*, 494 F.3d 378 (2nd Cir. 2007), in which the court dismissed the breach of contract claim because of the forum selection clause in the contract, but allowed other claims to stand because they did not arise out of that contract. Cheney Opp'n, pp. 20-24 (DE-14). However, Mr. Cheney misstates the facts of *Phillips*. He says: "The Phillips court decided that the artist's claims for copyright infringement (a federal cause of action) did not 'arise out of' the recording contract, even though the allegedly infringed works were recorded under the contract." *Id*., p. 20. However, in *Phillips*, the allegedly infringed works were *not* recorded under the

---

[3/] Apparently concerned that his ERISA "rollover" claim is moot, Mr. Cheney writes that his former employer's attempts "to transfer Mr. Cheney's funds . . . were made after the lawsuit was filed . . . .'" Cheney Opp'n, p. 19, n. 10 (DE-14, p. 25) (emphasis by Cheney). However, IPD Analytics' directive honoring Mr. Cheney's request was initiated *before* the lawsuit was filed, and while there was some delay in transferring the funds because Mr. Cheney provided a non-existent account number in Missouri for the rollover, and because the outside pension consultant failed to process the rollover request in a timely fashion, those funds have now been sent to Mr. Cheney's account in Missouri as he requested. Mr. Cheney signed his rollover request on March 10, 2008; it was countersigned by IPD Analytics' CEO, Mr. Krass, 8 days later on March 18, 2008 (3 months before suit filed) and promptly transmitted to IPD Analytics' outside pension consultant for processing. Krass Decl., ¶ 14, Ex. "3" thereto (DE-8-2, pp. 5, 15, 16); Krass Suppl. Decl. ¶ 10 (Ex. "A" hereto). Mr. Cheney's attempt to impose personal jurisdiction on defendants under ERISA for alleged failure to give a "COBRA" notice, has no basis in law. The COBRA notice provisions do not apply to employers like IPD Analytics with "fewer than 20 employees on a typical business day during the preceding calendar year." 29 U.S.C. § 1161(b). Krass Suppl. Decl. , Ex. "A" hereto, ¶ 6 (never more than 14 employees); *see also* Cheney Opp'n, p. 4, n. 3 ("IPD Analytics employs less than 20 people.") (DE-14, p. 10); *McGoldrick v. Datatrak Int'l, Inc.*, 425 F.Supp.2d 893, 895-97 (D. Minn. 1999) (finding no COBRA claim, as a matter of law, where employer never reached statutory threshold of 20 employees).

contract, as Mr. Cheney states. The contract only covered a single album of songs; it did not include the second album of songs which were the subject of the copyright infringement claims. 494 F.3d at 381-383.

Not only is Mr. Cheney's basic premise for his citation to *Phillips* a misstatement of its facts, but there is other language in *Phillips* useful here. That court states the well-established rule that a plaintiff's prior contractual agreement to litigate elsewhere trumps his filing choice:

> A plaintiff may think that as the initiator of a lawsuit he is the lord and master of where the litigation will be tried and under what law. But if he is a party to a contract that contains forum selection and choice of law clauses his view of himself as ruler of all he surveys, may, like an inflated balloon, suffer considerable loss of altitude.

*Id*. at 381-82 (affirming district court's interpretation of forum selection clause as mandatory). That court also observed that "federal courts have routinely rejected [the] suggestion that a claim arising under a law of the United States is exempt from provisions governing disputes between contracting parties." *Id*. at 388. The court repeated its historical "refusal . . . to allow 'a party's solemn promise to be defeated by artful pleading,'" stating that it would examine the substance of a plaintiff's claims, shorn of their labels, and focus on factual allegations. *Id*. at 388-89.

This approach has been routinely followed. In *Terra Int'l, Inc. v. Mississippi Chemical Corp.*, 119 F.3d 688, 692-95 (8th Cir. 1997), the forum selection clause, like here, applied to disputes arising under the contract. However, the plaintiff did not bring a claim for breach of contract, instead suing in tort. The court ruled that a plaintiff could not circumvent a forum selection clause by pleading tort claims which involved the same operative facts as a breach of contract claim, even if the plaintiff brought no breach of contract claim. *Id*. at 695.

Similarly, in *U.S.F&G v. Petroleo Brasileiro S.A.-Petrobras*, 2001 WL 300735 (S.D. N.Y. 2001), the forum selection clause, like here, covered claims arising under the contract. *Id*. at *13-14.

The plaintiff argued, just as Mr. Cheney does here, that its non-contract claims escaped the contractual forum selection clause. The court rejected that argument embracing "the strong public policy in favor of forum selection clauses," in construing the clause to encompass claims beyond breach of the contract containing the clause. *Id*. at *18-20. After all, the court reasoned, the alleged wrongful conduct was made possible principally because of the contractual relationship. *Id*. at *20.

Mr. Cheney argues that his claim for fraudulent inducement relieves him of the forum selection clause because "execution of the Employment Agreement was one result of this fraudulent inducement." Cheney Opp'n, p. 30 (DE-14, p. 36). However, "'[a] claim for fraud in the inducement of a contract is insufficient to invalidate a forum selection or choice-of-law clause found in that contract.'" *Marra v. Papandreou*, 59 F.Supp.2d 65, 71 (D. D.C. 1999), *Lambert v. Kysar*, 983 F.2d 1110, 1121 (1st Cir. 1993) (emphasis by court) (rejecting effort to escape forum selection clause "by alleging tortious conduct relating to the *formation*" of the contract, and stating "contract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties").

A general claim that a contract was fraudulently induced, as here, will not overcome a forum selection clause in that contract. The alleged fraud must be specifically directed at the forum selection clause. *Marra v. Papandreou*, 59 F.Supp.2d 65 (D. D.C. 1999):

> "A claim for fraud in the inducement of a contract is insufficient to invalidate a forum selection or choice-of-law clause found in that contract. Rather, it is the inclusion of those specific clauses plaintiffs seek to avoid that must have been induced by fraud."

*Id*. at 72 (citations omitted); *see also Haynsworth v. The Corporation a/k/a Lloyds of London*, 131 F.3d 956, 963 (5th Cir. 1997):

> Fraud and overreaching must be specific to a forum selection clause in order to invalidate it. That is, *The Bremen's* exception for unreasonable fraud or overreaching

"does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud . . . the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion. *Scherk [v. Alberto-Culver Co.]*, 417 U.S. [506,] 519, n. 14, 94 S.Ct. [2449,] 2457, n. 14, [41 L.Ed.2d 270 (1974)] (emphasis in original) (*citing Prima Paint Corp. v. Flood and Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed. 1270 (1967). Thus, alleging portions of such conduct as to the contract as a whole — or portions of it other than the [forum selection/choice of law] clause — are insufficient; the claims of fraud or overreaching must be aimed straight at the [forum selection/choice of law] clause in order to succeed.

(Ellipses by court, footnote omitted).

Here, Mr. Cheney has no such fraud claim. His fraudulent inducement claim avers representations as to whether the business of IPD Analytics constituted the practice of law, and whether he would receive equity ownership in IPD Analytics. Compl., Count VI (Fraudulent Inducement), ¶ 82, p. 15 (DE-1, p. 15).

> **3.    Litigating His Claims in the Southern District of Florida Will Not Deprive Mr. Cheney of His Day in Court**

Whatever "inconvenience" Mr. Cheney would suffer by being forced to litigate in the contractual forum he agreed to, is overcome by the forum selection clause unless it

will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain.

*The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 17-18, 92 S.Ct. 1907, 1917, 32 L.Ed.2d 513 (1972); *accord 2215 Fifth Street Assoc., L.P. v. U-Haul Int'l, Inc.*, 148 F.Supp.2d 50, 54 (D. D.C. 2001) (even where the real property which was the subject of the lawsuit was in the District of Columbia, forum selection clause was prima facie valid and would be enforced absent the party seeking to avoid it bearing "'the burden of demonstrating that 'trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in

court.'").

Recognizing this hurdle, Mr. Cheney argues that enforcing the forum selection clause will effectively deprive him of his day in court. Cheney Opp'n, p. 29 (DE-14, p. 35). For this argument, Mr. Cheney relies entirely on *Byrd v. Admiral Moving & Storage, Inc.*, 355 F.Supp.2d 234 (D. D.C. 2005). In *Byrd*, the Court found that where a forum selection clause is non-mandatory, it "does not override plaintiff's selection of Washington, D.C. as the venue for this suit." *Id*. at 238. The Court found that the forum selection clause in *Byrd* was non-mandatory because it did not include the word "exclusive" or the word "only" in reference to the forum selected. The forum selection clause here includes both words, to wit: "Any litigation . . . which arises out of this Agreement shall be instituted and prosecuted *only* in the appropriate state or federal court or other tribunal situated in Miami, Florida. Parties hereby submit to the *exclusive* jurisdiction of such courts and tribunals . . . ." Employment Agreement, ¶ 1.8, p. 3 (DE-8-2, p. 11) (emphasis added). Thus, unlike the facts of *Byrd*, the language in the forum selection clause here is mandatory thus "overrid[ing] plaintiff's selection of Washington, D.C. as the venue for this suit." *Byrd*, 355 F.Supp.2d at 238.

The mandatory language in the forum selection clause here is not the only material difference from the facts of *Byrd*. In *Byrd*, the Court found that the plaintiff was an unsophisticated *pro se* plaintiff who might not have understood the forum selection clause even if she had noticed it buried in the boilerplate language of the contract. *Id*. Here, the plaintiff is a lawyer and the forum selection clause is clearly legible in its own section of a short and simple contract. Employment Agreement, ¶ 1.8, p. 3 (DE-8-2, p. 11).

Finally, in *Byrd*, the Court found that the additional expense the *pro se* plaintiff would have to incur if suit was transferred to Florida could effectively deprive her of her day in court. *Id*. Mr. Cheney argues that "[t]he same is true for Mr. Cheney" because "after Defendants terminated his

employment, he has had no income for several months." Cheney Opp'n, p. 29 (DE-14, p. 35). First, Mr. Cheney is suggesting without actually saying it that because he has had no income for several months he does not have the financial resources to litigate his claims in Florida. However, in the two years he was employed by IPD Analytics preceding the last several months, Mr. Cheney's salary and bonuses totaled just over $577,000.00. Krass Suppl. Decl., ¶ 3 (Ex. "A" hereto). Second, Mr. Cheney's suggestion that IPD Analytics terminated his employment causing loss of income for several months, is belied by his own published words. In a letter he wrote IPD Analytics four days *before* he alleges he was involuntarily terminated, Mr. Cheney stated that as a result of IPD Analytics' "breach of the Equity Agreement, my trust in the management of the company has decreased. Relatedly, I have decided to relocate . . . ." Krass Suppl. Decl., ¶¶ 4-5 and referenced attachments (Ex. "A" hereto) (emphasis added); Compl., ¶¶ 40-42, p. 9 (DE-1, p. 9). Mr. Cheney posted the letter on the internet on February 16, 2008. *Id*. There Mr. Cheney added: "***Will South Florida mourn the loss of its most sophisticated resident?***" (emphasis by Mr. Cheney) *Id*. On the next business day, which was four days later, it was discovered that Mr. Cheney had already moved out of his office at IPD Analytics. Krass Suppl. Decl., ¶ 5 (Ex. "A" hereto).

In any event, cries of financial impediment to avoid an agreed-to forum have repeatedly been rejected. *See, P & S Business Machines, Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807-08 (11th Cir. 2003):

> The financial difficulty that a party might have in litigating in the selected forum is not a sufficient ground by itself for refusal to enforce a valid forum selection clause. *See Bonny v. Society of Lloyd's*, 3 F.3d 156, 160 n.11 (7th Cir. 1993) (reasoning that a "party's financial status at any given time in the course of litigation cannot be the basis for enforcing or not enforcing a valid forum selection clause"); *Moses v. Business Card Exp., Inc.*, 929 F.2d 1131, 1138-39 (6th Cir. 1991) (reasoning that economic disparity between franchisor and franchisees' claim of financial hardship were insufficient reasons to refuse enforcement of a forum selection clause); *see also Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 594-95, 111 S.Ct. 1522, 113

14

L.Ed.2d 622 (1991) (rejecting the Court of Appeals' finding of fact on insufficient evidence that respondents were physically and financially incapable of litigating in the selected forum and enforcing the forum selection clause); *Diaz Contracting, Inc. v. Nanco Contracting Corp.*, 817 F.2d 1047, 1052-53 (3rd Cir. 1987), *overruled on other grounds by Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3rd Cir. 1989) (concluding that the inability of the plaintiff to finance additional litigation in another forum was insufficient to prove unreasonableness).

Thus, Mr. Cheney's argument that "he has had no income for several months" falls far short of meeting his heavy burden of demonstrating that trial in the Southern District of Florida "will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *The Bremen*, *supra*, p. 13. As Mr. Cheney acknowledges, most of the witnesses are in Florida; should he want their depositions, he would have to incur the expense of taking them in Florida no matter where the case was being litigated.

    **4.**    **There is No Merit To Mr. Cheney's Argument That the Forum Selection Clause is Invalid for Fraud and Overreaching**

As set forth above, a general claim like Mr. Cheney's, that a contract was fraudulently induced, will not overcome a forum selection clause in that contract. *Marra v. Papandreou*, 59 F.Supp.2d 65, 72 (D. D.C. 1999). This issue is discussed fully at pages 11 and 12 hereinabove.[4/]

**B.**    **There is Neither General Nor Specific Jurisdiction Over These Defendants**

    **1.**    **The Government Contacts Exception Applies to IPD Analytics' Observation of Federal Court Hearings in the District of Columbia**

"One of the federal jurisdictional rules peculiarly applicable in this circuit is the so-called 'government contacts principle' by which certain relationships with federal agencies do not enter the

---

[4/]In the only case Mr. Cheney cites on this issue, *Armco, Inc. v. North Atlantic Ins. Co., Ltd.*, 68 F.Supp.2d 330 (S.D. N.Y. 1999), the fraud claims did not relate to the performance of the contract containing the forum selection clause and the plaintiff was not suing the defendant for breach of that contract. *Id.* at 338-389. Here, Mr. Cheney's fraud claims *do* relate to the performance of the contract containing the forum selection clause and he *is* suing defendants for breach of that contract.

calculus of minimum contacts with the District of Columbia for jurisdictional purposes." *Inv. Co. Inst. v. United States*, 550 F.Supp. 1213, 1216 (D. D.C. 1982).

Mr. Cheney argues that the government contacts exception does not apply to IPD Analytics' observation of federal court hearings in the District of Columbia. However, Mr. Cheney omits key words from his citation to the court's opinion in *Lex Tex Ltd. v. Skillman*, 579 A.2d 244 (D.C. App. 1990). Specifically, in *Lex Tex*, the defendant was an attorney being sued for professional malpractice in prosecuting a patent before the United States Patent and Trademark Office then located in the District of Columbia. *Id*. at 245. The attorney defendant challenged personal jurisdiction based on the government contacts exception. *Id*. at 246. Mr. Cheney says the court rejected the applicability of the exception, "holding that 'one can hardly demand the right to come to the District of Columbia to pursue activities exclusively on behalf of an out-of-state principal and expect to be absolutely immune from suit here . . . .'" Cheney Opp'n, p. 5 (ellipses by Cheney) (DE-14, p. 11) *citing Lex Tex*, 579 A.2d at 250. Mr. Cheney stops his quotation three words short. Those three words are added here in italics: ". . . one can hardly demand the right to come to the District of Columbia to pursue activities exclusively on behalf of an out-of-state principal and expect to be absolutely immune from suit here *by that principal* . . . ." *Lex Tex*, 579 A.2d at 250. Mr. Cheney was never IPD Analytics' principal.

Similarly, Mr. Cheney argues that in *Jacobsen v. Oliver*, 201 F.Supp.2d 93, 106 (D. D.C. 2002), the court held the government contacts exception inapplicable where "the defendant attorneys provided legal advice concerning a D.C. lawsuit to California residents *who were not parties to the lawsuit*." Cheney Opp'n, p. 5 (emphasis added) (DE-14, p. 11). However, in *Jacobsen*, Mr. Jacobsen sued his former attorneys, who resided outside the District of Columbia, for malpractice in representing him in a lawsuit filed by those attorneys in the District. *Id*. at 95-96. Mr. Jacobsen's

children also sued the defendant attorneys for malpractice arising from failure to include the children as plaintiffs in their father's suit in the District. *Id*. at 96. The children alleged that the attorneys "negligently advised them, via their father, that they had no legal basis to be joined as plaintiffs in the . . . litigation." *Id*. at 98. The court held that "the children's claims can fairly be said to 'arise out of' defendants' activities in the District, for defendants allegedly provided negligent legal advice regarding an ongoing lawsuit in the District in which their father was involved." *Id*. at 106.

Thus, Mr. Cheney's portrayal of *Jacobsen* as a case in which "the defendant attorneys provided legal services concerning a D.C. lawsuit to California residents *who were not parties to the lawsuit*," is not apt. Cheney Opp'n, p. 5 (DE-14, p. 11) (emphasis added). Of course, the subscribers to IPD Analytics' newsletters reporting on the status of patent litigation, are not parties to that litigation. Neither IPD Analytics nor its analysts observing the hearings are there to represent their newsletter subscribers in those cases. They are there to gather news to report in their subscription newsletter. This newsgathering function was present at the birth of what became the government contacts exception. In *Neely v. Philadelphia Inquirer Co.*, 62 F.2d 873 (D.C. Cir. 1932), the defendant was the publisher of a newspaper in Philadelphia, Pennsylvania. *Id*. at 874. The newspaper company maintained permanent offices in the District of Columbia to gather the news. The court found that such activity would not be counted as doing business in the District because of the District's nature as the seat of national government. *Id*. at 875. More than half a century later, the D.C. Circuit ruled the same way in a case against the Lexington Herald-Leader Co., a company which published a newspaper in Kentucky but maintained an office in the District of Columbia and employed one or more reporters at that office for the purpose of gathering news. *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 218 (D.C. Cir. 1986). The newspaper company also had "22 paid mail subscriptions in the District of Columbia and receive[d] approximately $3,000 per

year in revenue from [those] subscriptions." *Id*. at 219. The court ruled that such activity in the District was not "doing business" within the meaning of *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *Moncrief, supra*, at 221-22. IPD Analytics neither maintains an office nor has any subscribers in the District of Columbia; its newsgathering there is limited to traveling to the nation's Capitol to observe court hearings concerning patents involving public companies. Krass Decl., ¶ 7 (DE-8-2, p. 3).[5/]

The IPD Analytics' newsletter was never published from the District of Columbia notwithstanding Mr. Cheney's suggestion to the contrary. In argument, Mr. Cheney suggests that newsletters were published from the District. Cheney Opp'n, p. 2 (stating that a report would be written following observation of the court hearing in the District and "then immediately distributed to clients by e-mail.") (DE-14, p. 8). However, the citation for this statement, paragraph 12 of Mr. Cheney's Declaration, more accurately states that after he attended the hearing he sent his report not to subscribers, but to "Mr. Krass personally, who then immediately distributed it to clients by e-mail from his personal e-mail address at IPD Analytics." Cheney Decl., ¶ 12 (DE-14-3, p. 4). *All* IPD Analytics' newsletters are published from Mr. Krass' desktop computer in South Florida. Krass Suppl. Decl., ¶ 11 (Ex. "A" hereto).

> **2.    IPD Analytics' Recruiting Activity In The District of Columbia Does Not Subject it To Personal Jurisdiction Under the District's Long-Arm Statute**

Mr. Cheney asserts that defendants' recruiting activities in the District of Columbia subjected

---

[5/]While some courts have portrayed the newsgathering/government contacts exception as resting on first amendment considerations, the D.C. Circuit rejected that notion in the *Lexington Herald-Leader* case. *Id*. at 223 ("Our conclusion that the 'newsgathering exception' is not based upon first amendment considerations is supported by the *Neely* decision and subsequent interpretations of that decision.").

them to personal jurisdiction under Section 13-423(a)(1) of the District's long-arm statute, which provides for jurisdiction over a person "as to a claim for relief arising from the person's . . . transacting any business in the District of Columbia;" D.C. Code § 13-423(a)(1).

Mr. Cheney cites two "recruiting" cases, neither of which apply here. In arguing *Sanchez v. AT&T Corp.*, 1999 WL 1427692 (S.D. Fla. 1999), Mr. Cheney omits that the defendant challenging personal jurisdiction in Florida was employing the plaintiff in Mexico in a joint venture with a Florida company which jointly supervised the employee from Florida and paid the employee's salary from Florida, and omits that the Mexican employer did millions of dollars in business in Florida. *Id.* at *1, 3-6. Mr. Cheney's citation to *Coats v. Penrod Drilling Corp.*, 5 F.3d 877 (5th Cir. 1993) is also misplaced. In *Coats*, the Mississippi long-arm statute was far broader than here. *Id.* at 882:

> Under the [Mississippi long-arm] statute, one is "deemed to be doing business" if he "perform[s] any character of work or service in this state." . . . .[T]he Mississippi Supreme Court . . . defined the term to include doing "various acts here for the purpose of realizing a pecuniary benefit or otherwise accomplishing an object. . . . The Mississippi Supreme Court recently stated that the doing business prong "is so broad that it belies any suggestion it be limited to commercial activity."

An attempt to impose personal jurisdiction under the District of Columbia's long-arm statute, based on recruiting in the District, has been rejected. *Richards v. Duke University*, 480 F.Supp.2d 222, 230 (D. D.C. 2007), *summary aff'd*, 2007 WL 4589770 (D.C. Cir. 2007), *cert den'd*, ___ U.S. ___, 128 S.Ct. 2438 (2008).

### 3. There is No Personal Jurisdiction Over IPD Analytics for Contracting With Clients to Supply Services in the District of Columbia

Mr. Cheney asserts personal jurisdiction over defendants pursuant to Section 13-423(a)(2) of the District of Columbia's long-arm statute which provides for personal jurisdiction "over a person . . . as to a claim for relief arising from the person's . . . (2) contracting to supply services in the District of Columbia . . . ." Mr. Cheney argues that by virtue of its subscription agreements with

its customers IPD Analytics is contracting to supply services in the District. Cheney Opp'n, p. 9 (DE-14, p. 15).

However, there is nothing in IPD Analytics' subscription agreement contracting to provide any services in the District of Columbia to anyone. In the subscription agreement, IPD Analytics agrees to sell subscriptions to its newsletter. Subscription Agreement, ¶ 1 (DE-8-2, p. 6). Although one of the ways IPD Analytics gets the information it needs for its newsletters is to observe certain court hearings in the District of Columbia, no subscriber has contracted with IPD Analytics to do so.

> **4.** **There is No Personal Jurisdiction Over Intellectual Property Development, Inc. or Howard Krass, Based On Prior Litigation in the District of Columbia or Imputation of Contacts**

Mr. Cheney argues personal jurisdiction over defendants, Intellectual Property Development, Inc. and Howard Krass, pursuant to Section 13-423(a)(4) of the District of Columbia long-arm statute which provides for "personal jurisdiction over a person . . . as to a claim arising from the person's . . . causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia . . . ." Mr. Cheney argues that two appeals to the Federal Circuit filed by Intellectual Property Development, Inc., one seven years ago and one five years ago, meet the requirements of the statute. Cheney Opp'n, pp. 11, 12 (DE-14, pp. 17-18).

First, Mr. Cheney neither alleges nor argues that his claims arise out of those appeals nor could he; thus, he fails to make a prima facie case under the statute. Second, the cases Mr. Cheney cites are inapposite. Mr. Cheney cites *Adams v. Saenger*, 303 U.S. 59, 67-68 (1938) for the proposition that the filing of a lawsuit in the District of Columbia subjects the plaintiff to jurisdiction in the District for all purposes. However, all that the court held in *Adams* was that a plaintiff who files a lawsuit in the District of Columbia is subject to *in personam* jurisdiction for a counterclaim in that lawsuit. *Id*. at 67-68. That is what it says in the sentence preceding the one quoted by Mr.

Cheney. Similarly, Mr. Cheney cites *General Contracting & Trading Co., LLC v. Interpole, Inc.*, 940 F.2d 20, 23 n. 4 (1st Cir. 1991) for the proposition that "[b]y filing and prosecuting multiple appeals at the Federal Circuit, Intellectual Property Development has subjected itself to D.C. Courts for the purposes of personal jurisdiction." Cheney Opp'n, p. 12 (DE-14, p. 18). Again, the court's holding in *General Contracting & Trading Co., LLC*, was that the defendant in one suit pending in New Hampshire could countersue the plaintiff in the same jurisdiction for claims "arising out of the same nucleus of operative facts." 940 F.2d at 23. That the defendant filed a separate lawsuit, rather than a counterclaim, was found to be a distinction without a difference. *Id*.[6/]

Mr. Cheney attempts to impute the contacts of Intellectual Property Development, Inc. — specifically its two Federal Circuit appeals years ago — to Mr. Krass personally. Cheney Opp'n, p. 12 (DE-14, p. 18) ("Mr. Krass' Declaration is notably silent about his contacts with the District of Columbia between 2000 and 2003 — the years he was pursuing litigation through Intellectual Property Development in D.C."). Even if such contacts could be imputed to Mr. Krass they are insufficient as to him because they are insufficient as to Intellectual Property Development, Inc. as stated in the above paragraph.

Mr. Cheney also attempts to impute the contacts of IPD Analytics to both Intellectual Property Development, Inc. and Mr. Krass personally. However, as in *D'Onofrio v. SFX Sport Group, Inc.*, 534 F.Supp.2d 86, 92 (D. D.C. 2008), the acts Mr. Cheney attributes to Mr. Krass

> fall squarely within [Mr. Krass'] scope of employment . . . pursuant to [his] official corporate duties and responsibilities. None of the allegations involve [Mr. Krass] doing business with the District in [his] personal capacit[y].

Such "'acts, carried out within the scope of [Mr. Krass'] employment do not create sufficient

---

[6/]Section (a)(4) of the District's long-arm statute *also* requires the "plus" factors to establish jurisdiction. *See* Mot. at 9-10 (DE-8, pp. 15-16).

contacts to establish personal jurisdiction.'" *Id*. Mr. Cheney's allegations in any event fall far short

of what is required to pierce the corporate veil in either Florida or the District of Columbia, as both

jurisdictions require a party to prove that the corporate form was itself used to perpetrate a fraud or

other wrong. *See Gasparini v. Pordomingo*, 972 So.2d 1053, 1055 (Fla. 3d DCA 2008) (noting that

party must establish that corporate form was used fraudulently); *Empson & Co. v. Mar-Salle Imports,*

*Ltd.*, 1987 WL 12793, *3 (D. D.C. 1987) (same). Mr. Cheney does not, and cannot plead such fraud.

### C.    Venue is Improper

Defendants rely on the venue argument set forth in their motion at pages 14-16 (DE-8, pp.

20-22).

### SUMMARY CONCLUSION

Mr. Cheney's public policy argument — that enforcement of the forum selection clause

would interfere with a client's choice of counsel — has no merit because the subscribers to IPD

Analytics' newsletters are not choosing a lawyer when they subscribe; they are buying a subscription

service that is the same to all subscribers to the newsletter. There is, however, a strong public policy

favoring enforcement of forum selection clauses as repeatedly stated by the United States Supreme

Court, the D.C. Circuit, and this Court.

In addition, there is neither general nor specific jurisdiction over the defendants because the

government contacts/newsgathering exception applies to IPD Analytics' observation of federal court

hearings in the District of Columbia, and because neither IPD Analytics' recruiting in the District

nor the two Federal Circuit appeals of Intellectual Property Development, Inc., years ago, are

sufficient to subject defendants to personal jurisdiction under the District's long-arm statute.

Finally, venue is improper under 28 U.S.C. § 1391(b) because no defendants reside in the

District of Columbia, a substantial part of the events or omissions giving rise to the claim did not

occur in the District, and all of the defendants may not be "found" in the District of Columbia because of the absence of personal jurisdiction.  Venue is also improper under 29 U.S.C. § 1132(e)(2) because the 401(k) plan is not administered in the District of Columbia (it is administered in the Southern District of Florida), the alleged breach did not take place in the District of Columbia (it allegedly took place in the Southern District of Florida), and the defendants neither reside nor may be found in the District of Columbia (all of them reside and may be found in the Southern District of Florida).

This case should be dismissed, or transferred to the Southern District of Florida pursuant to the contractual forum selection clause, for lack of personal jurisdiction, improper venue, or in the interests of justice, pursuant to Rules 12(b)(2), (3), Fed.R.Civ.P., 28 U.S.C. §§ 1391(b), 1406(a) and/or 1404(a), and/or 29 U.S.C. § 1132(e)(2).

Dated: July 24, 2008                         Respectfully submitted,

EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, District of Columbia 20037
Telephone: (202) 861-0900
Telefax: (202) 296-2882
By:___/s/ Steven M. Umin_____
     Steven M. Umin, Esq.
     D.C. Bar Number 47985
     sumin@ebglaw.com
     Julianna S. Gonen, Esq.
     D.C. Bar Number 488759
     jgonen@ebglaw.com

RICHARD & RICHARD, P.A.
825 Brickell Bay Drive
Tower III - Suite 1748
Miami, Florida  33131
Telephone: (305) 374-6688
Fax: (305) 374-0384
By: ___/s/ Dennis Richard_____
     Dennis Richard, Esq.

dennis@richardandrichard.com
(*Pro Hac Vice* Admission
Florida Bar Number 148730)

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on this 24th day of July, 2008, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  We also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Clark S. Cheney, Esq.
Law Office of Clark S. Cheney
*Pro Se Plaintiff*
517 F Street, N.E.
Washington, D.C. 2002
Telephone: (202)
 253-7195
**Via U.S. Mail**

/s/ Dennis Richard
Dennis Richard, Esq.

H:\IPD Analytics\IPD-Cheney\Pleadings\reply brief in supp of mtd_mtd.wpd

24

## SUPPLEMENTAL DECLARATION OF HOWARD KRASS

I, Howard Krass, declare as follows:

1.      I am the chief executive officer and general manager of IPD Analytics, LLC ("IPD Analytics"), located in Bay Harbor Islands (a suburb of Miami), Florida.

2.      On February 3, 2006, in my capacity as CEO and president of IPD Analytics, I e-mailed Clark Cheney a letter offering him employment with IPD Analytics contingent on his execution of an Employment Agreement as a condition of the offer. A copy of the offer letter is attached hereto as Exhibit "1". This is the document referred to as "offer letter" in the Employment Agreement between IPD Analytics and Mr. Cheney. Mr. Cheney's response to the offer letter is part of Exhibit "1".

3.      During the two years Mr. Cheney was employed by IPD Analytics, his salary and bonuses totaled $577,003.00.

4.      Mr. Cheney directed a letter to me in my capacity as resident agent and general manager of IPD Analytics, dated February 15, 2008, a copy of which is attached hereto as Exhibit "2". Mr. Cheney also posted a copy of the letter on the internet, on Saturday, February 16, 2008, a copy of which is attached as Exhibit "3".

5.      On the morning of Tuesday, February 19, 2008, the first business day after Mr. Cheney's letter was posted on the internet, when I arrived at the offices of IPD Analytics, in Bay Harbor Islands, Florida, I found Mr. Cheney's office completely cleaned out. All of his personal belongings had been removed. Later that day Mr. Cheney confirmed to me that he had moved out of his office at IPD Analytics.

6.     IPD Analytics never employed more than 14 people on a typical business day during the one year period prior to February 19, 2008 or at any other time. Intellectual Property Development, Inc. has no employees.

7.     There is no relationship between IPD Analytics and its subscribers other than publisher and subscriber. The subscribers to IPD Analytics' newsletters are not parties to the cases reported on in those newsletters. IPD Analytics does not represent its subscribers before courts or anywhere else and does not give them legal advice or counsel as to their rights and obligations under the law.

8.     A copy of the letter dated May 2, 2008 from counsel for IPD Analytics, which is referenced in Mr. Cheney's complaint at paragraph 73, is attached hereto as Exhibit "4".

9.     IPD Analytics' 401(k) plan ("Plan"), in which Mr. Cheney participated as an employee of IPD Analytics, is administered and managed by IPD Analytics, LLC, with the assistance of an outside pension consultant located, respectively, in Bay Harbor Islands and Miami, Florida. Administrative claims for benefits must be filed in Bay Harbor Islands, Florida which is also where documents and information about the Plan can be obtained, and where the Plan Trustee is located. Excerpts of the Plan attached hereto as Ex. "5".

10.     On March 18, 2008, in my capacity as chief executive officer and general manager of IPD Analytics, I approved Mr. Cheney's request for a rollover of his 401(k) Plan to an account in Missouri and promptly transmitted it to IPD Analytics' outside pension consultant for processing. However, actual transfer of the rollover was delayed because Mr. Cheney provided a non-existent account number for the rollover and because the outside pension consultant failed to process the rollover request in a timely fashion. I was unaware

2

of the delay until I was served with Mr. Cheney's complaint.  Mr. Cheney recently requested

the money be sent by check to his account in Missouri, and the money has been sent as

requested.

      11.    All IPD Analytics' newsletters are published from my desktop computer in Bay

Harbor Islands, Florida.

Dated: July 24, 2008

                                HOWARD KRASS
                                Declarant

H:\IPD Analytics\IPD-Cheney\Pleadings\declaration of howard krass 2_mtd.wpd

**From:** Clark Cheney [clarkscheney@hotmail.com]
**Sent:** Friday, February 03, 2006 6:40 PM
**To:** hkrass@ipdanalytics.com
**Subject:** RE: IPD Analytics, LLC - Offer of Employment

Dear Howard,

It is my honor to accept your offer as described in your message below.
Thanks very much for your effort in putting it together. I'm excited to dig
into the work at IPD Analytics, I'm excited to join the team that you have
assembled, and I'm looking forward to getting to know you better as we work
together.

See you soon!
Clark

>From: "Howard Krass" <hkrass@ipdanalytics.com>
>Reply-To: <hkrass@ipdanalytics.com>
>To: "'Clark Cheney'" <clarkscheney@hotmail.com>
>Subject: IPD Analytics, LLC - Offer of Employment
>Date: Fri, 3 Feb 2006 18:23:19 -0500
>
>Clark Cheney
>517 F Street, NE
>Washington, D.C.
>20002
>
>February 3, 2006
>
>Re: Offer of Employment
>
>Dear Clark:
>
>    We are pleased to offer you the position of Analyst with IPD
>Analytics, LLC (the "Company"). As an Analyst, your base salary will be
>two hundred thousand dollars ($200,000.00) per year, payable in accordance
>with the Company's regular payroll practices. Your compensation will be
>subject to statutory deductions and withholding.
>
>    As an employee of the Company you will be eligible to enroll in the
>Company's benefit programs as they are established from time to time. Your
>current benefits will include healthcare (for you and a domestic partner)
>and disability insurance. If you should have any specific questions
>regarding our current benefit programs, please feel free to call Jackie
>Monroe. The Company will reimburse you for all expenses associated with
>moving you from Washington, D.C. to Miami, Florida, up to a maximum of
>$10,000.00. If you choose, the Company will also reimburse you for all
>your
>expenses associated with study for, being admitted to, and being a member
>of
>the Florida Bar, which shall mean a bar study course, all bar application

EXHIBIT __"1"__

>and testing fees, bar association dues, and approved continuing legal
>education (CLE) courses.
>
>    Upon acceptance of this offer you will receive a bonus in the amount
>of ten-thousand dollars ($10,000).  Additionally, in the event that during
>the term of your employment with the Company you purchase a full-time
>residence you will receive a one-time bonus of twenty-thousand dollars
>($20,000).
>
>    Upon your completion of employment with the Company for calendar
>year 2006, you will also receive a bonus in an amount to be determined at
>the discretion of the Company.  The target for your bonus at the end of
>calendar year 2006 is fifty-thousand dollars ($50,000.00).  You will be
>eligible for bonuses for future years in an amount to be determined at the
>discretion of the Company.  It is contemplated that in the event you
>achieve
>a performance level comparable to the other Company Analysts, as part of
>your bonus package for calendar year 2007, the Company will provide an
>opportunity for you to obtain equity in the Company that would vest over
>subsequent years.
>
>    The Company is an at-will employer, which means that your employment
>with the Company is for no specific period of time and may be terminated by
>the Company or you at any time, with or without prior notice and with or
>without cause.
>
>    Your employment pursuant to this offer is contingent on your
>execution of an Employment Agreement which is a condition of this offer and
>of your continued employment with the Company.  You will also be required
>to
>provide the Company with legally acceptable proof of your identity and
>authorization to work in the United States within three (3) days of your
>start date, and your failure to do so may, at the Company's discretion,
>render all terms of this offer of employment void and unenforceable.
>
>    We are very excited about the prospect of you becoming a colleague
>and we look forward to working with you.
>
>                Sincerely,
>
>
>
>                Howard B. Krass
>                CEO and President
>                IPD Analytics, LLC
>

CLARK S. CHENEY
1177 KANE CONCOURSE. SUITE 300
BAY HARBOR ISLANDS. FL 33154

February 15, 2008

Howard B. Krass, Resident Agent & General Manager
IPD Analytics, LLC
1177 Kane Concourse, Suite 300
Bay Harbor Islands, FL 33154

*Via electronic mail*

Re:    Breach of Equity Agreement; Relocation

Dear Howard,

This letter memorializes some of the facts regarding IPD Analytics' breach of the equity agreement we entered into via email on February 3, 2006, under which I agreed to leave my position at Dewey Ballantine and join IPD Analytics (the "Equity Agreement").

On December 5, 2007, you called a meeting with you, me, Malan Rampton, and Michael Bascone to discuss the Tech Media product. During that meeting, you described the Tech Media product as "very, very healthy."

On December 13, 2007, you called me into your office to discuss my bonus package for calendar year 2007. You began the meeting by thanking me for my work in 2007. You complemented me on the quality of my work, stating that I am performing at an "A+" level. You then showed me a sheet of paper that listed several figures, including my salary for the year and a cash bonus. As we discussed the numbers on the sheet, it became clear that the company had not complied with its matching obligations for 2007 as stated in the 401(k) plan papers, and I expressed as much to you.

You then asked if I had any other questions about my compensation. I told you that I expected to receive equity in the company as part of my bonus package for calendar year 2007. You told me that I would receive options in January 2009, retroactive to January 1, 2008. I told you that I considered that a breach of the Equity Agreement we negotiated as I decided whether to join the company. You denied that any such agreement existed. I then left your office to retrieve a copy of the Equity Agreement.

When I returned to your office, you were looking through a personnel file. You said you had read the offer letter in the file and that it contained no provisions about equity. I then handed you a copy of the Equity Agreement. When I handed you the letter, you turned it face down on the table and refused to read it. You stated that "no matter what" the letter I handed you said, you "never intended" to grant me equity as part of my bonus package for 2007.

EXHIBIT "2"

Later that day (December 13), you called me into your office again.  You said that I would not receive any equity in 2007 and that any further discussion of equity would not occur until after the New Year.

On January 17, 2008, I had lunch with Mark Mamolen, as per his request and with your knowledge and approval.  I understood from Mr. Mamolen that he was acting as an authorized agent of IPD Analytics.  During that meeting, Mr. Mamolen told me that the company intended to offer me a profit sharing arrangement.  Mr. Mamolen stated that the profit sharing arrangement would provide "about half a million dollars working for you" and had certain tax advantages over actual equity ownership.  He said that it would be difficult to value IPD Analytics as of the date we were talking (i.e., January 2008), but that he expected the company to grow to at least eight times its present value.  He also warned me not to exercise "pestering rights," and said the concern I expressed to you about matching 401(k) contributions is an example of such pestering.

I told Mr. Mamolen that the profit sharing arrangement he described did not sound like it fulfilled the Equity Agreement.  At the end of this conversation, Mr. Mamolen said he would talk with you, and he and I would meet again.

On February 7, 2008, Mr. Mamolen and I had lunch, again with your knowledge and approval, and again with Mr. Mamolen acting as IPD Analytics' agent.  Near the start of that meeting, I asked Mr. Mamolen whether the company denied that my employment offer included a provision for me to obtain equity in IPD Analytics as part of my bonus package for calendar year 2007.  Mr. Mamolen said that the company does not deny that it made such an offer and that I accepted it.  I also asked Mr. Mamolen whether he had any concern about my performance as an analyst.  He replied, "From everything I've heard, you've been great."

During the February 7 meeting, Mr. Mamolen described some aspects of the Class B Units he said the company intended to offer me in lieu of equity ownership.  I told Mr. Mamolen that the arrangement he described did not sound like it fulfilled the Equity Agreement.  I asked Mr. Mamolen if the company was willing to grant equity in IPD Analytics, as the term "equity" was understood by you and me at the time we negotiated the Equity Agreement (that is, long before the company developed the concept of Class B Units).  Mr. Mamolen said that IPD Analytics had decided not to provide me with any equity in the company.  Mr. Mamolen told me that if I believed the company's current offer of Class B Units does not satisfy the terms of the Equity Agreement, I would have to "ask a third party to decide" the issue.  I understood this comment to mean I would have to sue IPD Analytics to enforce the Equity Agreement.

At the close of the February 7 meeting, Mr. Mamolen gave me an unsigned copy of the "Amended and Restated Manager-Managed Operating Agreement of IPD Analytics, LLC."  He told me to read it and the three of us would then have another meeting.  However, later that day, Mr. Mamolen came into my office and told me that you would not meet with me on this issue.

I believe that IPD Analytics materially breached the Equity Agreement by failing to provide me with equity in the company as part of my bonus package for calendar year 2007. Further, the company's current offer to provide me with some amount of Class B Units in lieu of equity in the company does not cure that material breach.

As a result of the company's breach of the Equity Agreement, my trust in the management of the company has decreased. Relatedly, I have decided to relocate and plan to do so in the first week of March 2008. We should speak next week to discuss how my relocation will affect my employment with the company.

Neither this letter nor my relocation constitutes my resignation from IPD Analytics. I stand ready to continue performing as a Tech Media Analyst at the same "A+" level at which I have been performing.

Sincerely,

Clark S. Cheney





# Cheney Family Mushbowl!!

This is a self-contributing blog where you can write about what is going on in your life and keep everyone up-to-date. We thought this would be a good idea to keep in touch with each other, especially since we are spread out so much across the states. It's a good place to share your pictures and events with the family.

**blog archive**

▼ 2008 (23)

  ▼ February (8)

    Watch the excitement unfold!

    My Valentine's sonnet for Brock

    Valentine for Ernest Mann

    100 Things About Tawna

    Now I am famous...

    100 Things About Jenny

    Are ya in?

    Birthday Wishes to Me and Emma

 

EXHIBIT "3"

**saturday, february 16, 2008**

## Watch the excitement unfold!

Many of you are curious about how things are going with me and work. Here's the text of a letter I sent my boss last night that will bring you up to speed. I have a feeling there are exciting episodes ahead.

Dear Howard,

This letter memorializes some of the facts regarding IPD Analytics' breach of the equity agreement we entered into via email on February 3, 2006, under which I agreed to leave my position at Dewey Ballantine and join IPD Analytics (the "Equity Agreement").

On December 5, 2007, you called a meeting with you, me, Malan Rampton, and Michael Bascone to discuss the Tech Media product. During that meeting, you described the Tech Media product as "very, very healthy."

On December 13, 2007, you called me into your office to discuss my bonus package for calendar year 2007. You began the meeting by thanking me for my work in 2007. You complemented me on the quality of my work, stating that I am performing at an "A+" level. You then showed me a sheet of paper that listed several figures, including my salary for the year and a cash bonus. As we discussed the numbers on the sheet, it became clear that the company had not complied with its matching obligations for 2007 as stated in the 401(k) plan papers, and I expressed as much to you.

You then asked if I had any other questions about my compensation. I told you that I expected to receive equity in the company as part of my bonus package for calendar year 2007. You told me that I would receive options in January 2009, retroactive to January 1, 2008. I told you that I considered that a breach of the Equity Agreement we negotiated as I decided whether to join the company. You denied that any such agreement existed. I then left your office to retrieve a copy of the Equity Agreement.

When I returned to your office, you were looking through a personnel file. You said you had read the offer letter in the file and that it contained no provisions about equity. I then handed you a copy of the Equity Agreement. When I handed you the letter, you turned it face down on the table and refused to read it. You stated that "no matter what" the letter I handed you said, you "never intended" to grant me equity as part of my

► January (15)

Clark and Brock

Webbs in Miami

Sleeping Beauty

Winter in Afton

One year ago....

Going Green...

spoilers!spoilers!
spoilers!spoilers!

Clark survives dog
attack!

Some Jokes I Stole....

Oh what fun!

Blog is the new black

Greg Guides Ellen
Into "The Change"

The Star Market

Tawna

Curtis and
Jen...Laramie, WY

bonus package for 2007.

Later that day (December 13), you called me into your office again. You said that I would not receive any equity in 2007 and that any further discussion of equity would not occur until after the New Year.

On January 17, 2008, I had lunch with Mark Mamolen, as per his request and with your knowledge and approval. I understood from Mr. Mamolen that he was acting as an authorized agent of IPD Analytics. During that meeting, Mr. Mamolen told me that the company intended to offer me a profit sharing arrangement. Mr. Mamolen stated that the profit sharing arrangement would provide "about [redacted] working for you" and had certain tax advantages over actual equity ownership. He said that it would be difficult to value IPD Analytics as of the date we were talking (i.e., January 2008), but that he expected the company to grow to at least eight times its present value. He also warned me not to exercise "pestering rights," and said the concern I expressed to you about matching 401(k) contributions is an example of such pestering.

I told Mr. Mamolen that the profit sharing arrangement he described did not sound like it fulfilled the Equity Agreement. At the end of this conversation, Mr. Mamolen said he would talk with you, and he and I would meet again.

On February 7, 2008, Mr. Mamolen and I had lunch, again with your knowledge and approval, and again with Mr. Mamolen acting as IPD Analytics' agent. Near the start of that meeting, I asked Mr. Mamolen whether the company denied that my employment offer included a provision for me to obtain equity in IPD Analytics as part of my bonus package for calendar year 2007. Mr. Mamolen said that the company does not deny that it made such an offer and that I accepted it. I also asked Mr. Mamolen whether he had any concern about my performance as an analyst. He replied, "From everything I've heard, you've been great."

During the February 7 meeting, Mr. Mamolen described some aspects of the Class B Units he said the company intended to offer me in lieu of equity ownership. I told Mr. Mamolen that the arrangement he described did not sound like it fulfilled the Equity Agreement. I asked Mr. Mamolen if the company was willing to grant equity in IPD Analytics, as the term "equity" was understood by you and me at the time we negotiated the Equity Agreement (that is, long before the company developed the concept of Class B Units). Mr. Mamolen said that IPD Analytics had decided not to provide me with any equity in the company. Mr. Mamolen told me that if I believed the company's current offer of Class B Units does not satisfy the terms of the Equity Agreement, I would have to "ask a third party to decide" the issue. I understood this comment to mean I would have to sue IPD Analytics to enforce the Equity Agreement.

At the close of the February 7 meeting, Mr. Mamolen gave me an unsigned copy of the "Amended and Restated Manager-Managed Operating Agreement of IPD Analytics, LLC." He told me to read it and the three of us would then have another meeting. However, later that day, Mr. Mamolen came into my office and told me that you would not meet with me on this issue.

I believe that IPD Analytics materially breached the Equity Agreement by failing to provide me with equity in the company as part of my bonus package for calendar year 2007. Further, the company's current offer to provide me with some amount of Class B Units in lieu of equity in the company does not cure that material breach.

As a result of the company's breach of the Equity Agreement, my trust in the management of the company has decreased. Relatedly, I have decided to relocate and plan to do so in the first week of March 2008. We should speak next week to discuss how my relocation will affect my employment with the company.

Neither this letter nor my relocation constitutes my resignation from IPD Analytics. I stand ready to continue performing as a Tech Media Analyst at the same "A+" level at which I have been performing.
<!--[if !vml]--><!--[endif]-->
Sincerely,

Clark S. Cheney

*What will happen next?*

*Will Clark be fired?*

*Will the movers use the Star quilt Mom made to wrap his greasy bicycle?*

*Will South Florida morn the loss of its most sophisticated resident?*

*Stay tuned to the Cheney Family Mushbowl and watch the excitement unfold!*

Posted by Clark  at 4:26 AM

**0 comments:**

Post a Comment

Home                                    Older Post

Subscribe to: Post Comments (Atom)

**Akerman Senterfitt**
ATTORNEYS AT LAW

Fort Lauderdale
Jacksonville
Los Angeles
Madison
Miami
New York
Orlando
Tallahassee
Tampa
Tysons Corner
Washington, DC
West Palm Beach

One Southeast Third Avenue
25th Floor
Miami, Florida 33131-1714
www.akerman.com

305 374 5600 *tel*    305 374 5095 *fax*

May 2, 2008

VIA ELECTRONIC MAIL –
PRIVILEGED AND CONFIDENTIAL
SETTLEMENT COMMUNICATION

Gregory C. Ward, Esquire
WardKim LLLP
Suite 2600
One Financial Plaza
Fort Lauderdale, FL  33394

> Re:    Employment Agreement by and between Clark Cheney and IPD
>         Analytics, L.L.C. ("IPD") (the "Employment Agreement")

Dear Mr. Ward:

Receipt of your letter dated April 29, 2008 is hereby acknowledged.

Our review of your letter reveals that Mr. Cheney is clearly mistaken or confused about a number of issues.    Without addressing each of your client's apparent misunderstandings, we would simply note the following:

1.    Mr. Cheney resigned from IPD; he was not terminated by IPD.  In any event, according to the express terms of the Employment Agreement, Mr. Cheney was an employee-at-will whose employment could be terminated "at any time for any reason, whether with or without cause or with or without reason."

2.    IPD is unaware of any "option" granted to Mr. Cheney for him to obtain an equity interest in IPD.  IPD's offer of employment to Mr. Cheney contemplated that "in the event [Mr. Cheney achieve[s] a performance level comparable to the other Company Analysts, as part of [his] bonus package for calendar year 2007, the Company will provide an <u>opportunity</u> for [Mr. Cheney] to obtain equity in the Company that would vest over subsequent years."  (emphasis supplied).  However, the conditions precedent to his receiving an equity interest in IPD, as set forth in the offer of employment, were never satisfied.  In fact, as you concede in your letter,

{M2679355;2}



EXHIBIT ___"4"___

Gregory C. Ward, Esquire
May 2, 2008
Page 2

Mr. Cheney was offered equity in IPD to vest over time, which is standard for these types of plans and consistent with the offer letter, but he rejected this prior to resigning.

     3.    Mr. Cheney's assertion that IPD is somehow engaged in the practice of law in Florida is specious. As he is fully aware, IPD is not engaged by its clients to render legal services in connection with the clients' affairs, but rather to provide research information and views on ongoing intellectual property litigation of third parties.

     4.    The assertion that IPD terminated Mr. Cheney following his publication of an allegation regarding a purported ERISA violation is without any support in fact. IPD has no knowledge of any such "publication," and, again, Mr. Cheney resigned his position with IPD.

Thus, as you might glean from the foregoing, IPD is not inclined to accept the settlement proposal set forth in your letter of April 29, 2008. Moreover, IPD reserves all rights that it might have against Mr. Cheney arising out of the Employment Agreement and otherwise. In this regard, IPD will vigorously enforce all the terms of its Employment Agreement with Mr. Cheney, including, without limitation, the restrictive covenants in paragraphs 1.2 (confidentiality), 1.4 (noncompete), and 1.5 (nonsolicitation). Despite your assertions to the contrary, all of these restrictions are enforceable as a matter of Florida law. If either Mr. Cheney or you are unclear as to the force and effect of any of these provisions, however, please do not hesitate to contact me so that we might avoid litigation arising out of Mr. Cheney's violation of any such covenant(s).

               Very truly yours,

               **AKERMAN SENTERFITT**

               Leonard H. Bloom

LHB:ssc
cc: Howard B. Krass
    Robert I. Chaskes. Esq.

# DEFINED CONTRIBUTION VOLUME SUMBITTER PLAN AND TRUST
# BASIC PLAN DOCUMENT

EXHiBiT ___"5"___

# TABLE OF CONTENTS

**SECTION 1**
**PLAN DEFINITIONS**

| | | |
|---|---|---|
| 1.01 | Account. | 1 |
| 1.02 | Account Balance | 1 |
| 1.03 | Actual Contribution Percentage Test (ACP Test) | 1 |
| 1.04 | Actual Deferral Percentage Test (ADP Test) | 1 |
| 1.05 | Actuarial Factor | 1 |
| 1.06 | Adoption Agreement | 1 |
| 1.07 | After-Tax Contributions | 1 |
| 1.08 | Alternate Payee | 1 |
| 1.09 | Anniversary Years | 1 |
| 1.10 | Annual Additions | 2 |
| 1.11 | Annuity Starting Date. | 2 |
| 1.12 | Automatic Rollover | 2 |
| 1.13 | Average Contribution Percentage (ACP | 2 |
| 1.14 | Average Deferral Percentage | 2 |
| 1.15 | Beneficiary | 2 |
| 1.16 | Benefiting Participant | 2 |
| 1.17 | Break in Service | 2 |
| 1.18 | Cash-Out Distribution | 2 |
| 1.19 | Catch-Up Contributions | 2 |
| 1.20 | Catch-Up Contribution Limit | 2 |
| 1.21 | Code | 2 |
| 1.22 | Code §415 Limitation | 3 |
| 1.23 | Collectively Bargained Employee | 3 |
| 1.24 | Compensation Limit | 3 |
| 1.25 | Computation Period | 3 |
| | (a)    Eligibility Computation Period. | 3 |
| | (b)    Vesting Computation Period. | 3 |
| 1.26 | Current Year Testing Method | 3 |
| 1.27 | Custodian. | 3 |
| 1.28 | Defined Benefit Plan | 4 |
| 1.29 | Defined Contribution Plan | 4 |
| 1.30 | Designated Beneficiary. | 4 |
| 1.31 | Determination Date | 4 |
| 1.32 | Determination Year | 4 |
| 1.33 | Directed Account. | 4 |
| 1.34 | Directed Trustee | 4 |
| 1.35 | Direct Rollover. | 4 |
| 1.36 | Disabled | 4 |
| 1.37 | Discretionary Trustee | 4 |
| 1.38 | Distribution Calendar Year | 4 |
| 1.39 | Early Retirement Age | 4 |
| 1.40 | Earned Income | 4 |
| 1.41 | Effective Date | 5 |
| 1.42 | Elapsed Time | 5 |
| 1.43 | Elective Deferral Dollar Limit | 5 |
| 1.44 | Elective Deferrals | 5 |
| 1.45 | Eligible Employee | 5 |
| 1.46 | Eligible Rollover Distribution | 5 |
| 1.47 | Eligible Retirement Plan | 5 |
| 1.48 | Employee | 5 |
| 1.49 | Employer | 5 |
| 1.50 | Employer Contributions | 5 |
| 1.51 | Employment Commencement Date | 5 |
| 1.52 | Entry Date | 5 |
| 1.53 | Equivalency Method | 5 |
| 1.54 | ERISA | 5 |
| 1.55 | Excess Aggregate Contributions | 6 |
| 1.56 | Excess Amount | 6 |
| 1.57 | Excess Contributions | 6 |
| 1.58 | Excess Deferrals | 6 |

| | | |
|---|---|---|
| 1.59 | Excess Compensation | 6 |
| 1.60 | Fail-Safe Coverage Provision | 6 |
| 1.61 | Family Members | 6 |
| 1.62 | Favorable IRS Letter | 6 |
| 1.63 | General Trust Account | 6 |
| 1.64 | Hardship | 6 |
| 1.65 | Highly Compensated | 6 |
| | (a) Five-Percent Owner | 6 |
| | (b) Compensation limit | 6 |
| | (c) Determination Year | 6 |
| | (d) Lookback Year | 6 |
| | (e) Total Compensation | 7 |
| | (f) Top Paid Group | 7 |
| 1.66 | Highly Compensated Group | 7 |
| 1.67 | Hour of Service | 7 |
| | (a) Performance of duties | 7 |
| | (b) Nonperformance of duties | 7 |
| | (c) Back pay award | 7 |
| | (d) Related Employers/Leased Employees | 7 |
| | (e) Maternity/paternity leave | 7 |
| 1.68 | Integration Level | 8 |
| 1.69 | Key Employee | 8 |
| 1.70 | Leased Employee | 8 |
| 1.71 | Limitation Year | 8 |
| 1.72 | Lookback Year | 8 |
| 1.73 | Matching Contributions | 8 |
| 1.74 | Maximum Disparity Rate | 8 |
| 1.75 | Minimum Gateway Contribution | 8 |
| 1.76 | Multiple Employer Plan | 8 |
| 1.77 | Nonhighly Compensated | 8 |
| 1.78 | Nonhighly Compensated Group | 8 |
| 1.79 | Nonvested Participant Break in Service | 8 |
| 1.80 | Non-Key Employee | 8 |
| 1.81 | Normal Retirement Age | 8 |
| 1.82 | Participant | 9 |
| 1.83 | Participating Employer | 9 |
| 1.84 | Period of Severance | 9 |
| 1.85 | Permissive Aggregation Group | 9 |
| 1.86 | Plan | 9 |
| 1.87 | Plan Administrator | 9 |
| 1.88 | Plan Compensation | 9 |
| | (a) Determination period | 10 |
| | (b) Partial period of participation | 10 |
| 1.89 | Plan Year | 10 |
| 1.90 | Predecessor Employer | 10 |
| 1.91 | Predecessor Plan | 10 |
| 1.92 | Pre-Tax Deferrals | 10 |
| 1.93 | Prevailing Wage Formula | 10 |
| 1.94 | Prevailing Wage Service | 10 |
| 1.95 | Prior Year Testing Method | 10 |
| 1.96 | Qualified Domestic Relations Order (QDRO | 10 |
| 1.97 | Qualified Election | 11 |
| 1.98 | Qualified Joint and Survivor Annuity (QJSA) | 11 |
| 1.99 | Qualified Matching Contribution (QMAC) | 11 |
| 1.100 | Qualified Nonelective Contribution (QNEC) | 11 |
| 1.101 | Qualified Preretirement Survivor Annuity (QPSA) | 11 |
| 1.102 | Qualified Transfer | 11 |
| 1.103 | Reemployment Commencement Date | 11 |
| 1.104 | Related Employer | 11 |
| 1.105 | Required Aggregation Group | 11 |
| 1.106 | Required Beginning Date | 11 |
| 1.107 | Rollover Contribution | 11 |
| 1.108 | Roth Deferrals | 11 |

© Copyright 2006

| | | |
|---|---|---|
| 1.109 | Safe Harbor 401(k) Plan | 11 |
| 1.110 | Safe Harbor Contribution | 11 |
| 1.111 | Safe Harbor Matching Contributions | 11 |
| 1.112 | Safe Harbor Employer Contributions | 12 |
| 1.113 | Salary Deferrals | 12 |
| 1.114 | Salary Reduction Agreement | 12 |
| 1.115 | Self-Employed Individual | 12 |
| 1.116 | Short Plan Year | 12 |
| 1.117 | Targeted QNECs | 12 |
| 1.118 | Taxable Wage Base | 12 |
| 1.119 | Testing Compensation | 12 |
| 1.120 | Top Paid Group | 12 |
| 1.121 | Top Heavy Plan | 13 |
| 1.122 | Top Heavy Ratio | 13 |
| 1.123 | Total Compensation | 13 |
| | (a) W-2 Wages | 13 |
| | (b) Wages under Code §3401(a) | 13 |
| | (c) Code §415 Compensation | 13 |
| 1.124 | Trust | 14 |
| 1.125 | Trustee | 14 |
| 1.126 | Valuation Date | 14 |
| 1.127 | Year of Service | 14 |

## SECTION 2
## ELIGIBILITY AND PARTICIPATION

| | | |
|---|---|---|
| 2.01 | Eligibility | 15 |
| 2.02 | Eligible Employees | 15 |
| | (a) Only Employees may participate in the Plan | 15 |
| | (b) Excluded Employees | 15 |
| | (c) Employees of Related Employers | 16 |
| | (d) Ineligible Employee becomes Eligible Employee | 16 |
| | (e) Eligible Employee becomes ineligible Employee | 16 |
| | (f) Improper exclusion of eligible Participant | 17 |
| 2.03 | Minimum Age and Service Conditions | 17 |
| | (a) Application of age and service conditions | 17 |
| | (b) Entry Dates | 19 |
| 2.04 | Participation on Effective Date of Plan | 19 |
| 2.05 | Rehired Employees | 19 |
| 2.06 | Service with Predecessor Employers | 19 |
| 2.07 | Break in Service Rules | 20 |
| | (a) Break in Service | 20 |
| | (b) Nonvested Participant Break in Service rule | 20 |
| | (c) Special Break in Service rule for Plans using two Years of Service for eligibility | 20 |
| | (d) One-Year Break in Service rule | 20 |
| 2.08 | Waiver of Participation | 21 |

## SECTION 3
## PLAN CONTRIBUTIONS

| | | |
|---|---|---|
| 3.01 | Types of Contributions | 22 |
| 3.02 | Employer Contribution Formulas | 22 |
| | (a) Profit Sharing/401(k) Plan Employer Contribution formulas | 22 |
| | (b) Money Purchase Plan Employer Contribution formulas | 28 |
| | (c) Period for determining Employer Contributions | 30 |
| 3.03 | Salary Deferrals | 30 |
| | (a) Salary Reduction Agreement | 30 |
| | (b) Change in deferral election | 31 |
| | (c) Automatic deferral election | 31 |
| | (d) Catch-Up Contributions | 31 |
| | (e) Roth Deferrals | 32 |
| 3.04 | Matching Contributions | 33 |
| | (a) Contributions eligible for Matching Contributions | 33 |
| | (b) Period for determining Matching Contributions | 33 |
| | (c) True-up contributions | 33 |

|  |  | (d) | Qualified Matching Contributions (QMACs) | 33 |
| 3.05 | Safe Harbor Contributions |  |  | 34 |
| 3.06 | After-Tax Contributions |  |  | 34 |
| 3.07 | Rollover Contributions |  |  | 34 |
| 3.08 | Deductible Employee Contributions |  |  | 35 |
| 3.09 | Allocation Conditions |  |  | 35 |
|  |  | (a) | Application to designated period | 35 |
|  |  | (b) | Special rule for Money Purchase Plans in year of termination | 36 |
|  |  | (c) | Special allocation condition for Matching Contributions under the Plan | 36 |
|  |  | (d) | Service with Predecessor Employers | 36 |
| 3.10 | Contribution of Property |  |  | 37 |

## SECTION 4
## TOP HEAVY PLAN REQUIREMENTS

| 4.01 | Top Heavy Plan |  |  | 38 |
| 4.02 | Top Heavy Ratio |  |  | 38 |
|  |  | (a) | Defined Contribution Plan(s) only | 38 |
|  |  | (b) | Maintenance of Defined Benefit Plan | 38 |
|  |  | (c) | Determining value of Account Balance or accrued benefit | 39 |
| 4.03 | Other Definitions |  |  | 39 |
|  |  | (a) | Key Employee | 39 |
|  |  | (b) | Non-Key Employee | 40 |
|  |  | (c) | Determination Date | 40 |
|  |  | (d) | Permissive Aggregation Group | 40 |
|  |  | (e) | Required Aggregation Group | 40 |
|  |  | (f) | Present Value | 40 |
|  |  | (g) | Total Compensation | 40 |
|  |  | (h) | Valuation Date | 40 |
| 4.04 | Minimum Allocation |  |  | 40 |
|  |  | (a) | Determination of Key Employee contribution percentage | 40 |
|  |  | (b) | Determining of Non-Key Employee minimum allocation | 41 |
|  |  | (c) | Certain allocation conditions inapplicable | 41 |
|  |  | (d) | Participants not employed on the last day of the Plan Year | 41 |
|  |  | (e) | Participation in more than one Top heavy Plan | 41 |
|  |  | (f) | No forfeiture for certain events | 42 |
| 4.05 | Special Top Heavy Vesting Rules |  |  | 42 |
|  |  | (a) | Minimum vesting schedules | 42 |
|  |  | (b) | Shifting Top Heavy Plan status | 42 |

## SECTION 5
## LIMITS ON CONTRIBUTIONS

| 5.01 | Limits on Employer Contributions |  |  | 43 |
|  |  | (a) | Limitation on Salary Deferrals | 43 |
|  |  | (b) | Limitation on total Employer Contributions | 43 |
| 5.02 | Elective Deferral Dollar Limit |  |  | 43 |
|  |  | (a) | Excess Deferrals | 43 |
|  |  | (b) | Correction of Excess Deferrals | 43 |
| 5.03 | Code §415 Limitation |  |  | 46 |
|  |  | (a) | No other plan participation | 46 |
|  |  | (b) | Participation in another plan | 47 |
|  |  | (c) | Definitions | 48 |

## SECTION 6
## SPECIAL RULES AFFECTING 401(K) PLANS

| 6.01 | Nondiscrimination Testing of Salary Deferrals – ADP Test |  |  | 51 |
|  |  | (a) | ADP Test | 51 |
|  |  | (b) | Correction of Excess Contributions | 53 |
|  |  | (c) | Adjustment of deferral rate for Highly Compensated Employees | 56 |
|  |  | (d) | Special testing rules | 56 |
| 6.02 | Nondiscrimination Testing of Matching Contributions and After-Tax Contributions – ACP Test | | | 56 |
|  |  | (a) | ACP Test | 57 |
|  |  | (b) | Correction of Excess Aggregate Contributions | 60 |
|  |  | (c) | Adjustment of contribution rate for Highly Compensated Employees | 62 |

|  |  | (d) | Special testing rules | 62 |
| 6.03 |  | Disaggregation of Plans | | 63 |
|  | (a) | Plans covering Collectively Bargained Employees and non-Collectively Bargained Employees | 63 |
|  | (b) | Otherwise excludable Employees | 63 |
|  | (c) | Corrective action for disaggregated plans | 63 |
| 6.04 |  | Safe Harbor 401(k) Plan Provisions | | 64 |
|  | (a) | Safe harbor requirements | 64 |
|  | (b) | Eligibility for Safe Harbor Contributions | 66 |
|  | (c) | Different eligibility conditions | 66 |
|  | (d) | Provision of Safe Harbor Contribution in separate plan | 66 |
|  | (e) | Reduction or suspension of Safe Harbor Contributions | 67 |
|  | (f) | Deemed compliance with ADP Test | 67 |
|  | (g) | Deemed compliance with ACP Test | 67 |
|  | (h) | Rules for applying the ACP Test | 68 |
|  | (i) | Application of Top Heavy rules | 68 |
|  | (j) | Plan Year. | 68 |
| 6.05 |  | SIMPLE 401(k) Plan contributions | | 69 |
|  | (a) | Definitions | 69 |
|  | (b) | Contributions | 70 |
|  | (c) | Limit on Contributions | 70 |
|  | (d) | Election and notice requirements | 70 |
|  | (e) | Vesting requirements | 71 |
|  | (f) | Top Heavy rules | 71 |
|  | (g) | Nondiscrimination tests | 71 |

## SECTION 7
## PARTICIPANT VESTING AND FORFEITURES

| 7.01 |  | Vesting of Contributions | | 72 |
| 7.02 |  | Vesting Schedules | | 72 |
|  | (a) | Normal vesting schedules | 72 |
|  | (b) | Top Heavy vesting schedules | 73 |
|  | (c) | Special Vesting Rules | 73 |
| 7.03 |  | Year of Service | | 73 |
|  | (a) | Hours of Service | 73 |
|  | (b) | Elapsed Time method | 74 |
| 7.04 |  | Vesting Computation Period | | 75 |
| 7.05 |  | Excluded service | | 75 |
|  | (a) | Service before the Effective Date of the Plan | 75 |
|  | (b) | Service before a specified age | 75 |
| 7.06 |  | Service with Predecessor Employers | | 75 |
| 7.07 |  | Break in Service Rules | | 75 |
|  | (a) | Break in Service | 75 |
|  | (b) | One-Year Break in Service rule | 75 |
|  | (c) | Nonvested Participant Break in Service rule | 76 |
| 7.08 |  | Amendment of Vesting Schedule | | 76 |
| 7.09 |  | Special Vesting Rule - In-Service Distribution When Account Balance is Less than 100% Vested | 77 |
| 7.10 |  | Forfeiture of Benefits | | 77 |
|  | (a) | Cash-Out Distribution | 77 |
|  | (b) | Five-Year Forfeiture Break in Service | 79 |
|  | (c) | Missing Participant or Beneficiary | 79 |
|  | (d) | Excess Deferrals, Excess Contributions, and Excess Aggregate Contributions | 80 |
| 7.11 |  | Allocation of Forfeitures | | 80 |
|  | (a) | Reallocation as additional contributions | 80 |
|  | (b) | Reduction of contributions | 81 |
|  | (c) | Payment of Plan expenses | 81 |

## SECTION 8
## PLAN DISTRIBUTIONS

| 8.01 |  | Deferred distributions | | 82 |
| 8.02 |  | Available Forms of Distribution | | 82 |
| 8.03 |  | Amount Eligible for Distribution | | 82 |
| 8.04 |  | Participant Consent | | 83 |
|  | (a) | Involuntary Cash-Out threshold | 83 |

|  | (b) | Rollovers disregarded in determining value of Account Balance for Involuntary Cash-Outs | 83 |
|  | (c) | Participant notice | 83 |
|  | (d) | Special rules | 83 |
| 8.05 | Direct Rollovers | | 84 |
|  | (a) | Definitions | 84 |
|  | (b) | Direct Rollover notice | 85 |
| 8.06 | Automatic Rollover | | 85 |
|  | (a) | Automatic Rollover requirements | 85 |
|  | (b) | Involuntary Cash-Out Distribution | 85 |
|  | (c) | Treatment of Rollover Contributions | 85 |
| 8.07 | Distribution Upon Termination of Employment | | 86 |
|  | (a) | Account Balance not exceeding $5,000 | 86 |
|  | (b) | Account Balance exceeding $5,000 | 86 |
| 8.08 | Distribution Upon Death | | 86 |
|  | (a) | Death after commencement of benefits | 86 |
|  | (b) | Death before commencement of benefits | 86 |
|  | (c) | Determining a Participant's Beneficiary | 87 |
| 8.09 | Distribution to Disabled Employees | | 88 |
| 8.10 | In-Service Distributions | | 88 |
|  | (a) | After-Tax Contributions and Rollover Contributions | 89 |
|  | (b) | Employer Contributions | 89 |
|  | (c) | Salary Deferrals, QNECs, QMACs, and Safe Harbor Contributions | 89 |
|  | (d) | Hardship distribution | 89 |
| 8.11 | Sources of Distribution | | 91 |
|  | (a) | Exception for Hardship withdrawals | 91 |
|  | (b) | Roth Deferrals | 91 |
|  | (c) | In-kind distributions | 92 |
| 8.12 | Required Minimum Distributions | | 92 |
|  | (a) | Death of Participant Before Distributions Begin | 92 |
|  | (b) | Required Minimum Distributions During Participant's Lifetime | 93 |
|  | (c) | Required Minimum Distributions After Participant's Death | 93 |
|  | (d) | Definitions | 94 |
|  | (e) | Special Rules | 96 |
|  | (f) | Transitional Rule | 98 |
| 8.13 | Correction of Qualification Defects | | 99 |

**SECTION 9**
**JOINT AND SURVIVOR ANNUITY REQUIREMENTS**

| 9.01 | Application of Joint and Survivor Annuity Rules | | 100 |
|  | (a) | Money purchase plan | 100 |
|  | (b) | Profit sharing/401(k) plan | 100 |
|  | (c) | Exception to the Joint and Survivor Annuity Requirements | 100 |
|  | (d) | Administrative procedures | 100 |
|  | (e) | Accumulated deductible employee contributions | 100 |
| 9.02 | Pre-Death Distribution Requirements | | 100 |
|  | (a) | Qualified Joint and Survivor Annuity (QJSA) | 100 |
|  | (b) | Notice requirements | 101 |
|  | (c) | Annuity Starting Date | 101 |
| 9.03 | Distributions After Death | | 101 |
|  | (a) | Qualified Preretirement Survivor Annuity (QPSA) | 101 |
|  | (b) | Notice requirements | 102 |
| 9.04 | Qualified Election | | 102 |
|  | (a) | QJSA | 102 |
|  | (b) | QPSA | 102 |
| 9.05 | Transitional Rules | | 103 |
|  | (a) | Automatic joint and survivor annuity | 103 |
|  | (b) | Election of early survivor annuity | 104 |
|  | (c) | Qualified Early Retirement Age | 104 |

**SECTION 10**
**PLAN ACCOUNTING AND INVESTMENTS**

| 10.01 | Participant Accounts | 105 |
| 10.02 | Valuation of Accounts | 105 |

|  |  | (a) | Periodic valuation | 105 |
|  |  | (b) | Daily valuation | 105 |
| 10.03 | Adjustments to Participant Accounts | | | 105 |
|  |  | (a) | Distributions and forfeitures from a Participant's Account | 105 |
|  |  | (b) | Life insurance premiums and dividends | 105 |
|  |  | (c) | Contributions and forfeitures allocated to a Participant's Account | 106 |
|  |  | (d) | Net income or loss | 106 |
| 10.04 | Share or unit accounting | | | 106 |
| 10.05 | Suspense accounts | | | 106 |
| 10.06 | Investments under the Plan | | | 106 |
|  |  | (a) | Investment options | 106 |
|  |  | (b) | Common/collective trusts and collectibles | 107 |
|  |  | (c) | Limitations on the investment in Qualifying Employer Securities and Qualifying Employer Real Property | 107 |
| 10.07 | Participant-directed investments | | | 108 |
|  |  | (a) | Limits on participant investment direction | 108 |
|  |  | (b) | Failure to direct investment | 108 |
|  |  | (c) | Trustee to follow Participant direction | 109 |
| 10.08 | Investment in Life Insurance | | | 110 |
|  |  | (a) | Incidental Life Insurance Rules | 110 |
|  |  | (b) | Ownership of Life Insurance Policies | 111 |
|  |  | (c) | Evidence of Insurability | 111 |
|  |  | (d) | Distribution of Insurance Policies | 111 |
|  |  | (e) | Discontinuance of Insurance Policies | 111 |
|  |  | (f) | Protection of Insurer | 112 |
|  |  | (g) | No Responsibility for Act of Insurer | 112 |

### SECTION 11
### PLAN ADMINISTRATION AND OPERATION

| 11.01 | Plan Administrator | | | 113 |
| 11.02 | Designation of Alternative Plan Administrator | | | 113 |
|  |  | (a) | Acceptance of responsibility by designated Plan Administrator | 113 |
|  |  | (b) | Multiple alternative Plan Administrators | 113 |
|  |  | (c) | Resignation or removal of designated Plan Administrator | 113 |
|  |  | (d) | Employer responsibilities | 113 |
| 11.03 | Named Fiduciary | | | 113 |
| 11.04 | Duties, Powers and Responsibilities of the Plan Administrator | | | 113 |
|  |  | (a) | Delegation of duties, powers and responsibilities | 113 |
|  |  | (b) | Specific Plan Administrator responsibilities | 114 |
| 11.05 | Plan Administration Expenses | | | 114 |
|  |  | (a) | Reasonable Plan administration expenses | 114 |
|  |  | (b) | Plan expense allocation | 114 |
|  |  | (c) | Expenses related to administration of former Employee or surviving spouse | 115 |
| 11.06 | Qualified Domestic Relations Orders (QDROs) | | | 115 |
|  |  | (a) | In general | 115 |
|  |  | (b) | Definitions related to Qualified Domestic Relations Orders (QDROs) | 115 |
|  |  | (c) | Recognition as a QDRO | 115 |
|  |  | (d) | Contents of QDRO | 115 |
|  |  | (e) | Impermissible QDRO provisions | 116 |
|  |  | (f) | Immediate distribution to Alternate Payee | 116 |
|  |  | (g) | Fee for QDRO determination | 116 |
|  |  | (h) | Default QDRO procedure | 116 |
| 11.07 | Claims Procedure | | | 118 |
|  |  | (a) | Filing a claim | 118 |
|  |  | (b) | Plan Administrator's decision | 118 |
|  |  | (c) | Review procedure | 118 |
|  |  | (d) | Decision on review | 118 |
| 11.08 | Operational Rules for Short Plan Years | | | 118 |

### SECTION 12
### TRUST PROVISIONS

| 12.01 | Establishment of Trust | | | 120 |
| 12.02 | Types of Trustees | | | 120 |

|  |  |  |  |
|---|---|---|---|
|  | (a) | Directed Trustee | 120 |
|  | (b) | Discretionary Trustee | 120 |
| 12.03 | | Responsibilities of the Trustee | 121 |
|  | (a) | Responsibilities regarding administration of Trust | 121 |
|  | (b) | Responsibilities regarding investment of Plan assets | 122 |
| 12.04 | | Voting and Other Rights Related to Employer Stock | 123 |
| 12.05 | | Responsibilities of the Employer | 124 |
| 12.06 | | Effect of Plan Amendment | 124 |
| 12.07 | | More than One Trustee | 124 |
| 12.08 | | Annual Valuation | 124 |
| 12.09 | | Reporting to Plan Administrator and Employer | 124 |
| 12.10 | | Reasonable Compensation | 124 |
| 12.11 | | Resignation and Removal of Trustee | 125 |
| 12.12 | | Indemnification of Trustee | 125 |
| 12.13 | | Liability of Trustee | 125 |
| 12.14 | | Appointment of Custodian | 126 |
| 12.15 | | Modification of Trust Provisions | 126 |

**SECTION 13**
**PARTICIPANT LOANS**

|  |  |  |  |
|---|---|---|---|
| 13.01 | | Availability of Participant Loans | 127 |
| 13.02 | | Must be Available in Reasonably Equivalent Manner | 127 |
| 13.03 | | Loan Limitations | 127 |
| 13.04 | | Limit on Amount and Number of Loans | 127 |
|  | (a) | Loan renegotiation | 127 |
|  | (b) | Participant must be creditworthy | 128 |
| 13.05 | | Reasonable Rate of Interest | 128 |
| 13.06 | | Adequate Security | 128 |
| 13.07 | | Periodic Repayment | 128 |
|  | (a) | Unpaid leave of absence | 128 |
|  | (b) | Military leave | 128 |
| 13.08 | | Spousal Consent | 129 |
| 13.09 | | Designation of Accounts | 129 |
| 13.10 | | Procedures for Loan Default | 129 |
| 13.11 | | Termination of Employment | 130 |
|  | (a) | Offset of outstanding loan | 130 |
|  | (b) | Direct Rollover | 130 |
|  | (c) | Modified loan policy | 130 |

**SECTION 14**
**PLAN AMENDMENTS, TERMINATION, MERGERS AND TRANSFERS**

|  |  |  |  |
|---|---|---|---|
| 14.01 | | Plan Amendments | 131 |
|  | (a) | Amendment by the Volume Submitter practitioner | 131 |
|  | (b) | Amendment by the Employer | 131 |
|  | (c) | Reduction of accrued benefit | 132 |
| 14.02 | | Amendment to Correct Coverage or Nondiscrimination Violation | 132 |
|  | (a) | Amendment within correction period under Treas. Reg. §1.401(a)(4)-11(g) | 132 |
|  | (b) | Fail-Safe Coverage Provision | 132 |
| 14.03 | | Plan Termination | 134 |
|  | (a) | Full and immediate vesting | 134 |
|  | (b) | Distribution upon Plan termination | 134 |
|  | (c) | Termination upon merger, liquidation or dissolution of the Employer | 135 |
| 14.04 | | Merger or Consolidation | 135 |
| 14.05 | | Transfer of Assets | 135 |
|  | (a) | Protected benefits | 135 |
|  | (b) | Application of QJSA requirements | 136 |
|  | (c) | Transfers from a Defined Benefit Plan, Money Purchase Plan or 401(k) Plan | 136 |
|  | (d) | Qualified Transfer | 136 |
|  | (e) | Trustee's right to refuse transfer | 138 |

**SECTION 15**
**MISCELLANEOUS**

15.01 Exclusive Benefit ................................................................................................. 139
15.02 Return of Employer Contributions ..................................................................... 139
    (a)   Mistake of fact .......................................................................................... 139
    (b)   Disallowance of deduction ....................................................................... 139
    (c)   Failure to initially qualify ......................................................................... 139
15.03 Alienation or Assignment .................................................................................... 139
15.04 Participants' Rights ............................................................................................. 139
15.05 Military Service .................................................................................................... 140
15.06 Annuity Contract ................................................................................................. 140
15.07 Use of IRS compliance programs ....................................................................... 140
15.08 Governing Law ..................................................................................................... 140
15.09 Waiver of Notice .................................................................................................. 140
15.10 Use of Electronic Media ...................................................................................... 140
15.11 Severability of Provisions ................................................................................... 140
15.12 Binding Effect ...................................................................................................... 140


**SECTION 16**
**PARTICIPATING EMPLOYERS**

16.01 Participation by Participating Employers ........................................................... 141
16.02 Participating Employer Adoption Page ............................................................... 141
    (a)   Application of Plan provisions ................................................................. 141
    (b)   Plan amendments ..................................................................................... 141
    (c)   Trustee designation .................................................................................. 141
16.03 Compensation of Related Employers .................................................................. 141
16.04 Allocation of Contributions and Forfeitures ...................................................... 141
16.05 Discontinuance of Participation by a Participating Employer ........................... 141
16.06 Operational Rules for Related Employer Groups ............................................... 142
16.07 Special rules for Multiple Employer Plans ......................................................... 142
    (a)   Eligibility requirements ............................................................................ 142
    (b)   Vesting rules ............................................................................................. 142
    (c)   Code §415 Limit ....................................................................................... 143
    (d)   Top heavy rules ........................................................................................ 143
    (e)   Minimum coverage and nondiscrimination testing .................................. 143
    (f)   Other rules applicable to Multiple Employer Plans ................................. 143


**EXHIBIT A: ACTUARIAL FACTORS** ............................................................................... 144

# SECTION 2
# ELIGIBILITY AND PARTICIPATION

**2.01** **Eligibility**. In order to participate in the Plan, an Employee must be an Eligible Employee (as defined in Section 2.02) and must satisfy the Plan's minimum age and service conditions (as defined in Section 2.03). Once an Employee satisfies the Plan's minimum age and service conditions, such Employee shall become a Participant on the appropriate Entry Date (as selected in AA §4-2). An Employee who meets the minimum age and service requirements set forth herein, but who is not an Eligible Employee, will be eligible to participate in the Plan only upon becoming an Eligible Employee.

**2.02** **Eligible Employees**. Unless specifically excluded under AA §3-1 or this Section 2.02, all Employees of the Employer are Eligible Employees. AA §3-1 lists various classes of Employees that may be excluded from Plan participation. If an Employee is not an Eligible Employee (e.g., such Employee is a member of a class of Employees excluded under AA §3-1), that individual may not participate under the Plan, unless he/she subsequently becomes an Eligible Employee.

    **(a)** **Only Employees may participate in the Plan.** To participate in the Plan, an individual must be an Employee. If an individual is not an Employee (e.g., the individual performs services with the Employer as an independent contractor) such individual may not participate under the Plan. If an individual's status as a non-Employee is challenged by the IRS, the reclassification of such individual as an Employee will not create retroactive rights to participate in the Plan. Thus, for example, if the IRS should find that an independent contractor is really an Employee, such individual will be eligible to participate in the Plan as of the date the IRS issues a final determination declaring such individual to be an Employee (provided the individual has satisfied all conditions for participating in the Plan (as described in this Section 2)). For periods prior to the date of such final determination, the reclassified Employee will not have any rights to accrued benefits under the Plan, except as agreed to by the Employer and the IRS, or as set forth in an amendment adopted by the Employer.

    **(b)** **Excluded Employees.** The Employer may elect under AA §3-1 to exclude designated classes of Employees. Under the 401(k) Adoption Agreement, the Employer may elect to exclude different classes of Employees for different contribution sources under the Plan.

        **(1)** **Collectively Bargained Employees.** The Employer may elect under AA §3-1(b) to exclude Collectively Bargained Employees. For this purpose, a Collectively Bargained Employee is an Employee who is included in a unit of Employees covered by a collective bargaining agreement between the Employer and Employee representatives and whose retirement benefits are subject to good faith bargaining. For this purpose, an Employee will not be considered a Collectively Bargained Employee for a Plan Year if more than two percent of the Employees who are covered pursuant to the collective bargaining agreement are professionals as defined in section 1.410(b)-9 of the regulations.  For this purpose, the term "Employee representatives" does not include any organization more than half of whose members are Employees who are owners, officers, or executives of the Employer.

        **(2)** **Nonresident aliens.** The Employer may elect under AA §3-1(c) to exclude Employees who are nonresident aliens. For this purpose, a nonresident alien is neither a citizen of the United States nor a resident of the United States for U.S. tax purposes (as defined in Code §7701(b)), and who does not have any earned income (as defined in Code §911) for the Employer that constitutes U.S. source income (within the meaning of Code §861). If a nonresident alien Employee has U.S. source income, he/she is treated as satisfying this definition if all of his/her U.S. source income from the Employer is exempt from U.S. income tax under an applicable income tax treaty.

© Copyright 2006

(3) **Leased Employees.** The Employer may elect under AA §3-1(d) to exclude Leased Employees. Unless designated otherwise under AA §3-1(d), a Leased Employee is treated as an Eligible Employee for purposes of applying the eligibility rules under this Section 2. For this purpose, a "Leased Employee" is any person (other than an Employee of the Employer) who pursuant to an agreement between the recipient Employer and a "leasing organization" performs services for the recipient Employer on a substantially full time basis for a period of at least one year, and such services are performed under the primary direction or control of the recipient Employer. Contributions or benefits provided to a Leased Employee under a plan of the leasing organization which are attributable to services performed for the recipient Employer shall be treated as provided by the recipient Employer.

A Leased Employee shall not be considered an Employee of the recipient Employer if:

(i) such Employee is covered by a money purchase pension plan providing:

(1) a non-integrated Employer contribution of at least ten percent (10%) of compensation, as defined in Code §415(c)(3), but including amounts contributed to a Salary Reduction Agreement which are excludable from gross income under Code §§125, 402(e)(3), 402(h)(1)(B) or 403(b),

(2) immediate participation and

(3) full and immediate vesting; and

(ii) Leased Employees do not constitute more than twenty percent (20%) of the recipient's Employer's Nonhighly Compensated workforce.

(c) **Employees of Related Employers.** If the Employer is a member of a Related Employer group, Employees of each member of the Related Employer group may participate under this Plan, provided the Related Employer executes a Participating Employer Adoption Page under the Adoption Agreement. If a Related Employer does not execute a Participating Employer Adoption Page, any Employees of such Related Employer are not eligible to participate in the Plan. See Section 16.06 for operating rules that apply when the Employer is a member of a Related Employer group. Also see Section 16 for rules regarding participation of Employees of Related Employers.

(d) **Ineligible Employee becomes Eligible Employee.** If an Employee changes status from an ineligible Employee to an Eligible Employee, such Employee will become a Participant immediately on the date he/she changes status to an Eligible Employee, provided the Employee has satisfied the Plan's minimum age and service conditions and has passed the Entry Date (as defined in AA §4-2) that would otherwise have applied had the Employee been an Eligible Employee. If the Employee's original Entry Date (determined as if the Employee was always an Eligible Employee) has not passed as of the date the Employee becomes an Eligible Employee, the Employee will not become a Participant until such Entry Date. This requirement is deemed satisfied with respect to Salary Deferrals under the Plan if the Employee is permitted to commence making deferrals under the Plan as of the beginning of the first payroll period commencing after the Employee becomes an Eligible Employee. If an ineligible Employee has not satisfied the Plan's minimum age and service conditions at the time such Employee becomes an Eligible Employee, such Employee will become a Participant on the appropriate Entry Date following satisfaction of the Plan's minimum age and service requirements.

(e) **Eligible Employee becomes ineligible Employee.** If an Employee ceases to qualify as an Eligible Employee (i.e., the Employee changes status from an eligible class to an ineligible class of Employees), such Employee will immediately cease to participate in the Plan. If such Employee should subsequently become an Eligible Employee, he/she will be able to participate in the Plan in accordance with subsection (d) above.

(f)    **Improper exclusion of eligible Participant.** If the Plan improperly excludes a Participant who has satisfied the requirements under this Section 2 for participating under the Plan, the Employer may take reasonable action to correct such violation, provided such corrective action is consistent with the correction procedures applicable under the IRS' voluntary correction programs. For example, the violation may be corrected by making an additional contribution to the Plan on behalf of the omitted Participant or by allocating any available forfeitures under the Plan to such Participant to restore any missed contributions under the Plan.

2.03    **Minimum Age and Service Conditions.** AA §4-1 contains specific elections as to the minimum age and service conditions which an Employee must satisfy prior to becoming eligible to participate under the Plan.

(a)    **Application of age and service conditions.** The Employer may elect under AA §4-1 to impose minimum age and service conditions that an Employee must satisfy in order to participate under the Plan. The Plan may not require an Employee to attain an age older than age 21 or to complete more than one Year of Service. However, the Plan may require an Employee to complete two Years of Service prior to participating in the Plan if the Employer elects full and immediate vesting under AA §8. (The Employer may not require an Employee to complete more than one Year of Service to be eligible to make Salary Deferrals under the 401(k) Adoption Agreement.)

(1)    **Year of Service.** In applying the minimum service requirements under AA §4-1, an Employee will earn a Year of Service if the Employee completes at least 1,000 Hours of Service with the Employer during an Eligibility Computation Period (as defined in subsection (2) below). The Employer may modify the definition of Year of Service under AA §4-3(a) to require a lesser number of Hours of Service to earn a Year of Service. An Employee will receive credit for a Year of Service, as of the end of the Eligibility Computation Period during which the Employee completes the required Hours of Service needed to earn a Year of Service. An Employee need not be employed for the entire Eligibility Computation Period to receive credit for a Year of Service, provided the Employee completes the required Hours of Service during such period.

(2)    **Eligibility Computation Periods.** In determining whether an Employee has earned a Year of Service for eligibility purposes, an Employee's initial Eligibility Computation Period is the 12-month period beginning on the Employee's Employment Commencement Date. Subsequent Eligibility Computation Periods will either be based on Plan Years or Anniversary Years (as set forth in AA §4-3).

(i)    **Plan Years.** If the Employer elects under AA §4-3 to base subsequent Eligibility Computation Periods on Plan Years, the Plan will begin measuring Years of Service on the basis of Plan Years beginning with the first Plan Year commencing after the Employee's Employment Commencement Date. Thus, for the first Plan Year following the Employee's Employment Commencement Date, the initial Eligibility Computation Period and the first Plan Year Eligibility Computation Period may overlap. (See Section 11.08 for rules that apply if there is a Short Plan Year.)

(ii)    **Anniversary Years.** If the Employer elects under AA §4-3 to base subsequent Eligibility Computation Periods on Anniversary Years, the Plan will measure Years of Service after the initial Eligibility Computation Period on the basis of 12-month periods commencing with the anniversaries of the Employee's Employment Commencement Date.

(3)    **Hours of Service.** In calculating an Employee's Hours of Service for purposes of applying the eligibility rules under this Section 2.03, the Employer will count the actual Hours of Service an Employee works during the year. (See Section 1.67 for the definition of Hours of

**11.07**  **Claims Procedure.** The Plan Administrator shall establish a procedure for benefit claims consistent with the requirements of ERISA Reg. §2560.503-1. The Plan Administrator is authorized to conduct an examination of the relevant facts to determine the merits of a Participant's or Beneficiary's claim for Plan benefits. The claims procedure must incorporate the following guidelines:

(a)  **Filing a claim.** The claims procedure will set forth a reasonable means for a Participant or Beneficiary to file a claim for benefits under the Plan.

(b)  **Plan Administrator's decision.** The Plan Administrator must provide a claimant with written notification of the Plan Administrator's decision relating to a claim within a reasonable period of time (not more than 90 days unless special circumstances require an extension to process the claim) after the claim was filed. If the claim is denied, the notification must set forth the reasons for the denial, specific reference to pertinent Plan provisions on which the denial is based, a description of any additional information necessary for the claimant to perfect the claim, and the steps the claimant must take to submit the claim for review.

(c)  **Review procedure.** The claims procedure will provide a claimant a reasonable opportunity to have a full and fair review of a denied claim. Such procedure shall allow a review upon a written application, for the claimant to review pertinent documents, and to allow the claimant to submit written comments to the Plan Administrator. The procedure may establish a limited period (not less than 60 days after the claimant receives written notification of the denial of the claim) for the claimant to request a review of the claim denial.

(d)  **Decision on review.** If a claimant requests a review, the Plan Administrator must respond promptly to the request. Unless special circumstances exist (such as the need for a hearing), the Plan Administrator must respond in writing within 60 days of the date the claimant submitted the review application. The response must explain the Plan Administrator's decision on review.

**11.08**  **Operational Rules for Short Plan Years.** The following operational rules apply if the Plan has a Short Plan Year. A Short Plan Year is any Plan Year that is less than a 12-month period, either because of the amendment of the Plan Year, or because the Effective Date of a new Plan is less than 12 months prior to the end of the first Plan Year.

(a)  If the Plan is amended to create a Short Plan Year, and an Eligibility Computation Period or Vesting Computation Period is based on the Plan Year, the applicable computation period begins on the first day of the Short Plan Year, but such period ends on the day which is 12 months from the first day of such Short Plan Year. Thus, the computation period that begins on the first day of the Short Plan Year overlaps with the computation period that starts on the first day of the next Plan Year. This rule applies only to an Employee who has at least one Hour of Service during the Short Plan Year.

If a Plan has an initial Short Plan Year, the rule in the above paragraph applies only for purposes of determining an Employee's Vesting Computation Period and only if the Employer elects under AA §8-4 to exclude service earned prior to the adoption of the Plan. For eligibility and vesting (where service prior to the adoption of the Plan is not ignored), if the Eligibility Computation Period or Vesting Computation Period is based on the Plan Year, the applicable computation period will be determined on the basis of the Plan's normal Plan Year, without regard to the initial short Plan Year.

(b)  If Employer Contributions are allocated for a Short Plan Year, any allocation condition under AA §6-6 or AA §6B-7 (under the 401(k) Adoption Agreement) that requires a Participant to complete a specified number of Hours of Service to receive an allocation of such Employer Contributions will not be prorated as a result of such Short Plan Year unless otherwise specified in AA §6-6 or AA §6B-7, if applicable.

provisions of the Plan are ambiguous as to the application of an amendment to a terminated Participant or former Employee, the Plan Administrator has the authority to make a final determination on the proper interpretation of the Plan.

**15.05** **Military Service.** To the extent required under Code §414(u), an Employee who returns to employment with the Employer following a period of qualified military service will receive any contributions, benefits and service credit required under Code §414(u), provided the Employee satisfies all applicable requirements under the Code and regulations.

**15.06** **Annuity Contract.** Any annuity contract distributed under the Plan must be nontransferable. In addition, the terms of any annuity contract purchased and distributed to a Participant or to a Participant's spouse must comply with all requirements under this Plan.

**15.07** **Use of IRS compliance programs.** Nothing in this Plan document should be construed to limit the availability of the IRS' voluntary compliance programs, An Employer may take whatever corrective actions are permitted under the IRS voluntary compliance programs, as is deemed appropriate by the Plan Administrator or Employer. If the Employer's Plan fails to attain or retain qualification, such Plan will no longer participate in this Volume Submitter Plan and will be considered an individually designed plan.

**15.08** **Governing Law.** The provisions of this Plan shall be construed, administered, and enforced in accordance with the provisions of applicable Federal Law and, to the extent applicable, the laws of the state in which the Trustee has its principal place of business. The foregoing provisions of this Section shall not preclude the Employer and the Trustee from agreeing to a different state law with respect to the construction, administration and enforcement of the Plan.

**15.09** **Waiver of Notice.** Any person entitled to a notice under the Plan may waive the right to receive such notice, to the extent such a waiver is not prohibited by law, regulation or other pronouncement.

**15.10** **Use of Electronic Media.** The Plan Administrator may use telephonic or electronic media to satisfy any notice requirements required by this Plan, to the extent permissible under regulations (or other generally applicable guidance). In addition, a Participant's consent to immediate distribution, as required by Section 8.04, may be provided through telephonic or electronic means, to the extent permissible under regulations (or other generally applicable guidance). The Plan Administrator also may use telephonic or electronic media to conduct plan transactions such as enrolling participants, making (and changing) salary reduction elections, electing (and changing) investment allocations, applying for Plan loans, and other transactions, to the extent permissible under regulations (or other generally applicable guidance).

**15.11** **Severability of Provisions.** In the event that any provision of this Plan shall be held to be illegal, invalid or unenforceable for any reason, the remaining provisions under the Plan shall be construed as if the illegal, invalid or unenforceable provisions had never been included in the Plan.

**15.12** **Binding Effect.** The Plan, and all actions and decisions made thereunder, shall be binding upon all applicable parties, and their heirs, executors, administrators, successors and assigns.